## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**STATE OF GEORGIA**

**v.**

**DAVID J. SHAFER**

    **Defendant.**

**Case Number:**

## NOTICE OF REMOVAL OF STATE COURT ACTION TO FEDERAL COURT AND REQUST FOR HABEAS OR EQUITABLE RELIEF

David J. Shafer removes this proceeding from the Fulton County Superior Court (Case No. 23SC188947, filed August 14, 2023) to the United States District Court for the Northern District of Georgia under 28 U.S.C. §§ 1442 & 1455.[1] Mr. Shafer is entitled to remove the state criminal case as a matter of right. The State Indictment (the "Indictment"), attached as Exhibit A, charges Mr. Shafer with conduct that stems directly from his service as a Presidential Elector nominee acting under the authority of

---

[1] Pursuant to 28 U.S.C. § 1455, Mr. Shafer has filed his Notice, signed pursuant to Federal Rule of Civil Procedure 11, in this Court, the geographical jurisdiction that embraces the jurisdiction in which the Fulton County prosecution is pending, within 30 days of his arraignment in the Fulton County prosecution. *See* 28 U.S.C. §§ 1455(a), (b). Mr. Shafer has furthermore attached the Indictment from the Fulton County prosecution, which is the sole process, pleading or order served upon him. *See* 28 U.S.C. § 1455(a).

the Constitution and the Electoral Count Act ("ECA"),[2] 3 U.S.C. § 1 *et seq.*, and at the direction of the President and other federal officers.  Mr. Shafer has numerous federal defenses, including official immunity, federal preemption, supremacy clause immunity, defenses under the Due Process Clause, and First Amendment defenses. In short, Mr. Shafer satisfies each of the three criteria for removal under Sections 1442 and 1445.

In addition or alternatively, this Court should assert its habeas or equitable jurisdiction to bar the State's prosecution, which seeks to criminalize a political dispute that only Congress possesses the authority to resolve. The Supremacy Clause plainly bars the State's attempt here to criminalize the actions of persons acting pursuant to federal authority to achieve the purposes of the national government. Neither the State of Georgia nor any of its localities has the authority to prosecute Mr. Shafer for these actions, and this Court should exercise its clear authority to correct this injustice and halt this unlawful and unconstitutional attempted prosecution now.

---

[2] The ECA was amended by Congress in 2022. References to the ECA herein are to the previous version of the ECA in place in 2020 at the time the events in the Indictment at issue took place. A copy of the 2020 version of the ECA is attached hereto for the Court's reference as Exhibit F.

# I. FACTUAL AND LEGAL BACKGROUND

## A. Factual Background

### 1. The 2020 Presidential Election in Georgia

On March 4, 2020, the State Executive Committee of Georgia Republican Party nominated David Shafer and fifteen other Georgians as presidential electors ("Presidential Electors") pursuant to the Constitution of the United States; the Electoral Count Act of 1887 (ECA), 3 U.S.C. §§ 1 *et seq*.; and the laws of the State of Georgia for the November 3, 2020, general election. The next day, March 5, 2020, the Georgia Republican Party certified to the Secretary of State that David Shafer and fifteen other Georgians were the Republican nominees for Presidential Elector.

The general election was held on November 3, 2020. On November 20, 2020, Georgia Secretary of State Brad Raffensperger certified the election results, which showed that Joe Biden won the Georgia presidential election by 12,670 votes out of 4,998,482 votes cast (a margin of 0.26%). On the same day, President Donald J. Trump, pursuant to O.C.G.A. § 21-2-495, demanded a recount of the vote for president.

On December 4, 2020, President Trump and Mr. Shafer, in his capacity as a Presidential Elector nominee and voter, filed a "Verified Petition to Contest Georgia's Presidential Election Results for Violations of the Constitution and Laws of the State of Georgia, and Request for Emergency Declaratory and Injunctive Relief" in the Superior

Court of Fulton County pursuant to O.C.G.A. § 21-2-521, initiating *Trump et al. v. Raffensperger et al.*, Case No. 2020CV343255 (the "Georgia election challenge"). On December 7, 2020, Secretary Raffensperger issued a statement that he had re-certified the election for Joe Biden following the recount. The second certification showed that Biden had won the Georgia presidential election by 11,779 votes out of 4,977,617 votes cast (a margin of 0.24%).[3] On the same date, Georgia Governor Brian Kemp and Lieutenant Governor Geoff Duncan issued a statement that "[t]he judicial system remains the only viable—and quickest—option in disputing the results of the November 3rd election in Georgia." *Id.*

On December 9, 2020, the Superior Court of Fulton County issued an order stating that the Superior Court would consider the election contest "in the normal course." The following day, December 10, 2020, legal counsel sent an electronic mail (e-mail) to Mr. Shafer, reconfirming counsels' previous oral legal advice:

> [T]hat our slate of delegates meet on December 14th (per the Federal Deadline) and cast their ballots in favor of President Trump *and* specifically per the Georgia Election Code. It is essential that our delegates act and vote *in the exact manner as if Governor Kemp has certified the Presidential Contest in favor of President Trump*. I believe that this is still the most conservative course of action to preserve the best chance for Georgia to ultimately support the President's re-election. As we discussed

---

[3] *See* Max Greenwood, "Georgia secretary of state recertifies election results after recount" The Hill (December 7, 2020), available at https://thehill.com/homenews/campaign/529028-georgia-secretary-of-state-says-he-will-recertify-election-results-after/.

> in the 1960 Hawaii case, the convening of our electors and their casting of ballots in favor of President Trump in the specifically required form and manner *is necessary in order to preserve our state and party's say in the presidential contest*.

Exhibit B (emphasis added).

On December 11, 2020, President Trump and Mr. Shafer filed an emergency petition for writ of certiorari with the Georgia Supreme Court, *Trump et al. v. Raffensperger et al.*, Case No. S21M0561, contending that the Superior Court's consideration of the Georgia election challenge action "in the normal course" would not provide timely relief before date required under federal law for Presidential Electors to cast their ballots (December 14, 2020). As of the filing of the emergency petition, the Superior Court had set no hearing in that action.

On December 12, 2020, the Georgia Supreme Court denied the emergency petition. *Id.* On the same date, legal counsel advised Mr. Shafer that the Supreme Court order did not end the Georgia election challenge action, which remained pending in the Fulton Superior Court. Counsel advised Mr. Shafer that he and the other Republican Presidential Electors remained contingent Electors and reiterated that Mr. Shafer and the other contingent Electors should meet on December 14, 2020 to cast their votes to preserve remedies in the pending election contest.

On December 14, 2020, Mr. Shafer and the other contingent Republican Presidential Electors met at the State Capitol. Contrary to the allegations in the

Indictment, this meeting was not held secretly nor for any nefarious purpose. By law, the meeting was to commence at noon, and around this time, Mr. Shafer invited members of the news media into the meeting room and allowed them to set up their cameras before calling the meeting to order, which they did. As Mr. Shafer is now aware, a court reporter was present to transcribe the proceedings.[4]

In the meeting, Mr. Shafer stated that President Trump had filed a challenge to the certified election results, that the election contest had not yet been heard or decided by any judge with the authority to hear it. Mr. Shafer emphasized that, "in order to preserve President Trump's rights in the pending contest, it was important that the contingent Presidential Electors meet that day and cast their votes." *See* Exhibit C, p. 3. During the meeting, an attorney for the President stated: "We are conducting this… because the contest of the election in Georgia is ongoing. And so we continue to contest the election of the electors in Georgia. And so we are going to conduct this in accordance with the Constitution of the United States, and we are going to conduct the electorate today similar to what happened in 1960 in Hawaii." *Id*. at 7. Mr. Shafer then informed those in attendance that: "And if we did not hold this meeting, then our election contest would effectively be abandoned; …" *Id*. at 8. The attorney confirmed

---

[4] *See* Transcript of December 14, 2020 Contingent Presidential Elector Meeting (attached hereto as Exhibit C)**.**

Mr. Shafer's statement was correct. *Id*. Mr. Shafer then further explained: "And so the only way for us to have any judge consider the merits of our complaint, the thousands of people who we allege voted unlawfully, is for us to have this meeting and permit the contest to continue; is that not correct?" *Id*. The attorney again confirmed that Mr. Shafer's statement was correct. *Id*.

On the same date, Mr. Shafer posted the following on Twitter (now X):





2. __The Precedent of the 1960 Presidential Election in Hawaii Relating to Contingent Electors__

In the presidential election of 1960, the judicial challenge to the election was not finally adjudicated prior to the date on which the ECA required Presidential Electors to cast their votes. *See* Expert Declaration of Professor Todd Zywicki, attached as Exhibit D, ¶ 10. In that election, Richard Nixon, the Republican candidate, was initially certified by the State of Hawaii as the winner of the vote. *Id*. at ¶ 11. Supporters of John F. Kennedy, the Democrat candidate, filed a legal action contesting the election, alleging various voting irregularities. *Id*. The action was still pending on the date Hawaii's Presidential Electors were to meet. *Id*. As a result of the pending election contest, the certified electors for Nixon and uncertified elector nominees for Kennedy met separately at the Hawaii State capitol building on December 19, 1960, cast their votes for their respective candidates, and submitted those contingent ballots to Congress as the ECA required. *Id*.

Ultimately, Kennedy prevailed in the judicial election contest, and the election was re-certified in his favor. *See* Exhibit D, ¶ 12. The Governor of Hawaii sent a second Certificate of Ascertainment to Congress, reporting that as a result of the lawsuit, the electoral votes of Hawaii were to be recorded for Kennedy rather than Nixon. *Id*. Congress then counted these votes of the Kennedy electors. *Id*.

The response of the political parties to the judicial contest of the 1960 Hawaii election was cited as precedent by advocates for Democratic presidential candidate Al Gore during the contested 2000 presidential election, *see* Exhibit D, ¶¶ 13, 14 and touted by many constitutional scholars as the ideal way to preserve election challenges in a close, contested presidential election. *Id.* at ¶¶ 13-19.

### 3.  The Fulton County District Attorney's Investigation and Prosecution of Mr. Shafer

On January 20, 2022, the District Attorney for Fulton County/the Atlanta Judicial Circuit sent a letter to the Chief Judge of the Superior Court of Fulton County, requesting that a special purpose grand jury ("SPGJ") under Georgia law be impaneled for the purpose of investigating possible attempts to disrupt the administration of the 2020 elections in the State of Georgia.[5] The Superior Court issued an order impaneling a SPGJ to investigate potential disruptions to the administration of the 2020 elections.

The SPGJ was impaneled on May 2, 2022. The District Attorney and her office caused the SPGJ to investigate for nearly eight months, issuing subpoenas compelling

---

[5] In that letter, DA Willis claimed that her office was the "sole agency with jurisdiction that is not a potential witness to conduct related to [criminal interference in the 2020 Georgia election]." *See* Jan. 20, 2021 Letter from DA Willis to Judge Brasher (attached hereto as Exhibit G). Given the three federal investigations and two federal criminal indictments that have stemmed from the 2020 election, this representation was plainly inaccurate, and yet the investigation of the national election continued.

the appearance of approximately 75 alleged witnesses, including a United States Senator, and compelling the production of other alleged evidence. The SPGJ was dissolved on January 9, 2023, although its full report has not yet been released.

On August 14, 2023, the District Attorney and her office filed an Indictment against former President Trump, former Chief of Staff Meadows, the Presidential Elector defendants, and others. The Indictment opens with a reference to the November 3, 2020, United States presidential election. *See* Exhibit A, p. 14. The prosecution charges the Presidential Elector defendants in relation to the meeting of the contingent Presidential Electors, the casting of their ballots and the certification of their votes. *Id.* at 40-42. It alleges as criminal in violation of State law alleged solicitation of the Vice President of the United States and officials of the United States Department of Justice, *id.* at 18, 45, 46, 50, 62, 63; and alleged strategies to disrupt and delay the joint session of the Congress of the United States on January 6, 2021, in Washington, D.C., *id.* at 17, 24, 38, 48, 49, 57, 58, 62, 63.

**B.  Legal Background: The Constitution and the Electoral Count Act**

The Constitution vests Congress alone with the authority to receive, adjudicate, and count presidential electoral ballots or returns. *See* U.S. Const. Amend. XII. To address the chaos that had ensued in previous presidential elections, in 1887, Congress

passed the ECA to govern how it would receive, adjudicate, and count the presidential elector ballots.[6]

Under the ECA, Congress delegated to the States limited authority to determine, in the first instance, who were the valid presidential electors for their State. Specifically, the ECA provides that if a State's adjudicative body (in Georgia, a court in a judicial contest) issues a final decision in disputes regarding Presidential Electors *at least six days in advance* of the date that Presidential Electors have to meet and cast their presidential ballots (the "safe harbor" date), the state's final judicial decision will be given conclusive effect by Congress on January 6. *See* 3 U.S.C §§ 5, 15. But, when States fail to issue a final adjudication of such disputes on or before the ECA's safe harbor deadline, their authority to determine who their valid presidential electors are is extinguished, and all authority returns to Congress to resolve any remaining disputes. *See* 3 U.S.C. §§ 5, 6, and 15.[7]

---

[6] *See* Siegel, at 556-60 (providing a detailed history of the ECA and the application of its provisions).

[7] The legislative history of the ECA clarifies its intent to give Congress alone the power to resolve such disputes:

> The two Houses are, by the Constitution, authorized to make the count of electoral votes. They can only count legal votes, and in doing so must determine, from the best evidence to be had, what are legal votes....
> * * * * *
> The power to determine rests with the two houses, and there is no other constitutional tribunal.

Importantly, the ECA makes explicit that Congress is to receive *both* Presidential

Elector ballots *and contingent Presidential Elector ballots*. *See* 3 U.S.C. § 15.[8] The

_____

*Bush v. Gore*, 531 U.S. 98, 154 (2000) (Souter, J., dissenting) (*quoting* H.R. Rep. No. 1638, 49th Cong., 1st Sess., 2 (1886) (report submitted by Rep. Caldwell, Select Committee on the Election of President and Vice–President)).

[8] The pertinent part of Section 15 of the ECA provides as follows:

> *If more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate,* those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law; and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State,* unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*

3 U.S.C. § 15 (emphasis added).

ECA states that *"when"* it received presidential elector ballots *and* "*paper[s]*

*purporting to be a [presidential elector ballot] from a State,*" *id.*, it must open them and

adjudicate them as follows:

1.      If any of the Presidential Elector ballots *or papers purporting to be a*

*presidential electoral ballot* submitted to Congress can legitimately claim that

they were declared the valid Presidential Electors by the State's adjudicative

process outlined in 3 U.S.C. § 5 by the safe harbor deadline (discussed above),

then those votes are presumptively the "true" returns from that State;

2.      If none of the competing Presidential Elector slates *or purported*

*presidential slates* presented to Congress could properly claim that they were the

product of the State's final adjudication of the dispute by the safe harbor deadline

(which was the case with Georgia in 2020), then the House and Senate together

have to agree on which of the competing Presidential Elector ballots and

purported ballots were the true returns from the State*;*

3.      If the House and Senate cannot agree on which of the multiple presidential

elector ballots is the true Presidential Elector ballot from a State, then the ECA

requires Congress to count the electoral ballots that the Governor has certified.

_____

*See* 3 U.S.C. § 15. In this way, the ECA's plain text recognizes the legitimate role of contingent electors in disputed presidential elections. It also dispels any notion that the Presidential Electors who are ascertained or certified by a State's governor before or on the ECA's "safe harbor" date are the presumptively valid Presidential Electors. The *only* way under the ECA for a state to decide for Congress who the State's true Presidential Electors are is by exercising its delegated judicial authority *by or before* the safe harbor date to reach a final adjudication of the Presidential Elector dispute. Absent the State achieving this safe harbor status (which Georgia did not do in 2020), *neither slate* of *Presidential Electors is presumptively or conclusively valid*, *both can be sent to Congress under the plain language of the ECA*, and Congress is free to disregard the Governor's certificate of ascertainment and adjudicate for itself who the State's true or valid electors are. *See* 3 U.S.C. §15.[9] *Only if* Congress *cannot agree* on the valid ballot does the Governor's certificate of ascertainment even become relevant. *See* 3 U.S.C. § 15.

---

[9] Because of these provisions of the ECA and Georgia law, *both* sets of presidential electors in a state become *contingent presidential electors* by *operation of law* when a judicial challenge to the presidential electors is filed in that state. *See* Exhibit D, ¶¶ 8-9. Mr. Shafer is referred to throughout alternatively as a presidential elector, a contingent presidential elector, or a presidential elector nominee, depending upon the context, but his status in the 2020 presidential election was the same as all of the other Georgia presidential electors, including those for Joe Biden.

## II. <u>GROUNDS FOR REMOVAL</u>

The federal officer removal statute permits the removal of a state criminal prosecution against any federal officer or person acting under that officer who is acting "under color of" that federal office. *See* 28 U.S.C. § 1442. The purpose of the statute is "to provide a federal forum for cases where federal officials must raise defenses arising from their official duties ... [and] to protect federal officers from interference by hostile state courts." *Mesa v. California*, 489 U.S. 121, 137 (1989) (quotations omitted). "The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice." *Arizona v. Manypenny*, 451 U.S. 232, 241-242 (1981) (internal citations omitted).

Section 1442 must be liberally construed. *See Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007) (internal citations and quotations omitted). A party seeking removal under Section 1442(a)(1) must satisfy a three-pronged test: (1) that they are a federal officer or acted under a federal officer; (2) that the actions for which they are being charged were performed under the color of that federal office or authority; and (3) that they have a colorable federal defense. *See Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017) (internal citations omitted). Mr. Shafer satisfies all three of these criteria.

A.  **Mr. Shafer Was, or Was Acting Under, an Officer of the United States at the Time of the Conduct Charged in the Fulton County Prosecution**

The phrase "officer of the United States" in Section 1442 "'appl[ies] to all officers and employees of the United States or any agency thereof.'" *Int'l Primate Prot. League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 84 (1991) (quoting H.R. Rep. No. 308, 80th Cong., 1st Sess., A134 (1947)). As a contingent Presidential Elector, Mr. Shafer was an officer of the United States for the purposes of Section 1442 at the time of the conduct charged in the Fulton County prosecution.[10]

---

[10] In other contexts, the Supreme Court has mentioned in *dicta* that presidential electors are not federal officers. *See, e.g., Ray v. Blair*, 343 U.S. 154, 225 (1952); *Burroughs v. United States*, 290 U.S. 534, 545 (1934) (citing *In re Green*, at 379). In the context of the broad application of Section 1442 and removal, however, an individual can be a federal officer with a right to removal even where they are not employees or agents of the federal government. *See Georgia v. Heinze*, No. 1:21-CV-04457-VMC, 2022 WL 15265493, at *1, *6 (N.D. Ga. Oct. 25, 2022); *Robinson v. Sauls*, No. 1:18-CV-131-TCB, 2019 WL 12338303, at *3 (N.D. Ga. Sept. 16, 2019). Indeed, federal statutes in the specific elections' context treat Presidential Electors as federal officers. *See* Voting Rights, 52 U.S.C.A. § 10101 ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote *for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions*, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.") (emphasis added); Voting Rights Enforcement, 52 U.S.C. § 10307 (same); Intimidation of Votes, 18 U.S.C. 594 (same). As such, the fact that Presidential Electors are not federal officers in the narrow sense considered in *Ray* and *Burroughs* does not foreclose them from being federal officers under the broad interpretation to be given that term under Section 1442. In any event, however, as discussed herein, they exercise

A Presidential Elector's role and duties are set forth in Art. II, § 1, cl. 3 and the Twelfth Amendment. The Constitution directs Presidential Electors to meet in their respective States, to vote by ballot, to make a list of all the persons voted for, to sign and certify the list, and to transmit the list sealed to Congress, directed to the President of the United States Senate. *See* U.S. Const. Art. II, § 1, cl. 3. Congress, through the ECA, specifies when and where Presidential Electors (and contingent Presidential Electors) must meet and give their votes, and sets forth requirements for the making, signing, and certifying of the Electors' votes and sending the same to Congress. *See* 3 U.S.C. §§ 7, 9, 10. In short, Mr. Shafer's duties as a contingent Presidential Elector are created by the U.S. Constitution and governed by federal law.

The Supreme Court's reasoning in *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 770, 805 (1995), is instructive. There, the Court analogized the constitutional authority creating presidential electors to that creating Members of Congress. *Id.* Like Members of Congress, presidential electors are created by the Constitution, elected by the States, but serve a federal role under federal authority. *See* Section III.C.1 (discussing the case and its analogy to Presidential Electors). Just as Members of Congress are federal

---

exclusive federal authority when they meet and cast their ballots, and they at least act at the direction of federal officers.

officers for purposes of Section 1442,[11] so too then, by the same analogy, are presidential electors. Mr. Shafer was an officer of the United States for the broad purposes of removal under Section 1442.[12]

At a minimum, Mr. Shafer was acting under officers of the United States for the purposes of Section 1442. The words "acting under" in Section 1442(a)(1) are also broadly construed. *See Watson*, 551 U.S. at 147 (internal citations omitted); *accord Caver*, 845 F.3d at 1142 (citing *Watson*, 551 U.S. at 147). The words can mean "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 151-152; *Caver*, 845 F.3d at 1142 (citing *Watson*, 551 U.S. at 52). The Supreme Court has approved removal for defendants who were "*working hand-in-hand*

---

[11] *See, e.g., Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) (accepting removal under § 1442 and affirming quashal of state subpoenas issued to a member of Congress); *Williams v. Brooks*, 945 F.2d 1322, 1324 n.2 (5th Cir. 1991) (explaining that the district court had removal jurisdiction over a state matter against a member of Congress as an officer of the United States for purposes of § 1442(a)(1)); *Richards v. Harper*, 864 F.2d 85, 86 (9th Cir. 1988) (same); *Hill Parents Ass'n v. Giaimo*, 287 F. Supp. 98, 99 (D. Conn. 1968) ("A member of Congress is unquestionably an officer of the United States as this term is commonly used and must be considered as such pursuant to Section 1442(a)(1).")

[12] Additionally, Mr. Shafer is charged in a RICO conspiracy with other federal officers, including Jeffrey Clark, who is charged in his capacity as an officer at the Department of Justice. A conspiracy, "if proved, makes actionable any deed by one of the conspirators chargeable to all" and "the act of one is the act of all." *See, e.g., Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 573–74 (2019) (citations omitted). Because Mr. Shafer is, therefore, directly charged with the conduct of other federal officers acting in their official capacities, removal as to Mr. Shafer is also appropriate.

*with the federal government* to *achieve a task that furthers an end of the federal government.*" *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1181 (7th Cir.2012) (emphasis added). Section 1442 "contemplated that literally thousands of persons would be drawn into its enforcement and that some of them otherwise would have little or no appearance of official authority." *City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 820 (1966) (internal citations and quotations omitted).

Mr. Shafer and the other Republican Electors in the 2020 election acted at the direction of the incumbent President and other federal officials. Attorneys for the President and Mr. Shafer specifically instructed Mr. Shafer, verbally and in writing, that the Republican electors' meeting and casting their ballots on December 14, 2020 was consistent with counsels' advice and was necessary to preserve the presidential election contest. *See* Exhibit B. Further, an attorney for the President was present at the December 14, 2020 meeting of the presidential electors itself and advised the Presidential Electors, including Mr. Shafer, that performance of their duties was necessary on behalf of the President and the Constitution. *See* Exhibit C; *cf. United States v. Trump*, Case No. 1:23-cr-00257, Doc. No. 1, ¶ 66 (alleging presidential electors acted at the direction of the President and other federal officials).

Additionally, in executing his duties as a Presidential Elector, Mr. Shafer assisted the President of the Senate and the Archivist of the United States in carrying out their

duties.[13] In acting as a contingent Presidential Elector, Mr. Shafer was "working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Ruppel,* 701 F.3d at 1181. Without Mr. Shafer and other Presidential Electors, Congress could not perform its duty to receive, adjudicate, and count presidential elector ballots, nor could the President of the Senate perform his federal duties.

The Court of Appeals has upheld removal of State court actions to federal court for Members of Congress, *see supra* at FN 11, and where the defendant's connection to the federal government is much more attenuated than Mr. Shafer's direct federal authority. *See, e.g., Magnin*, 91 F.3d at 1426, 1427, 1428 (one defendant was employed by private aircraft engine manufacturer and was also a "designated manufacturing inspection representative" of the Federal Aviation Administration); *Caver*, 845 F.3d at 1144, 1145, 1146 (defendant was a State electrical cooperative); *Peterson v. Blue Cross/Blue Shield of Texas*, 508 F.2d 55, 56, 58 (5th Cir. 1975) (defendant was

---

[13] The ECA provides that presidential elector ballots and contingent presidential elector ballots must be sent to the President of the Senate and the Archivist of the United States. *See* 3 U.S.C. § 11. Federal law requires that on the sixth day of January after every meeting of the Presidential Electors, the President of the Senate shall, in the presence of Congress, open all the certificates from Presidential Electors (including papers purporting to be such certificates or ballots). *See* U.S. Const. Art. II § 1, cl. 3; Amend. XII; 3 U.S.C. § 15. Disputes between competing presidential ballots are adjudicated by Congress. *See* 3 U.S.C. § 15. The votes are then counted, and the President of the Senate announces the vote and declares the persons elected President and Vice President. *Id*.

executive of State health insurer and employee of a State health department); and *State of Tex. ex rel. Falkner v. Nat'l Bank of Com. of San Antonio, Tex.*, 290 F.2d 229, 231 (5th Cir. 1961) (defendants were State banks). Given the broad construction required to be given to Section 1442's removal provisions, Mr. Shafer, as a contingent Presidential Elector, nominated to perform federal, Constitutional functions, was an officer of the United States or, at minimum, within the broad category of persons acting under such officers for the purposes of Section 1442. In sum, Mr. Shafer satisfies this prong of the removal test.

**B.  Mr. Shafer Acted Under the Color of Federal Office at the Time of the Conduct Charged in the Fulton County Prosecution.**

"[T]he right of removal under s 1442(a)(1) is made absolute whenever a suit in a state court is for any act 'under color' of federal office…" *Willingham v. Morgan*, 395 U.S. 402, 406 (1969). "'The phrase "relating to" is broad and requires only "a 'connection' or 'association' between the act in question and the federal office.'" *Caver*, 845 F.3d at 1144 (internal quotations omitted). "'The hurdle erected by this requirement is quite low...'" *Id*. (internal quotations omitted).

Mr. Shafer easily satisfies the second requirement for removal under Section 1442(a), requiring that he show a connection between his federal duties and the acts for which he is being prosecuted. The Indictment in the Fulton County prosecution charges Mr. Shafer for actions he took to fulfill his federal obligations as a contingent Elector

for the 2020 election. *See* Exhibit A, pp. 13-17, 20, 28, 31-32, 35-42, 76-81. The Constitutional and federal provisions defining Mr. Shafer's duties and responsibilities as a contingent Presidential Elector are set forth above. The connection between the conduct alleged in the Fulton County Indictment and Mr. Shafer's actions as a contingent Presidential Elector is clear. These facts satisfy the low threshold of the second requirement for removal.

### C.   Mr. Shafer Possesses Federal Defenses to the Fulton County Prosecution.[14]

A colorable federal defense under Section 1442 "need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin*, 91 F.3d at 1427 (internal citations and quotations omitted). "Under the federal officer removal statute… *the federal-question element is met if the defense depends on federal law*." *Acker*, 527 U.S. at 431 (emphasis added).

### 1. As a Federal Officer, Mr. Shafer Has Official Immunity

Under the Supremacy Clause, federal officers are immune from state prosecution if (1) the officer "was authorized to do [what he did] by the law of the United States," (2) whether "it was his duty to do [it] as [an officer] of the United States," and whether

---

[14] Because Mr. Shafer is charged with all eighteen of his co-defendants in a RICO conspiracy, he is also charged with their conduct. As such, he is entitled to incorporate their federal defenses to these actions, and he adopts those defenses as though fully set forth herein. *See* Footnote 12, *supra*.

(3) "in doing that act he did no more than what was necessary and proper for him to do." *Denson v. United States*, 574 F.3d 1318, 1346–47 (11th Cir. 2009) (quoting *In re Neagle*, 135 U.S. 1, 57) (1890)). "Although setting out three distinct questions for analysis, at bottom, *Neagle* stands for the proposition that an officer of the United States cannot be held in violation of state law while simultaneously executing his duties as prescribed by federal law." *Id.* at 1347.

Importantly, the removal statute "is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Mesa*, 489 U.S. at 133 (quoting *Willingham*, 395 U.S. at 409). Federal courts must credit the removing party's theory of the case for purposes of determining if a federal officer both acted "under color of office" and raised "a colorable federal defense." *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999). "The officer need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407.[15]

Here, the Indictment charges Mr. Shafer with conduct relating to the exercise of his federal duties as a contingent Presidential Elector in the 2020 presidential election. *See* Exhibit A, pp. 13-17, 20, 28, 31-32, 35-42, 76-81. As set forth in greater

---

[15] The Department of Justice has taken the position that an asserted defense of Supremacy Clause immunity is sufficient to satisfy the third element under Section 1442. *See State of Georgia v. Kim*, case number Case 1:23-cv-00113-MLB (N.D. Ga. 2023), Supplemental Statement of Interest, ECF No. 28.

detail in Section III, Mr. Shafer was specifically authorized by federal law to take the actions that he took, and he did no more than was necessary to fulfill his federal obligations. *See Denson*, 574 F.3d at 1346–47. Additionally, Mr. Shafer not only subjectively believed his actions were justified, but his belief was objectively reasonable. As set forth in Section III, Mr. Shafer's actions *were* specifically authorized by federal law. And, as set forth in Section I.A.2., Mr. Shafer reasonably relied on the only existing legal precedent (1960 Hawaii) and on specific legal advice that his actions were legal and constitutional.

## 2. **Mr. Shafer's Preemption Defense**

Preemption is also a recognized federal defense for purposes of Section 1442. *See, e.g., Caver*, 845 F.3d at 1145–46. As also set forth in greater detail in Section III, the State criminal laws in the Indictment are preempted as applied to Mr. Shafer under structural preemption, *see* Section III.B.1. (explaining that State laws that attempt to operate in areas under which they have no authority under the Constitution are preempted); field preemption, *see* Section III.B.2. (explaining that laws that interfere with federal authority in a field that federal law has occupied are preempted); and conflict preemption, *see* Section III.B.3. (explaining that state laws that conflict with federal authority are preempted).

### 3. **Mr. Shafer's Supremacy Clause Immunity Defense**

In this case, as explained in more detail in Section III, the State's Indictment of Mr. Shafer attempts to criminalize, under general State criminal laws, actions that were taken pursuant to exclusive federal authority, which are specifically contemplated by and permitted by the Constitution and federal law, and that are inseparably connected to the functioning of the national government. Mr. Shafer is not subject to state authority or jurisdiction for actions he took as a Presidential Elector, which are wholly within the authority of the national government. Under the Supremacy Clause, actions taken under the authority of the United States that are closely connected to the function of the national government cannot be violations of the criminal laws of the state. Mr. Shafer, therefore, is immune from prosecution by the State. *See, e.g., In Re Loney*, 134 U.S. at 376 (defendants who were regular citizens released from state custody by federal habeas when state attempted to charge them under state perjury law for their testimony in a contested congressional election because the state court had no authority or jurisdiction to prosecute conduct so inseparably connected with the functioning of the National Government**).**

## 4. **Mr. Shafer's Due Process Defenses**

The Due Process Clause of the Constitution[16] requires that a criminal statute give "'fair warning ... in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear.'" *United States v. Lanier*, 520 U.S. 259, 265 (1997) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). The rule is based upon the principle that "'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Id.* (*quoting Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)); *quoting United States v. Harriss*, 347 U.S. 612, 617 (1954)). "'All are entitled to be informed as to what the State commands or forbids.'" *Bouie*, 378 U.S. at 351 (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

The rule of lenity, also grounded in due process, requires that criminal statutes be narrowly construed in favor of the accused. *See United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010) (Pryor, J., concurring) (citing *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820)). "When a criminal statute is ambiguous in its application

---

[16] The Fifth Amendment to the U.S. Constitution states, in pertinent part, that "No person shall… be deprived of life, liberty, or property, without due process of law…" U.S. Const. Amend. V. The Fourteenth Amendment similarly provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1.

to certain conduct, the rule of lenity requires it to be construed narrowly." *United States v. McLemore,* 28 F.3d 1160, 1165 (11th Cir. 1994).

Accordingly, "due process *bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope*…" *Lanier*, 520 U.S. at 266 (internal citations omitted) (emphasis added). "[A] statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). In other words, "a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (quoting *Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)).

In this case, Mr. Shafer had no notice or fair warning that either his conduct in serving as a contingent Presidential Elector during the 2020 general election or his being a party to a complaint filed in a legal proceeding could possibly violate the statutes which the Fulton County prosecutors have charged.[17] The State criminal statutes

---

[17] Indeed, quite the opposite. Mr. Shafer was specifically advised by skilled legal counsel that his actions were legal. The only legal precedent, the 1960 Hawaii election, was conducted in exactly the same manner as the Georgia contingent electors conducted themselves, and the ballots of the contingent electors in that case were counted by

charged in the Indictment are constitutionally barred under the Due Process Clause as applied to Mr. Shafer's conduct.

### 5. Mr. Shafer's First Amendment Defenses

The First Amendment generally prevents the government from criminalizing speech or expressive conduct because of disapproval of the ideas expressed. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Mr. Shafer's conduct for which he is charged in the Indictment -- serving as a contingent Presidential Elector and joining as a party in the Georgia election contest -- is protected activity at the core of the First Amendment. *Smith v. Arkansas State Highway Emp., Loc. 1315*, 441 U.S. 463, 464 (1979) ("The First Amendment "protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances.") Freedom of speech "'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1650 (2022) (quoting *Monitor Patriot Co.*, at 272).

The right of association "protects the right of citizens 'to band together in promoting among the electorate candidates who espouse their political views.'" *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) (quoting *California Democratic Party*

---

Congress. *See* Exhibit D. Far from having notice that his actions could be considered criminal, Mr. Shafer had every reason to know that they were not.

*v. Jones*, 530 U.S. 567, 574 (2000)). It "encompasses a political 'party's decisions about the identity of, and the process for electing, its leaders." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989) (internal citations omitted). "An association must merely engage in expressive activity that could be impaired in order to be entitled to protection." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655 (2000).

The First Amendment's Petition Clause "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). The right to petition the courts constitute "an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).

The actions for which Mr. Shafer is being prosecuted are protected by the First Amendment. Mr. Shafer's nomination as a Presidential Elector during the 2020 election, his meeting with other contingent Presidential Electors, his petitioning of the courts in that capacity, his casting a ballot and signing and certification of a list to send to Congress clearly constituted protected political expression, protected political association, and the protected right to petition. The State cannot criminalize Mr. Shafer's constitutionally protected (and legal) conduct. *See, e.g., Thomas v. Collins*, 323 U.S. 516, 539–540 (1945) ("[A]ny attempt to restrict [First Amendment] liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear

and present danger. . . . Only the gravest abuses, endangering paramount interests, give

occasion for permissible limitation. It is therefore in our tradition to allow the widest

room for discussion, the narrowest range for its restriction, particularly when this right

is exercised in conjunction with peaceable assembly.")

### D. **Mr. Shafer Satisfies the Requirements for Removal Pursuant to 28 U.S.C. § 1442.**

As set forth above, the evidence shows that Mr. Shafer was a federal officer and

acted under federal officers as a contingent Presidential Elector, that the Fulton County

prosecution is connected to Mr. Shafer's conduct as a contingent Elector, and that Mr.

Shafer has colorable federal defenses to the Fulton County charges. Mr. Shafer is

entitled to removal of the action to this Court.

### III.  **THE SUPREMACY CLAUSE BARS THE STATE'S INDICTMENT AND PROSECUTION, AND THIS COURT SHOULD ASSERT JURISDICTION TO PREVENT THIS UNCONSITUTIONAL ENCROACHMENT ON EXCLUSIVE FEDERAL AUTHORITY**

### A.  **This Court Has Jurisdiction to Issue Pretrial Federal Relief**

The Supremacy Clause ousts States from asserting their authority or jurisdiction

to interfere with exclusively federal functions, including through indictment under State

criminal statutes. When State authorities nonetheless pursue criminal indictments that

interfere with or obstruct areas of exclusive federal authority, federal courts are

empowered[18], to protect federal sovereignty from such improper State criminal

indictments through the Writ of Habeas Corpus, 28 U.S.C. § 2241 (the "Habeas

Statute") or by exercise of its equitable authority through injunction or declaratory

relief.[19]

---

[18] *See, e.g., Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 508 (1973) (Rehnquist, J., dissenting) (citing *Wildenhus's Case*, 120 U.S. 1 (1887); *In re Loney*, 134 U.S. 372 (1890); *In re Neagle*, 135 U.S. 1). Such pre-trial federal relief is also available when the State attempts to criminalize actions that interfere with the authority and operations of the federal government. *See U.S. ex rel. Noia v. Fay*, 300 F.2d 345, 354-55 (2d Cir. 1962), *aff'd sub nom. Fay v. Noia*, 83 S. Ct. 822 (1963) (noting Supreme Court has upheld issuance of pre-trial federal writ in State prosecutions where the State court had "no jurisdiction to entertain an action so inseparably connected with the functioning of the National Government"); *cf. People of State of New York v. Eno*, 155 U.S. 89, 94 (1894) ("When the petitioner is in custody by State authority *for an act done or omitted to be done in pursuance of a law of the United States*... the courts of the United States have *frequently interposed by writs of habeas corpus and discharged prisoners* who were held in custody under state authority") (quoting *Ex parte Royall*, 117 U.S. 241, 252 (1886) (emphasis added)).

[19] "Federal courts have a virtually unflagging obligation ... to exercise the jurisdiction given to them." *Colo. River Water Conservation Dist. v/ United States*, 424 U.S. 800, 817 (1976). Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* at 813. Abstention is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.* at 813. Federal courts are empowered to halt an improper State prosecution through equitable means, such as an injunction or a declaratory judgment. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[I]f an individual claims federal law immunizes him from state regulation, *the court may issue an injunction* upon finding the *state regulatory actions preempted*.") (citing *Ex parte Young*, 209 U.S. 123, 155–156 (1908)).

In this case, as explained in more detail herein, the State's Indictment of Mr. Shafer attempts to criminalize, under general State criminal laws, actions that were (1) taken pursuant to exclusive federal authority, and (2) specifically contemplated by and permitted by the Constitution and federal law. Citizens of the states are not subject to state authority or jurisdiction when acting in a matter which is wholly within the authority of the national government. *See, e.g., In Re Loney*, 134 U.S. at 376 (defendants released from state custody by federal habeas when state attempted to charge them under state perjury law for their testimony in a contested congressional election because the state court had no jurisdiction to prosecute conduct so inseparably connected with the functioning of the National Government)**;** *In re Neagle*, 135 U.S. at 99 (federal officer responsible for protecting federal judge who killed a man in the line of duty was released pretrial from state charges because he was acting under the authority of the law of the United States and, therefore, not liable to answer in the courts of California for murder charges); *In re Waite*, 81 F. 359, 372 (N.D. Iowa 1897) (state criminal laws not applicable to a pension examiner appointed under the laws of the United States for acts done in connection with his duties as examiner); *Thomas*, 173 U.S. at 283 (holding that state had no authority to apply its criminal laws to the director of a national soldiers' home in Ohio because he was acting on federal authority and *"[u]nder such circumstances the police power of the state has no application."*) (emphasis added).

Additionally, acts done under the authority of the United States cannot be violations of the criminal laws of the state. *See In re Waite*, 81 F. at 372 ("Being done within the general scope of the authority conferred by the laws of the United States, the rightfulness or validity thereof cannot be tested by the provisions of the criminal statutes of the state"); *see also* Section III.B.1 (explaining that State laws that attempt to operate in areas under which they have no authority under the Constitution are preempted); Section III.B.2 (explaining that laws that interfere with federal authority are preempted); Section III.B.3 (explaining that state laws that conflict with federal authority are preempted). As such, the State has no authority to criminalize Mr. Shafer's actions under any State law, and pretrial federal relief is available, necessary, and appropriate.

**B. The State Is Preempted by The Constitution and Federal Law From Prosecuting Mr. Shafer**

Federal preemption, in which the Constitution or federal law preempts state law, stems from the Supremacy Clause, which provides "a clear rule that federal law 'shall be the supreme Law of the Land[.]'" *Arizona v. United States*, 567 U.S. 387, 398 (2012). Federal law recognizes several distinct types of preemption that apply in this case to preempt the State's criminal laws, and Mr. Shafer's Indictment, therefore, is preempted.

Structural preemption occurs when the Constitution commits authority over a subject to the federal government alone, foreclosing a role for states and localities. It

differs from field and conflict preemption in that it looks to the Constitution as the source of the federal authority instead of to a federal statute.  "Structural preemption may have a clear textual basis, such as the exclusive federal authority over patent, copyright, and bankruptcy, or it may draw on the structure and relationships created by the Constitution." *See, e.g.,* Clare Huntington, *The Constitutional Dimension of Immigration Federalism,* 61 Vand. L. Rev. 787, 808–09 (2008) (discussing structural preemption) (internal citations omitted). Under structural preemption, the operative question is whether the state is exercising a power that the Constitution grants exclusively to the federal government. Ben Meade, *Interstate Instability: Why Colorado's Alien Smuggling Statute Is Preempted by Federal Immigration Laws,* 79 U. Colo. L. Rev. 237, 242–43 (2008) (discussing structural preemption).

Under field preemption, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399 (internal citation omitted). Field preemption can occur in one of two ways: (1) when the intent to completely displace a state law can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it," *id.*; or (2) where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.*

Conflict preemption is exactly as it sounds: when state law conflicts with federal law, state law is preempted. *Id.* Like field preemption, conflict preemption can also occur in two ways: (1) when compliance with both federal and state regulations is impossible, *id.* (internal citations omitted); and (2) "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations omitted).

Because the State's criminal laws are preempted in this context under each of these types of preemption, the State has no authority to pursue its Indictment or prosecution against Mr. Shafer.

### 1.  The State's Indictment Is Structurally Preempted

As discussed in detail in Section III.C., the Constitution creates Presidential Electors and vests the States only with the authority for their legislatures to set the manner of their appointment. Because the State here is not and cannot be acting pursuant to the power granted by Article II of the Constitution to the Georgia state legislature to set the manner of appointment of Presidential Electors or by Congress in the ECA, it is structurally preempted from bringing and prosecuting this Indictment.

The Supreme Court has applied structural preemption in the analogous context of the Elections Clause. *See U.S. Term Limits*, 514 U.S. at 805 (finding that the Presidential Elector Clause under Article II parallel to the Elections Clause at issue in

Article I).  As discussed in greater detail in Section III.C., the Court concluded that

when an office (such as Presidential Electors) is created by the Constitution, the State

has no "original powers" with regard to those offices or entities; therefore, no power to

act with regard to those officers is reserved to the States under the Tenth Amendment.

The Court then held that "the Framers intended the Constitution to be the exclusive

source" of authority for those offices, and that the Framers thereby "divested" States of

any power with regard to them that is not expressly granted to them in the Constitution.

*Id.* at 800–01; *see also* Section III.C.1.[20]

Because the State's Indictment attempts to exercise authority it has not been

delegated by either by Article II of the Constitution or the ECA (and that has been

expressly delegated exclusively to Congress by Article II and the ECA), it is structurally

preempted.

## 2. <u>Congress Has Occupied the Field of Presidential Elector Balloting and Adjudication, Preempting Any State Interference With the Same</u>

Field preemption applies when either (a) the federal framework of regulation is

so pervasive that Congress left no room for the States to supplement it or (b) when the

_____

[20] The Supreme Court has also determined that in this structural preemption context, the presumption against preemption that is sometimes invoked in its Supremacy Clause cases is not applicable. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 13-14 (2013) ("We have never mentioned [the presumption against preemption] in our Election Clause cases . . . .")

federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws. Both types of field preemption apply here.

First, Congress' regulation of and over the casting, collection, adjudication, and counting of presidential elector ballots and purported presidential elector ballots is comprehensive. Indeed, the ECA has been described as so "detailed" and "comprehensive" that even federal courts should be divested of jurisdiction to interfere with Congress' authority to adjudicate and count presidential elector ballots. *Bush v. Gore*, 531 U.S. at 155 (2000). The legislative history of the ECA clarifies its intent to give Congress alone the power to resolve such disputes:

> The two Houses are, by the Constitution, authorized to make the count of electoral votes. They can only count legal votes, *and in doing so must determine, from the best evidence to be had, what are legal votes*....
> * * * * *
> The power to determine rests with the two houses, and *there is no other constitutional tribunal.*

531 U.S. at 154 (*quoting* H.R. Rep. No. 1638, 49th Cong., 1st Sess., 2 (1886) (report submitted by Rep. Caldwell, Select Committee on the Election of President and Vice–President)) (emphasis added); *see generally* Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541 (2004) (Siegel) (describing in detail the comprehensive provisions of the ECA, their application, and their legislative history). Through the ECA, then, Congress has comprehensively occupied the field in presidential elector (*and contingent* presidential

elector) balloting and adjudication, and the States have no authority under the ECA to inject themselves into this process.

Second, the federal interest here is so dominant that the exclusion of any state law must be presumed. "The power [of Congress] to judge of the legality of the [electoral] votes is a necessary consequent of the power to count. The existence of this power is of *absolute necessity to the preservation of the Government*. The *interests of all the States in their relations to each other in the Federal Union demand that the ultimate tribunal to decide upon the election of President should be [Congress],* in which the States in their federal relationships and the people in their sovereign capacity should be represented." *Bush v. Gore*, 531 U.S. at 155 (internal quotations and citations omitted) (emphasis added); *see also Burroughs,* 290 U.S. at 545 ("[P]residential electors . . . exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States. *The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated.*) (internal citation omitted) (emphasis added); *see also In re Loney*, 134 U.S. at 376, (holding states cannot use state criminal laws to interfere with Congress' adjudication of a dispute over who was the correct Congressman to be seated

because that function is so inseparably connected to the functioning of the national government).

In sum, Congress has occupied the field of receiving, adjudicating, and counting presidential elector ballots *and* purported presidential elector ballots. The State's Indictment attempting to encroach upon and obstruct Congress' authority through criminal prosecution is preempted, and Mr. Shafer's Indictment is without authority or jurisdiction.

### 3. The State's Use State of Laws to Criminalize the Conduct of Presidential Electors Conflicts with the ECA and Obstructs Congress' Authority Under The Twelfth Amendment and the ECA

Conflict preemption also applies in two scenarios: (a) when compliance with both federal and state law is impossible, and (b) when state law obstructs the execution of Congress' objectives and purposes. Here, again, both principles apply to preempt the State's Indictment.

As noted, the ECA specifically permits the submission of both presidential elector ballots and "purported" or contingent presidential elector ballots to Congress for its adjudication. 3 U.S.C. § 15. The State's Indictment, in essence, seeks to criminalize the submission of contingent or "purported" presidential elector ballots. *See* Exhibit A, pp. 13-17, 20, 28, 31-32, 35-42, 76-81. Under the State's theory, Mr. Shafer could not take the necessary steps to both execute a contingent or purported presidential elector

ballot (as he was entitled to do under the ECA) and also comply with the State's current application of its criminal laws. The State's Indictment conflicts with the plain language of the ECA, and it is preempted.

Additionally, the State's attempt to use its criminal laws to prohibit the submission of contingent or "purported" presidential electoral ballots to Congress plainly obstructs Congress' objectives and purposes as expressed in the ECA. Again, the ECA is plain that Congress is to receive *both* presidential elector ballots *and contingent or purported presidential electoral ballots* so that it can exercise its exclusive authority to adjudicate the valid ballot. *See* 3 U.S.C. § 15; *see also* Section III.C.3. The State, however, is attempting to obstruct, through criminal prosecution, Congress' right and ability to receive and adjudicate contingent or purported presidential elector ballots by criminalizing them. *See generally* Section III.C. The State's Indictment plainly and directly obstructs Congress' objectives and purposes (indeed, its exclusive authority) under the ECA, and its Indictment is preempted.

## C. <u>Presidential Electors Are Created by the Constitution and Perform Exclusive Federal Government Functions When They Convene and Cast Their Electoral Ballots</u>

Presidential Electors are created by Article II, § 1, cl. 2 of the Constitution (the "Presidential Electors Clause"). The Constitution gives state legislatures authority to set the manner in which their states appoint Presidential Electors. *See* U.S. Const., Art. II,

§ 1. It also vests Congress with the exclusive authority to receive, adjudicate, and count Presidential Elector ballots. *See* U.S. Const. Amend XII. This authority necessarily includes Congress' right to receive and adjudicate presidential elector ballots *and* contingent *or* "*purported*" presidential elector ballots. *See, e.g., Bush v. Gore*, 531 U.S. at 155.

Because Congress has sole and exclusive authority over the receipt, adjudication, and counting of both presidential elector ballots *and contingent or purported presidential elector ballots*, *see* U.S. Const. Amend XII and 3 U.S.C. § 15, the State has no authority over the conduct of presidential electors, including *"purported" or "contingent" presidential electors*, after the ECA's safe harbor date. Similarly, the State has no authority to invade Congress's exclusive authority to receive and adjudicate ballots *and purported ballots* by attempting to use the State's criminal laws to prohibit or obstruct the submission of them to Congress. The State, therefore, has no authority or jurisdiction to indict or prosecute Mr. Shafer under these facts.

1.  **Congress' Authority Over Federal Elections and Presidential Electors**

Under the Supremacy Clause of the U.S. Constitution, "[t]he states have no power… to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by congress to carry into effect the powers vested in the national government." *McCulloch v. State*, 17 U.S. 316, 317 (1819). Because

Presidential Electors are created by the Constitution, any state authority to regulate the casting of Presidential Elector ballots "had to be delegated to, rather than reserved by, the States." *See U.S. Term Limits*, 514 U.S. at 805 (noting the Tenth Amendment "could only 'reserve' that which existed before and that "*the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them....* No state can say, that it has reserved, *what it never possessed*.") (quoting 1 Story § 627) (emphasis added).[21] Applying these principles to the analogous Presidential Elector Clause, "[i]n the absence of any constitutional delegation to the States of power to [regulate or proscribe the conduct of Presidential Electors], such a power does not exist." *See U.S. Term Limits*, 514 U.S. at 805; *cf. Cook v. Gralike*, 531 U.S. 510, 523 (2001) ("By process of elimination, the States may regulate the incidents of such elections, including balloting, *only within the exclusive delegation of power [by the Constitution and Congress]." Id.* (emphasis added). The State's attempt here to interfere with and regulate Presidential Electors is

---

[21] While the issue in *U.S. Term Limits* was the States' lack of authority to add qualifications for their state-elected Congressman under Article I, § 4, cl. 1, the Supreme Court specifically indicated that the same analysis would apply, for the same reasons, to Presidential Electors created under the Art. II, § 1, cl. 2. *Id.* at 805 ("This duty [for Congress to set qualifications for members of Congress under the Elections Clause, Art. I, § 4, cl. 1] *parallels the duty* under Article II that "*Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors."* Art. II, § 1, cl. 2. *These Clauses are express delegations of power to the States to act with respect to federal elections*.") (emphasis added).

not grounded in any Constitutional grant or Congressional delegation; it is, therefore, invalid under the Supremacy Clause. *Id.* at 805; *Cook*, 531 U.S. at 523.

In the context of Presidential Electors, the Constitution and Congress have delegated power to the States in only two discreet areas: (1) the Constitution grants authority to a *state legislature* to set the manner of appointment of its Presidential Electors, *see* U.S. Const. Art. II, § 1; and (2) Congress, through the ECA, delegated to the states the limited right for its adjudicative body (in Georgia, a court and judicial contest) to resolve disputes about Presidential Electors on or before the ECA's safe harbor date. *See* 3 U.S.C. § 5. No other constitutional provision or federal statute gives the States authority over Presidential Electors or the casting of Presidential Elector ballots.

As discussed herein, neither of the two specific areas delegated to the States permits the State to interfere with or regulate – whether by statute or criminal indictment – Presidential Electors' meeting and casting ballots on the date and time required by federal law. Because the State's Indictment is not and cannot be grounded upon either of the two limited federal grants of authority States have been given with regard to Presidential Electors and purported Presidential Electors, the State is wholly without authority or jurisdiction to insert itself into this federal arena through state criminal prosecution or otherwise. Because the State's Indictment interferes with a federal

function granted exclusively to Congress under the Constitution and ECA, its actions are prohibited by the Supremacy Clause. This Court should assert federal jurisdiction to halt and prohibit such unauthorized and unconstitutional proceedings.

### 2. The Authority Granted to State Legislatures By The Constitution to Appoint Presidential Electors Does Not Authorize the State's Prosecution

As noted, Article II, § 1, cl. 2, provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," its Presidential Electors.[22] As the Supreme Court has made clear, a state's authority under Article II to select the *manner* of Presidential Electors' *appointment* is separate and distinct from the *exclusive federal authority* under which Presidential Electors act when meeting to ballot for President and Vice-President:[23] "Presidential electors exercise *a federal function* in *balloting for*

---

[22] In Georgia, Presidential Elector nominees are selected through the state's two political parties, and Presidential Electors are selected based upon the results of the state's popular vote. *See, e.g.,* O.C.G.A. § 21-2-134 (nomination of presidential electors); O.C.G.A. § 21-2-172 (nomination of candidates by convention).

[23] In *Ray v. Blair*, for example, the Supreme Court upheld the State of Alabama's requirement that Presidential Electors, *as part of their qualification for appointment*, must pledge to vote for the candidate of their respective political party who received the most votes for President and Vice-President. 343 U.S. at 225. While acknowledging that "Presidential Electors *exercise a federal function in balloting for President and Vice-President*," the court determined that state legislatures could, as part of their appointment power, require Presidential Electors to commit to voting for the political party's candidate as a qualification for holding the office of Presidential Elector. *Id.* at 231. In *Chiafalo v. Washington*, the Supreme Court upheld a state's right to impose penalties, including criminal penalties, on presidential electors who violated a state law requiring them to vote for the candidate of their respective political party who received the most votes for President and Vice-President. 140 S. Ct. 2316, 2324 (2020). In so

*President and Vice-President*[.]" *Ray*, 343 U.S. at 224–25 (emphasis added); *Burroughs v. United States*, 290 U.S. 534, 545 (1934) (Presidential Electors "*exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States*") (emphasis added); *see also Matter of Guerra*, 193 Wash. 2d 380, 393 (2019), *aff'd sub nom. Chiafalo*, 140 S. Ct. 2316 ("The State *does not dispute that presidential electors perform a federal function when casting a vote in the Electoral College*") (emphasis added); *cf. United States v. Trump*, Case No. 1:23-CR-00257-TSC, ECF Doc. No. 1, ¶ 9 (Aug. 1, 2023) (describing the process "by which the results of the election for President of the United States are collected, counted, and certified" as a "federal government function" that is "foundational to the United States' democratic process").

In this case, the Indictment of Mr. Shafer for the actions that he took as a Presidential Elector is not (and cannot be) grounded in the power given to state legislatures by the Constitution to select the manner of Presidential Electors' appointment. Quite obviously, the Fulton County District Attorney is not the state legislature, and her office, therefore, has *no* authority with regard to Presidential

---

holding, the Supreme Court specifically grounded its decision on the State's constitutional authority to set the *qualifications for the appointment* of Presidential Electors. *Id.*

Electors under Article II, § 1 of the Constitution. Even if this obstacle could be surmounted (which it cannot), the Indictment does not allege any violations by Mr. Shafer with regard to the manner of his appointment as a Presidential Elector. *See* Exhibit A**,** pp. 13-17, 20, 28, 31-32, 35-42, 76-81**.** Instead, as the Indictment itself makes clear, the Fulton County District Attorney is attempting to punish Mr. Shafer for the exercise of his federal function as a Presidential Elector in balloting for President and Vice-President and to prohibit, under pain of criminal prosecution, Mr. Shafer (and all other citizens who may serve as Presidential Electors) from performing their Presidential Elector duties to meet and cast ballots. *See* 3 U.S.C § 15.

In short, Article II, § 1, cl. 2 giving appointment power over presidential electors to state legislatures provides no basis or authority for the State's Indictment. And because the State cannot tether its Indictment as to presidential electors to any other constitutional or federal legislative delegation of authority to the State, it lacks the authority and jurisdiction to bring it.

**3.** **<u>Congress' Delegation to the States of the Right to Adjudicate Disputes Regarding Presidential Electors Before or By the Safe Harbor Day Under the ECA Does Not Authorize the State's Indictment and Prosecution</u>**

Under the Twelfth Amendment and the ECA**,** Congress has *sole authority* to receive, adjudicate, and count of Presidential Elector ballots, specifically including "return[s] ***or paper[s] purporting to be a return*** *from a State*." *See* 3 U.S.C. § 15

(emphasis added). As described above in Section I.B., Congress has delegated to the States, through Section 5 of the ECA, the opportunity for their judicial process to conclusively resolve disputes over presidential electors *if* those disputes are finally adjudicated *by the safe harbor date* (six days before presidential electors are required to meet and vote). *See* 3 U.S.C §§ 5, 15. If the States do not render a final judicial determination by the safe harbor day, however, their role in determining the State's valid slate of Presidential Electors has terminated. From that point, only Congress has authority to receive, adjudicate, and count the Presidential Elector ballots or returns, *including* "return[s] *or paper[s] purporting to be a return from a State*." *See* 3 U.S.C. §§ 5, 15 (emphasis added).[24]

Georgia has a judicial process to resolve disputes about who are the State's true presidential electors. *See* O.C.G.A. §§ 21-2-520 *et seq*. In the context of the 2020 presidential election, Mr. Shafer properly availed himself of this judicial process to contest the presidential elector slate in Georgia. As the docket from that case, attached hereto as Exhibit E, demonstrates, however, the matter was not finally adjudicated -- or

---

[24] That is not to suggest that the State judicial contest would be moot if not decided by the safe harbor date. As the example from Hawaii in 1960 (discussed in Section I.B. above) shows, when such a judicial challenge is finally adjudicated even past the safe harbor date, those results can be transmitted to Congress for its consideration; it simply does not have the conclusive effect that a final determination by the safe harbor date would have under the ECA. *See* 3 U.S.C. § 5.

even adjudicated at all -- by December 8, 2020, the "safe harbor" date in Section 5 of the ECA.

Because that judicial challenge remained unresolved on the ECA's safe harbor date (Dec. 8. 2020), Georgia did not meet the ECA's safe harbor provision in the 2020 election and, as such, missed its opportunity to decide who its true presidential electors were. 3 U.S.C. § 5, 15. At that point, all authority to adjudicate disputes about valid presidential electors was *exclusively* Congress'. *See* 3 U.S.C. §§ 5, 15. The Indictment in this case, however, seeks to usurp Congress' authority and function by obstructing Congress' explicit right under the ECA to receive ballots and purported ballots so that it can adjudicate them.

As detailed in Section I.B., Congress passed the ECA to establish specific rules for it to adjudicate the validity of presidential elector ballots *and purported presidential elector ballots* under these circumstances. *See* 3 U.S.C. § 15. Thus, the ECA makes plain that more than one slate of presidential elector ballots from a state can be executed and sent to Congress for its consideration. 3 U.S.C § 15 (describing the rules for counting "more than one return *or paper purporting to be a return from a State*) (emphasis added).[25]

---

[25] Indeed, the practice of sending more than one presidential elector ballot to Congress from one state was commonplace throughout our Nation's history, *see, e.g.,* Siegel, at 630-631 (describing the historical practice in American elections of states submitting

As applied to the 2020 presidential election in Georgia, under the specific terms of the ECA, neither the Republican nor the Democrat presidential electors could claim that they had been declared the valid presidential electors by the State's adjudicative process because the judicial challenge to the election had not been finally adjudicated by the ECA's safe harbor date (December 8, 2020). *See* 3 U.S.C. §§ 5, 15. As such, the ECA expressly allows *both* presidential elector ballots to be sent to Congress, and Congress was not required to give either ballot the presumption of validity. *See* 3 U.S.C. §§ 5, 15.[26]

Plainly, Congress' limited delegation of its authority to the States under the ECA to permit them to attempt to conclusively adjudicate presidential elector disputes by the safe harbor deadline (Dec. 8, 2020) in advance of the presidential electors meeting and voting (Dec. 14, 2020), which Georgia did not accomplish in 2020, can provide no authority or jurisdictional basis for the State's law enforcement arm to interfere with, prevent, or otherwise regulate the manner in which presidential electors meet, cast, and

---

competing slates of electors in presidential elections), so commonplace that Congress passed the ECA to provide specific rules it would employ to ascertain which of the competing elector ballots, including contingent or purported returns, was the state's legitimate one. *Id.*

[26] Had both sets of Georgia presidential elector ballots been presented to Congress, both houses of Congress would have had to agree on which ballot was Georgia's true ballot. Only if Congress could not agree on the valid ballot from the competing presidential elector slates would the ECA's default provision making the ballot certified by the State's Governor the one that must be counted apply. *Id.* at § 15.

send their ballots to Congress as required under the ECA after that safe harbor date. Instead, the ECA specifically anticipates and permits the submission of those presidential ballots and purported ballots, and the State has no authority to obstruct Congress' receipt of either.

In short, when a State, like Georgia in 2020, fails to resolve election disputes by the ECA's safe harbor date, the State has *no authority to interfere* -- through legislation or attempted criminalization -- with Congress' express Constitutional and federal statutory authority to *receive and adjudicate* presidential elector ballots, *including contingent or purported presidential elector ballots*. *See* U. S. Const. Amend. XII; 3 U.S.C § 15. Permitting a State to criminalize the preparation or sending of "purported" presidential elector ballots to Congress, therefore, usurps and obstructs Congress' exclusive authority. Under the Supremacy Clause, the State is prohibited from doing so, and this Court should assert its jurisdiction to protect federal sovereignty and prevent this unconstitutional and unlawful attempted prosecution[27]

---

[27] *See generally* Edward B. Foley, *Preparing for A Disputed Presidential Election: An Exercise in Election Risk Assessment and Management*, 51 Loy. U. Chi. L.J. 309, 345 (2019) ("[W]hile state and federal courts may play significant roles in shaping the dynamics of a dispute that reaches Congress, by declaring who is the lawful winner of the state's popular vote and which slate of presidential electors the state's governor must certify as authoritative, *ultimately neither the state nor federal judiciary can prevent a party's slate of presidential electors from purporting to meet on December 14 and acting as if they can cast the state's electoral votes--even if those individuals lack any indicia of authority under state law.* As long as these individuals do meet and do purport

# IV. <u>CONCLUSION</u>

Pursuant to pursuant to 28 U.S.C. § 1442, 28 U.S.C. § 1455, the Supremacy Clause , and this Court's habeas and equitable authority, Defendant David J. Shafer respectfully requests that the Court:

A.      Promptly examine Defendant's Notice of Removal of State Court Action to Federal Court and Request for Habeas Corpus or Equitable Relief;

B.      Order an evidentiary hearing to be held promptly;

C.      Remove the prosecution of *State of Georgia v. Shafer*, Case No. 23SC188947, in the Superior Court of Fulton County, Atlanta Judicial Circuit, to this Court;

D.      Notify the Superior Court of Fulton County of the removal of the prosecution and direct that the Superior Court of Fulton County proceed no further;

E.      Assert jurisdiction of this matter under either habeas or equitable relief and terminate or prohibit the State's prosecution; and

F.      Enter any orders as may be necessary or proper.

---

to send their electoral votes to the President of the Senate, *then even the intervention of the Supreme Court cannot stop a dispute regarding a state's electoral votes from reaching Congress*.") (emphasis added).

Respectfully submitted and signed pursuant to Federal Rule of Civil Procedure 11, this 21st day of August, 2023.

*/s/ Craig A. Gillen*

Craig A. Gillen
Georgia Bar No. 294838
Anthony C. Lake
Georgia Bar No. 431149
GILLEN & LAKE LLC
400 Galleria Parkway
Suite 1920
Atlanta, Georgia 30339
(404) 842-9700
cgillen@gwllawfirm.com

*/s/ Holly A. Pierson*

Holly A. Pierson
Georgia Bar No. 579655
PIERSON LAW LLC
2851 Piedmont Road NE, STE 200
Atlanta, GA 30305
(404) 353-2316
hpierson@piersonlawllc.com

*Counsel for David J. Shafer*