EXHIBIT D

## EXPERT DECLARATION OF PROFESSOR TODD ZYWICKI

1.

My name is Todd Zywicki.  I am the George Mason Foundation Professor of Law at the Antonin Scalia Law School at George Mason University in Arlington, Virginia.  I have published academic papers on a range of subjects, including specifically laws governing presidential elections and transitions.  *See* Todd Zywicki, *The Law of Presidential Transitions and the 2000 Election,* 2001 BYU L. Rev. 1573 (2001), available at https://digitalcommons.law.byu.edu/lawreview/vol2001/iss4/3/.[1]   On December 4, 2000, while the Bush-Gore election dispute was ongoing, I was invited to testify before Congress on the law governing presidential elections and transitions.[2]  I have also practiced law in the State of Georgia. My full curriculum vitae is attached hereto as **Exhibit A.**

2.

I have been asked to render an expert opinion with respect to the reasonableness and propriety of the casting of contingent presidential electoral votes when a judicial contest to a Presidential election has been filed under the Georgia Election Code but has not been decided as of the date that the Presidential Electors are required by the federal Electoral Count Act ("ECA") to meet and cast their votes. I have also been asked to

---

[1] *See also* Michael T. Morley, *Ascertaining the President-Elect Under the Presidential Transition Act,* 74 STAN. L. REV. May 2022), *available in* https://www.stanfordlawreview.org/online/ascertaining-the-president-elect-under-the-presidential-transition-act/ (referring to my article as "the most comprehensive analysis of the issue" of the process to "ascertain" the results of a presidential election).

[2] Testimony before United States House of Representatives, Committee on Government Reform, Subcommittee on Government Management, Information, and Technology, on "Transitioning to a New Administration: Can the Next President Be Ready?" (Dec. 4, 2000).

render an expert opinion with respect to the reasonableness and propriety of actions taken by the 2020 Republican nominees for Presidential Elector when confronted with an unresolved judicial contest to a presidential election on the date that the Presidential Electors were required to meet.

3.

The Georgia Election Code provides that the Georgia Presidential Electors be elected in 1964 and every four years thereafter in the General Election, which is held the first Tuesday after the first Monday in November. *See* O.C.G.A. § 21-2-10.

4.

The U.S. Constitution provides that "[t]he Congress may determine the time of choosing the [presidential] electors, and the day on which they shall give their votes; which day shall be the same throughout the United States." *See* U.S. CONST. art. II, § 1; U.S. CONST, Amendment 12.  The Electoral Count Act ("ECA"), in turn, requires Presidential Electors to meet in their respective states on the first Monday after the second Wednesday in December of each Presidential election year and cast their votes for President and Vice President.[3] *See* 3 U.S.C. §§ 7-8.

5.

The date set by the ECA for the Presidential Electors to meet and vote was presumably selected by Congress with the intent of allowing sufficient time for States to count their votes in the Presidential election and then certify the appropriate slate of Presidential Electors (i.e., the Presidential Electors for the party whose candidate received the most votes for President).

---

[3] In the 2020 presidential election, this date was December 14, 2020.

6.

When election results have been certified but a judicial contest to that election is still pending, Georgia law provides that contingent commissions may be issued to the person who was apparently elected and that such person may take office. O.C.G.A. § 21-2-503(a) (permitting the issuance of a commission to a person who appears to have been elected to office "notwithstanding the fact that the election of such person to any office may be contested in the manner provided by this chapter."); *see also* O.C.G.A. § 21-2-503(c) ("Upon the certification of the results of the election, a person elected to a federal, state, or county office may be sworn into office notwithstanding that the election of such person may be contested in the manner provided by this chapter.")

7.

That same Code section just as explicitly makes the validity of such a commission contingent on the ultimate outcome of the judicial contest. Specifically, O.C.G.A. § 21-2-503(a) provides that "[w]henever it shall appear, by the final judgment of the proper tribunal having jurisdiction of a contested election, *that the person to whom such commission shall have been issued has not been elected legally to the office for which he or she has been commissioned, then a commission shall be issued to the person who shall appear to be elected legally to such office*." (Emphasis added). The statute goes on to state that "[t]he issuing of such commission *shall nullify the commission already issued*." *Id.* (Emphasis added).[4]

---

[4] Additionally, O.C.G.A. § 21-2-503(c) further provides that "[u]pon the final judgment of the proper tribunal having jurisdiction of a contested election which orders a second election or declares that another person was legally elected to the office, *the person sworn into such office shall cease to hold the office and shall cease to exercise the powers, duties, and privileges of the office immediately*." (Emphasis added).

8.

Upon the filing of an action contesting a Presidential election under the Georgia Election Code, then, *both* the certified (but contested) Presidential Electors and the uncertified (but contesting) Presidential Electors become contingent Presidential Electors by operation of law. Where litigation is still pending and will not be resolved by a "final judgment of the proper tribunal" by the time the Presidential Electors are required to meet and vote by the ECA, the state faces a dilemma. If the state attempts to short-circuit the election contest before final resolution of the claims in the case, it would deny the candidates, the voters, and the public an opportunity to have disputes regarding the election adjudicated, which is contrary to Georgia and federal law. If the state certifies the contingent winner as the actual and final winner on or before the date set forth in the ECA for presidential electors to cast their ballots it would deprive the state of all of its electoral votes should the contesting candidate ultimately prevail in his or her judicial contest, which is also contrary to Georgia and federal law.  In such circumstances, and to avoid these unlawful and unintended consequences, both sets of Presidential Electors could execute their respective ballots on the date required by federal law, with the State ultimately certifying the election for whichever candidate prevails in the judicial election contest.

9.

When faced with this dilemma, the best and most prudent way to ensure that Georgia has valid presidential electoral ballots for Congress to count would be for both sets of contingent Presidential Electors to meet and cast their votes for President and Vice President in the required format. Both sets should fulfill their duties and complete, execute, and submit the required paperwork as prescribed by the Constitution and the ECA as though the election contest had been adjudicated in each of their favor. Given the disagreeable nature of the first two alternatives (either short-circuiting electoral challenges or risking being unrepresented in the Presidential election), this option of certifying contingent slates of electors offers a reasonable, proper and lawful solution to the problem. Both sets of contingent Presidential Electors performing their duties as though the unresolved judicial contest had been (or will be) adjudicated in their favor is entirely consistent with both federal and Georgia law, and it is the only way to assure that the State of Georgia would have valid presidential electoral votes available to be counted by Congress regardless of the ultimate outcome of the judicial election challenge. The lawfulness, reasonableness and propriety of this solution is supported by ~~state and federal law5 and further evidenced by a review of historical precedent where~~ that solution has been offered.

---

[5] In addition to the Georgia law outlined herein, the ECA specifically anticipates that Congress may, at times, receive two competing presidential electoral ballots from one state. The federal statute is plain that there is nothing improper about the submission of two slates and that the decision of which of these two competing slates is to be counted must be resolved solely by Congress. *See* 3 U.S.C. § 15 ("If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of

10.

In several presidential elections throughout history, including most recently in the contested elections of 1960, 2000, and 2020, judicial challenges to the presidential election had not been finally adjudicated either on or immediately prior to the date that the ECA requires the Presidential Electors to cast their votes. In each of these elections, the question has arisen as to the appropriate and lawful actions that must be taken to preserve the ability of both presidential candidates and the state itself to have valid presidential electoral votes available to be ultimately counted by Congress regardless of the ultimate outcome of the vote count or judicial challenge. The clear (and historically uncontroversial) legal answer in each of these circumstances is that both sets of the Presidential Electors should meet, vote, and transmit ballots to Congress to preserve the ability of that state to have valid electoral votes that can be counted by Congress.

11.

a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law*; and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State*, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*) (emphasis added).

In the 1960 presidential election, for example, Richard Nixon, the Republican candidate, was initially certified by the State of Hawaii as having carried the state. Supporters of John F. Kennedy, the Democrat presidential candidate, filed a legal action contesting the election and charging voting irregularities in 198 of Hawaii's 240 precincts, including the claim that there were more votes counted in the presidential election contest than were actually cast and that 1,283 ballots were unaccounted for in the final tabulation.   That election contest was still pending and unresolved on December 19, 1960, when the Presidential Electors were required by the ECA to meet and cast their votes. Accordingly, both sets of Presidential Electors -- the certified (but contested) Republican/Nixon electors and the uncertified (but contesting) Democratic/Kennedy electors -- met separately at the Hawaii state capitol building and each cast their votes for their respective candidates in the same manner and form as though their candidate had won the state.

12.

Ultimately, on December 30, 1960, John F. Kennedy prevailed in the judicial contest, and the election was re-certified in his favor. On January 4, 1961, the Governor of Hawaii transmitted a second Certificate of Ascertainment on behalf of the state reporting that as a result of the lawsuit, the electoral votes of Hawaii were to be recorded for Kennedy rather than Nixon. Because the Democratic Presidential Electors had cast ballots back on December 19, 1960 in the precise form required by the Constitution and the ECA, Congress was able to and did count the votes from Hawaii when it met on January 6, 1961 to count the votes and certify the result. A copy of the paperwork completed and executed by the Hawaii Democratic Presidential Electors on December

19, 1960 and mailed to the Administrator of General Services of the United States of America on December 20, 1960 is attached as **Exhibit B.**[6]

13.

In the contested Presidential election of 2000, the concept of two contingent elector slates specifically relying on the Hawaii precedent was actively promoted by advocates for the Democratic presidential candidate, Al Gore, drawing support from noted constitutional scholars.[7]

14.

Democrat Congresswoman Patsy Mink of Hawaii publicly advocated for the submission of two elector slates from Florida to Congress in the 2000 election as follows:

> *The [Hawaii] precedent of 40 years ago suggests the means for resolving the electoral dispute in Florida: ...both slates of electors meet on December 18 and send their certificates to Congress; the Governor of Florida send a subsequent certificate of election based on ... the decision of the court; and Congress accepts the slate of electors named by the Governor in his final certification.*

*See* Statement of Representative Patsy Mink, Congressional Record, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm.

---

[6] Two of the three Democratic Presidential Electors who executed the Hawaii electoral documents, William Heen and Gilbert Metzger, were retired federal judges and noted constitutional scholars.

[7] The judicial challenges to the 2000 election in Florida were finally adjudicated before December 18, 2020, the date the Presidential Electors were required by the ECA that year to meet and vote, so two electoral ballots were not executed and submitted from Florida in that election.

15.

In anticipation of the likelihood of a close and contested presidential election in 2020, electoral college scholars openly and publicly advocated for both sets of Presidential Electors to each cast their ballots for their respective candidates on the date required by the ECA and submit both ballots to Congress in any state where the vote count was not yet final or was subject to a pending, unresolved judicial contest. Michael Rosin and Jason Harrow argued, for example, that Hawaii's approach to dealing with the issue by having both sets of electors meet and case votes for their candidate *"should serve as a model for a close election this year or in any year."* Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election/or Presidential Electors: Part 2* (Oct. 23, 2020), available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2 (emphasis added); *see id.* (stating "the way the recount was handled by all involved [in the 1960 election in Hawaii] provides a model for how a very close election should be determined"). Rosin and Harrow went on to note that when the judicial contest eventually resulted in Kennedy being declared the winner, the state re-issued its certification: "Fortunately, because both slates of electors had voted on the proper day, there was still a chance to tell Congress which slate was actually appointed by the voters." *Id.*

16.

Rosin and Harrow further explain that although the process "feels disorderly," "in fact the dueling certificates, with the Governor later telling Congress who really won, was an excellent way to navigate a system that, for no good reason, occasionally provides too short a time to conduct a full recount in a very close election." *Id.* The authors also

point out that both sets of presidential electors executing contingent ballots in these circumstances eliminates the risk that the state could lose its presidential electoral votes altogether: "[I]f, by elector voting day, a result is still uncertain and no presidential electors from a particular state cast votes, then Congress probably cannot count any electoral votes from that state for that particular election. . . . That means if a state wants to have its electoral votes counted, but which presidential electors were appointed by the voters on election day remains uncertain . . . . *there is only one possible solution: both potentially-winning slates of electors should case elector votes  on the day required while the recount continues.*" *Id.* (emphasis added).

17.

Harrow and Rosin subsequently argue that the 1960 Hawaii precedent of casting two sets of contingent electoral votes provides not only one reasonable solution to the difficulty of squaring the ECA's purported deadlines with a fair and accurate vote count, but actually provides the *best* solution to a difficult problem.[8] Even if one disagrees with that considered judgment, it makes plain that the State of Hawaii was not violating the law in 1960 by doing so, nor would subsequent sets of presidential electors be doing so by following this precedent: Harrow and Rosin were obviously not advocating for or urging some sort of criminal conspiracy in holding 1960 Hawaii up as a model for future close elections.

---

[8] Jason Harrow and Michael L. Rosin, *How To Decide a Very Close Election for Presidential Electors: Part 3*, TAKECARE (Oct. 28, 2020), *available in* https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-3.

18.

While the 2020 presidential election was in process, former CNN host Van Jones, an attorney, and Professor Larry Lessing of Harvard Law School similarly advocated that Presidential Electors should follow the Hawaii precedent if the election was not finally decided in their state by the date the ECA required Presidential Electors to meet and cast their votes. As they write, "Even though Richard Nixon said it should not be a precedent, what he did in 1960 *should be the model for this election* in 2020." Doing so would allow the state to take its time "to have an orderly and complete vote count." In particular, they described the execution of both sets of presidential ballots a "genius legal insight," noting that *the only way their votes could matter was if they were cast on the day that Congress had set.*  *See*  Van Jones and Larry Lessing, "WHY PENNSYLVANIA SHOULD TAKE ITS TIME COUNTING VOTES," https://www.cnn.com/2020/11/04/opinions/pennsylvania-take-time-counting-votes-opinion-jones-lessig/index.html (Nov. 4, 2020) (citing favorably to the 1960 Hawaii precedent and noting that "[t]he key – *and this is the critical fact for 2020 as well* – is that the Democratic slate had also met on December 19 and had also cast their ballots in the manner specified by the Constitution. *When they voted, no one knew whether their votes would matter. But at least someone recognized that the only way their votes could matter was if they were cast on the day that Congress had set.* History does not record who had that *genius legal insight.*") (Emphasis added).

19.

The actions taken by both sets of Presidential Electors in Hawaii in 1960 that have been lauded and advocated by elected officials and legal scholars in 2000 and 2020 are supported by and consistent with federal and Georgia law.  Specifically, federal law expressly anticipates and permits the submission of more than one slate of Presidential Electors from a State, and the Constitution gives Congress exclusive jurisdiction to adjudicate the validity of those competing slates within the parameters set in the ECA and through their own internal procedures.  *See* 3 U.S.C.A. § 15 and U.S. CONST. art. II, § 1.[9]  *See also* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (explaining Congress'

---

[9] That statute states, in pertinent part, as follows:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate,* those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law;* and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by Lawful electors appointed in accordance with the laws of the State,* unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof shall be counted.*

3   U.S.C.A. § 15 (emphasis added).

process to adjudicate between two sets of presidential elector ballots from the same state), available at https://crsreports.congress.gov/product/details?prodcode=RL32717; Todd Zywicki, *The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. Rev. 1573, 1609 n. 110 (2001) ("Hawaii's situation in 1960 is also important in that it provides the primary congressional precedent for congressional procedures for resolving disputes over two competing Certificates of Ascertainment."), available at https://digitalcommons.law.byu.edu/lawreview/vol2001/iss4/3/.

20.

In 2020, Georgia was confronted with the identical dilemma as Hawaii in 1960, except that in Georgia, the Democratic candidate for President had been certified as having carried the state, and it was the Republican candidate who filed a legal action contesting the election. That judicial contest was still pending on December 14, 2020 when the Presidential Electors were required by the ECA to meet and cast their votes. Indeed, no hearing or other proceeding had even been had in that contest.

21.

Based upon the materials that I have reviewed, the contingent Georgia Republican Presidential Electors received advice of legal counsel to take the actions they took on December 14, 2020, and they followed the Hawaii precedent precisely, using materially identical forms and the same procedures as the contingent 1960 Hawaii Democratic Presidential Electors. At the same time, the contingent Georgia Republican Presidential Electors publicly announced that the votes they cast and related actions they took were expressly contingent on the outcome of the pending election contest and were cast only to protect and preserve the remedies for that contest and the ability of the

State of Georgia to have a valid electoral ballot for Congress to count on January 6, 2021 regardless of the ultimate outcome that contest.

22.

Legally, the Georgia Democratic Presidential Electors were also acting contingently in casting their votes, as their status as Presidential Electors was directly contingent on the outcome of the pending judicial contest to the election. Despite this fact, the Georgia Democratic Presidential Electors made no similar announcement that their votes and actions on December 14, 2020 were contingent on the outcome of the election contest. They, however, have come under no criticism or scrutiny for having not done so.

23.

Based upon the Hawaii precedent as well as federal and Georgia law, when contingent Presidential Electors execute contingent electoral ballots under these circumstances, they are not required to insert into those ballots any reference to the pending election contest or that they are executing their ballots provisionally or contingently. Indeed, the insertion of such additional or surplus language into the Presidential Elector's ballots could render them subject to validity challenges. And by operation of Georgia and federal law, their contingent nature is obvious on their face.

24.

Tellingly, the contingent 1960 Hawaii Democratic Electors included no such reference in the certificates they executed. Instead, in their documents, they declared themselves to be "duly and legally appointed and qualified" and "certified by the Executive" even though they had not been so certified as of the date the certificates were executed. Additionally, they stated in those documents that "We hereby certify that the

lists of all the votes of the state of Hawaii given for President, and of all the votes given for Vice President, are contained herein." *See* Exhibit B. As noted, those ballots were ultimately the ones that Congress officially counted as the official electoral votes of Hawaii for the 1960 presidential election.

25.

Accordingly, the fact that the 2020 electoral ballots cast by the contingent Georgia Republican Presidential Electors did not include any explicit reference to the pending election challenge or the contingent nature of the ballots does not render them false or invalid. Instead, these ballots, which were prepared by and in the specific form advised by legal counsel, were in exactly the correct and necessary format for the contingent Georgia Republican Electors to perform their duties legally and validly as prescribed by the Constitution, federal and Georgia law.

26.

As noted, the 2020 Georgia Democratic Electors were also acting contingently when they met and voted. The Democrats also (appropriately) did not include any reference to the pending judicial election contest or the contingent nature of the ballots they were executing in their documents. Instead, both sets of contingent Presidential Electors by necessity completed and executed the requisite paperwork as prescribed by law and as though they possessed uncontested certificates at that time of execution.

27.

Additionally, transmission of the contingent Republican electoral ballots to Congress (and to the other entities required to receive them) at the time that they are executed is part of the legally required process under federal law to ensure that the ballots are valid and available to be counted by Congress if the judicial contest changes

the outcome of the election.  In the 1960 Hawaii example, the contingent Democratic Presidential Electors not only executed their ballots as provided by federal law, but they also transmitted them to Congress and as otherwise required by federal law at the time that they executed them.  Failure to transmit the ballots as required by law would put the validity of the electoral ballots at issue.

28.

The fact that there was a recount ordered by the court in the 1960 Hawaii election is irrelevant and does not distinguish the 1960 Hawaii situation from the 2020 presidential election in Georgia in any legally material way.  The legally relevant point is that a judicial challenge was filed in Hawaii in 1960, that challenge was pending and unresolved at the time federal law required the presidential electors to cast their ballots. As a result, to preserve Hawaii's ability to have their electoral votes counted regardless of the ultimate outcome of the judicial challenge, both sets of presidential electors lawfully, prudently, and appropriately cast their ballots. In Hawaii, the court took action in response to that challenge, and the court ultimately entered judgment for the challenger, John Kennedy, and declared him the winner of the election.  One of the steps to that result happened to be a recount, but that fact specific to the Hawaii situation has no legal relevance to the 2020 election challenge in Georgia that was pending when the electors were required to act on December 14, 2020.  In Georgia, unlike in Hawaii (and contrary to Georgia law requiring a timely consideration), the court took *no* action on the pending election challenge – it did not even schedule a timely hearing, much less assess any of the evidence to determine what steps (such as a recount) may be necessary to adjudicate the challenge. Georgia's court could have ordered a recount, assessed the merits of the evidence submitted with the complaint in that case, or taken any number

of other actions to adjudicate the matter, up to and including declaring Trump as the actual winner of the Georgia election. The fact that the Hawaii court acted rapidly to resolve the pending issues and the Georgia court dragged its feet bears no legal or logical relevance as to the precedential value of the 1960 Hawaii election or to the propriety of the actions taken by Georgia s presidential electors on December 14, 2020, the date mandated by the ECA. And regardless, because the result of the litigation and any subsequent remedy the court might order remained unresolved as of that date, neither set of Georgia's 2020 presidential electors could have known on December 14, 2020 what actions the court would or would not take (including but not limited to ordering a recount) in adjudicating the election challenge or what the ultimate outcome of that challenge would be.

29.

In light of the 1960 Hawaii precedent and the widespread support from elected officials and legal scholars that the execution and submission of both presidential electoral ballots in a close election has received since then, reasonable attorneys could not have predicted that a presidential elector in 2020 taking the same actions taken in Hawaii in 1960 could or would be viewed anything but entirely proper; certainly they could not have reasonably predicted that any law enforcement official would ever suggest that any or all of these actions were criminal. Given the difficulties presented under current laws, the actions taken by the state of Georgia were the best available means for addressing extended electoral challenges that remain unresolved by the relevant deadlines. Once the challenges are resolved, the appropriate response should be for the State to disregard the losing slate of electors and certify the winning slate; there is no basis to criminally prosecute those who acted to ensure the state's electoral votes

would be counted in the event that known but unresolved election contests remain pending as of the deadline.[10]

30.

Based on my analysis of the historical record, particularly the example of the 1960 Hawaii election, it is my expert opinion that the contingent Republican Presidential Electors in Georgia in 2020 acted in a reasonable, proper, and lawful manner. Moreover, it is my opinion, shared by a consensus of experts who have considered the issue over the past several decades, that the casting of contingent electoral votes is not only reasonable, proper and lawful, but the best approach available to enable the resolution of election contests while preserving the ability of a state to have its electoral votes counted by Congress should a judicial contest change the outcome of the election.   In conclusion, it is my opinion that the actions taken by the contingent Georgia Republican Presidential Electors *were* lawful, reasonable, proper, and necessary, and any suggestion that they could be "criminal" ignores legal and historical precedent, the reasoned advice of legal counsel received, and the plain language of the Constitution, federal and Georgia law.

---

[10] Although a full discussion of the constitutional implications of any State taking such action against its Presidential Electors is beyond the scope of this declaration, it is worth noting that the actions taken by the Republican presidential elector nominees in Georgia in 2020 enjoy broad constitutional protection, regardless of the Hawaii precedent.

Signed this day // July, 2023.

Todd Zywicki
George Mason Foundation of Profession of Law
Antonin Scalia School of Law
George Mason University
3301 Fairfax Drive
Arlington, VA 22201

### PROFESSOR TODD J. ZYWICKI

GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW
ANTONIN SCALIA LAW SCHOOL, GEORGE MASON UNIVERSITY
3301 N. FAIRFAX DR.
ARLINGTON, VA 22201
703-993-9484
tzywick2@gmu.edu
Web Page: http://mason.gmu.edu/~tzywick2/

## PUBLICATIONS

### BOOKS

Editor, UNPROFITABLE SCHOOLING: EXAMINING CAUSES OF, AND FIXES FOR, AMERICA'S BROKEN IVORY TOWER (with Neal McCluskey), (Cato Press, 2019).

LAW AND ECONOMICS: PRIVATE AND PUBLIC (with Maxwell Stearns and Tom Micelli), (West, 2018).

TEACHERS MANUAL TO LAW AND ECONOMICS: PRIVATE AND PUBLIC PUBLIC (with Maxwell Stearns and Tom Micelli), (West, 2018).

Editor, RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS (with Peter J. Boettke), (Edward Elgar, 2017).

CONSUMER CREDIT AND THE AMERICAN ECONOMY (with Thomas Durkin, Gregory Elliehausen, and Michael Staten), (Oxford University Press, 2014).

PUBLIC CHOICE CONCEPTS AND APPLICATIONS IN LAW (with Maxwell Stearns) (West Publishing, 2009).

Editor, *The Rule of Law, Freedom, and Prosperity*, 10 SUPREME COURT ECONOMIC REVIEW (Chicago: University of Chicago Press, 2003). 278 pp.  ISBN: 0-226-99962-9**).**

- Reviewed by Professor William A. Fischel, 14(6) LAW AND POLITICS BOOK REV. 493-97 (June 2004).

### ARTICLES AND BOOK CHAPTERS

*Simple Rules for a Complex Regulatory World: The Case of Financial Regulation* (with Christopher Mufarrige), __ EUROPEAN J. OF L. & ECON. __ (Forthcoming 2020), working paper *available* here.

*Bruce Yandle and the Art of Economic Communication*, *in* THE LEGACY OF BRUCE YANDLE 67-98 (Donald J. Boudreaux and Roger Meiners, eds., 2020), *available* here.

*Friedrich A. Hayek* (with Edward Peter Stringham), *in* ENCYCLOPEDIA OF LAW & ECONOMICS (Alain Marciano and Giovanni Battista Ramello, eds.) (2019).

*A Chip Off the Old Block or a New Direction for Payment Card Security? The Law and Economics of the U.S. Transition to EMV* (with James Cooper), 2018 MICH. ST. L. REV. 869 (2018).

*The Behavioral Economics of Behavioral Law & Economics*, 5 REVIEW OF BEHAVIORAL ECONOMICS 439 (2018).

*The Chrysler and General Motors Bankruptcies*, *in* RESEARCH HANDBOOK ON CHAPTER 11 REORGANIZATION 298 (Barry Adler, ed., 2020).

*The Changing of the Guard: The Political Economy of Administrative Bloat in Higher Education* (with Christopher Koopman), *in* UNPROFITABLE SCHOOLING: EXAMINING CAUSES OF, AND FIXES FOR, AMERICA'S BROKEN IVORY TOWER 147 (Todd J. Zywicki and Neal McCluskey, eds., 2019).

*Introduction* (with Neal McCluskey), *in* UNPROFITABLE SCHOOLING: EXAMINING CAUSES OF, AND FIXES FOR, AMERICA'S BROKEN IVORY TOWER 1 (Todd J. Zywicki and Neal McCluskey, eds., 2019).

*Law and Economics: The Contributions of the Austrian School of Economics* (with Peter J. Boettke), *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 3 (Todd J. Zywicki and Peter J. Boettke, eds., 2017).

*Austrian Law and Economics and Efficiency in the Common Law*, *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 192 (Todd J. Zywicki and Peter J. Boettke, eds. 2017).

*Bankruptcy Judge as Central Planner* (with Shruti Rajagopalan), *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 371 (Todd J. Zywicki and Peter J. Boettke, eds., 2017).

*Conclusion: The Future of "Austrian" Law and Economics* (with Peter J. Boettke), *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 423 (Todd J. Zywicki and Peter J. Boettke, eds., 2017).

*Behavioral Law & Economics Goes to Court: The Fundamental Flaws in the Behavioral Law & Economics Arguments Against No-Surcharge Laws*, 82 MISSOURI L. REV. 770 (2017) (Symposium on behavioral law & economics).

*Punishing Rewards: How Clamping Down on Credit Card Interchange Fees Can Hurt the Middle Class* (with Julian Morris, Geoffrey A. Manne, and Ian Lee), Macdonald-Laurier Institute (Nov. 2017).

*Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses* (with Geoffrey A. Manne and Julian Morris), International Center for Law & Economics Working Paper (April 25, 2017).

*Dodd-Frank at Five Years: Its Impact on Freedom and the Rule of Law*, 43 J. OF FINANCIAL TRANSFORMATION 62 (2016).

*Do Americans Really Save Too Little and Should We Nudge Them to Save More? The Ethics of Nudging Retirement Savings*, 16 GEORGETOWN J. OF LAW & PUBLIC POLICY 877 (2017).

*Market-Reinforcing versus Market-Replacing Consumer Finance Regulation*, in REFRAMING FINANCIAL MARKET REGULATION: ENHANCING STABILITY AND PROTECTING CONSUMERS (Hester Peirce and Benjamin Klutsey eds. 2016).

*Market Based Nudges: How Financial Markets Improve Their Own Choice Architecture*, in NUDGE THEORY IN ACTION: BEHAVIORAL DESIGN IN POLICY AND MARKETS (2016).

*The Rule of Law During Times of Economic Crisis*, in ECONOMIC AND POLITICAL CHANGE AFTER CRISIS: PROSPECTS FOR GOVERNMENT, LIBERTY, AND THE RULE OF LAW 36 (Stephen H. Balch and Ben Powell, eds., 2016).

*Rent-Seeking, Crony Capitalism, and the Crony Constitution*, 23 SUPREME CT. ECON. REV. 77 (2016).

*The Law and Economics of Consumer Debt Collection and Its Regulation*, 28 LOYOLA CONSUMER L. J. 167 (2016).

*The CFPB's Arbitration Study: A Summary and Critique* (with Jason Scott Johnston), 35(5) BANKING AND FINANCIAL SERVICES POLICY REPORT 9 (May 2016).

*Consumer Credit and the American Economy: An Overview* (with Thomas A. Durkin and Gregory Elliehausen), 11 J. L. ECON. & POL'Y 279 (2015).

*Dodd-Frank at Five Years: Implications for Consumers and the Economy*, 34(11) BANKING AND FINANCIAL SERVICES POLICY REPORT 1 (Nov. 2015).

*The Consumer Financial Protection Bureau and the Return of Paternalistic Command-and-Control Regulation*, 16(2) ENGAGE 48 (2015).

*Hayek's Jurisprudence: And Ratnapala's Hayek*, 33(2) UNIVERSITY OF QUEENSLAND LAW JOURNAL 311 (2015).

*Bruno Leoni's Legacy and Continued Relevance*, 30(1) J. OF PRIVATE ENTERPRISE 131-41 (2015).

*Behavior, Paternalism, and Policy: Evaluating Consumer Financial Protection* (with Adam C. Smith), 9 NYU J. OF LAW & LIBERTY 201 (2015).

*An Assessment of Behavioral Law and Economics Contentions and What We Know Empirically About Credit Card Use by Consumers* (with Thomas A. Durkin and Gregory Elliehausen), 22 SUPREME COURT ECON. REV. 1 (2014).

*Commentary on CFPB Report: Data Point: Checking Account Overdraft* (with G. Michael Flores) (2014).

*Price Controls on Payment Card Interchange Fees: The U.S. Experience* (with Geoffrey Manne and Julian Morris), ICLE Financial Regulatory Research Program White Paper 2014-2 (2014).

*Keynote Address: Is There a George Mason School of Law and Economics?* 10 J. LAW, ECONOMICS & POLICY 543 (2014).

*Uncertainty, Evolution, and* Behavioral *Economic Theory* (with Geoffrey Manne), 10 J. OF LAW, ECONOMICS & POLICY 555 (2014).

*Overdraft Protection and Consumer Protection: A Critique of the CFPB's Analysis of Overdraft Programs* (with G. Michael Flores and Brian M. Deignan), 33(3) BANKING AND FINANCIAL SERVICES POLICY REPORT 10 (March 2014).

*The Consumer Financial Protection Bureau, in* PERSPECTIVES ON DODD-FRANK AND FINANCE (2014, MIT Press).

*The Behavioral Law and Economics of Fixed-Rate Mortgages (And Other Just-So Stories)*, 21 SUPREME COURT ECON. REV. 157 (2014).

*Payday Lending, Bank Overdraft Protection, and Fair Competition at the Consumer Financial Protection Bureau* (with Robert L. Clarke), 33 REVIEW OF BANKING AND FINANCIAL LAW 235 (2013-2014).

*Commentary: CFPB Study of Overdraft Programs* (with G. Michael Flores), MERCATUS RESEARCH (Nov. 4, 2013).

*Credit Where It's Due: How Payment Cards Benefit Canadian Merchants and Consumers, and How Regulation Can Harm Them* (with Ian Lee, Geoffrey A. Manne, and Julian Morris), MacDonald-Laurier Institute (Oct. 2013).

*The Economics and Regulation of Network Branded Prepaid Cards*, 65 FLORIDA L. REV. 1477 (2013).

*The Consumer Financial Protection Bureau: Savior or Menace?*, 81 GEORGE WASHINGTON L. REV. 856 (2013).

*Libertarianism, Law and Economics, and The Common Law*, 16 CHAPMAN L. REV. 309 (2013) (symposium on "Libertarian Legal Theory").

*The Bankruptcy Clause, in* THE HERITAGE GUIDE TO THE CONSTITUTION (2d ed. 2013).

*The Coinage Clause, in* THE HERITAGE GUIDE TO THE CONSTITUTION (2d ed. 2013).

*Senate Vacancies, in* THE HERITAGE GUIDE TO THE CONSTITUTION  (2d ed. 2013).

*Auto Bailout or UAW Bailout? Taxpayer Losses Came from Subsidizing Union Compensation*, HERITAGE FOUNDATION BACKGROUNDER #2700 (June 13, 2012).

*The Senate and Hyper-Partisanship: Would the Constitution Look Different if the Framers Had Known that Senators Would be Elected in Partisan Elections?* 10 GEORGETOWN J. L. & PUB. POL'Y 375 (2012).

*The Economics and Regulation of Bank Overdraft Protection*, 69 WASHINGTON & LEE L. REV. 1141 (2012).

*Economic Uncertainty, The Courts, and The Rule of Law*, 35 HARVARD J. OF L. & PUB. POL'Y 195 (2012).

*The Balancing of Markets, Litigation, and Regulation*, 7 J. OF LAW, ECONOMICS, AND POL'Y 351 (2010).

*Perspectives on Dodd-Frank Wall Street Reform and Consumer Protection Act*, 7 J. OF LAW, ECONOMICS, AND POL'Y 307 (2010).

*Protecting the Public Health: Litigation and Obesity*, 7 J. OF LAW, ECONOMICS, AND POL'Y 259 (2010).

*The Auto Bailout and the Rule of Law*, NATIONAL AFFAIRS, Issue 7, p. 66 (Spring 2011).

*Does Increased Litigation Increase Justice in a Second-Best World?*, *in* THE AMERICAN ILLNESS (Frank Buckley, ed., 2013, Yale University Press).

*Hayekian Anarchism* (with Edward Peter Stringham), 78 J. ECON. BEHAVIOR & ORGANIZATION 290 (2011).

*Rivalry and Superior Dispatch: An Analysis of Competing Courts in Medieval and Early Modern England* (with Edward Peter Stringham), 147 PUBLIC CHOICE 497 (2011).

*Common Law and Economic Efficiency* (with Edward Peter Stringham), *in* 7 ENCYCLOPEDIA OF LAW AND ECONOMICS: THE PRODUCTION OF LEGAL RULES (2d ed., Francesco Parisi, ed., 2012).

*The Economics of Payment Card Interchange Fees and the Limits of Regulation*, ICLE FINANCIAL REGULATORY PROGRAM WHITE PAPER SERIES (June 2, 2010).

*Expansion of Liability Under Public Nuisance* (with Henry N. Butler), 18 SUPREME COURT ECONOMIC REVIEW 1 (2010).

*Money To Go*, 33(2) REGULATION 32 (2010).

*Subprime Mortgages: What We Have Learned From a New Class of Homeowners* (with Satya Thallam), *in* LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE 181 (2010).

*Anna Nicole Smith Goes Shopping: The New Forum Shopping Problem in Bankruptcy*, 2010 UTAH L. REV. 511 (2010).

*Consumer Use and Government Regulation of Title Pledge Lending*, 22 LOYOLA CONSUMER L. REV. 425 (2010).

*Three Problematic Truths About the Consumer Financial Protection Agency Act of 2009* (with Joshua D. Wright), 1 LOMBARD STREET, No. 12 (2009).

*The Market for Information and Credit Card Regulation*, 28(1) BANKING AND FINANCIAL SERVICES POLICY REPORT 13 (2009).

*The Law and Economics of Subprime Lending* (with Joseph Adamson), 80 UNIVERSITY OF COLORADO L. REV. 1 (2009).

*Spontaneous Order and the Common Law: Gordon Tullock's Critique*, 135 PUBLIC CHOICE 35 (2008).

*Posner, Hayek, and the Economic Analysis of Law* (with Anthony B. Sanders), 93 IOWA L. REV. 559 (2008).

*Bankruptcy, in* THE CONCISE ENCYCLOPEDIA OF ECONOMICS (2d ed., David Henderson ed. 2008).

*Consumer Bankruptcy, Doctrinal Issues in, in* ENCYCLOPEDIA OF LAW AND SOCIETY: AMERICAN AND GLOBAL PERSPECTIVES (2008).

*Evolutionary Psychology, in* ENCYCLOPEDIA OF LAW AND SOCIETY: AMERICAN AND GLOBAL PERSPECTIVES (2008).

*Institutional Review Boards as Academic Bureaucracies: An Economic and Experiential Analysis*, 101 NORTHWESTERN L. REV. 861 (2007).

*The U.S. Federal Trade Commission and Competition Advocacy: Lessons for Latin American Competition Policy* (with James C. Cooper), in LATIN AMERICAN ANTITRUST DEVELOPMENTS (D. Daniel Sokol ed.) (2007).

~~*Group Selection, in* INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL SCIENCES, 2ND ED. (2007).~~

*Institutional Review Boards and Academic Bureaucracies*, 101 NORTHWESTERN L. REV. 861 (2007).

*Is Forum-Shopping Corrupting America's Bankruptcy Courts?* 94 GEORGETOWN L. J. 1141 (2006) (Review essay of Lynn M. LoPucki, *Courting Failure: How Competition for Big Cases is Corrupting the Bankruptcy Courts*).

*Institutions, Incentives, and Consumer Bankruptcy Reform*, 62 WASHINGTON & LEE L. REV. 1071 (2005).

*An Economic Analysis of the Consumer Bankruptcy Crisis*, 99 NORTHWESTERN L. REV. 1463 (2005).

*Wine, Commerce, and the Constitution* (with Asheesh Agarwal), 1 NYU J. LAW & LIBERTY 609 (2005).

*The Original Meaning of the 21st Amendment* (with Asheesh Agarwal), 8 GREEN BAG 2d 135 (2005).

*Wine Wars: Uncorking E-Commerce?* (with Asheesh Agarwal and Jerry Ellig, 27(4) REGULATION 10 (Winter 2004-2005).

*Obesity and Advertising Policy* (with Debra Holt and Maureen Ohlhausen), 12 GEORGE MASON L. REV. 979 (2004) (Symposium on Obesity, Health Claims, and Advertising).

*The Theory and Practice of Competition Advocacy at the FTC* (with James Cooper and Paul Pautler), 72 ANTITRUST L. J. 1091 (2005) (Symposium on 90th Anniversary of FTC).

*The FTC and State Action: Evolving Views on the Proper Role of Government* (with John T. Delacourt), 72 ANTITRUST L.J. 1075 (2005) (Symposium on 90th Anniversary of FTC).

*The Bankruptcy Clause*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 112 (2005).

*The Coinage Clause*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 114 (2005).

*Senate Vacancies*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 415 (2005).

*Reconciling Group Selection and Methodological Individualism*, 7 ADVANCES IN AUSTRIAN ECONOMICS 267 (2004).

*The Past, Present, and Future of Bankruptcy Law in America*, 101 MICHIGAN L. REV. 2016 (2003).

*The Rise and Fall of Efficiency in the Common Law: A Supply-Side Analysis*, 97 NORTHWESTERN L. REV. 1551 (2003).

*The Rule of Law, Freedom, and Prosperity*, 10 SUPREME COURT ECONOMIC REVIEW 1 (2003), *reprinted and translated  El Estado De Derecho, La Libertad y La Prosperidad*, 4(2) APUNTES DE ECONOMIA Y POLITICA: ANALISIS ECONOMICO DE LAS DECISIONES PUBLICAS 2 (2005).

*Baptists?  The Political Economy of Environmental Interest Groups*, 53 CASE WESTERN RESERVE LAW REVIEW 315 (2002) (symposium on BJORN LOMBORG, THE SKEPTICAL ENVIRONMENTALIST: MEASURING THE REAL STATE OF THE WORLD (2001)).

*Competition Policy and Regulatory Reforms: Means and Ends*, *in* HOW SHOULD COMPETITION POLICY TRANSFORM ITSELF? DESIGNING THE NEW COMPETITION POLICY (2003).

*Corporate Law Practice*, *in* THE OXFORD COMPANION TO AMERICAN LAW (Kermit Hall ed.) (2002).

*Bankruptcy Law As Social Legislation*, 5 TEX. REV. L. & POLITICS 393 (2001).

*The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. REV. 1573 (2001).

*Evolutionary Psychology and the Social Sciences*, 13 *Humane Studies Review*, Issue 1 (Fall 2000) (On-Line Journal available at http://www.humanestudiesreview.org/index.html)

*With Apologies to Screwtape: A Response to Professor Alexander*, 9 J. BANKR. L. & PRACTICE 613 (2000).

Book Review Essay, BRUCE G. CARRUTHERS & TERENCE C. HALLIDAY, RESCUING BUSINESS: THE MAKING OF CORPORATE BANKRUPTCY LAW IN ENGLAND AND THE UNITED STATES, 16 BANKR. DEV. J. 361 (2000).

*The Economics of Credit Cards* 3 CHAPMAN L. REV.  79 (2000) (Selected to participate in Chapman Law School "Rising Stars in Bankruptcy" symposium).

*Talk is Cheap: The Existence Value Fallacy* (with Donald J. Boudreaux and Roger E. Meiners), 29 ENVIRONMENTAL LAW 765 (1999).

*Was Hayek Right about Group Selection After All?* 13 REV. OF AUSTRIAN ECON. 81 (2000).

*Industry and Environmental Lobbyists: Enemies or Allies? in* THE COMMON LAW AND THE ENVIRONMENT: RETHINKING THE STATUTORY BASIS FOR MODERN ENVIRONMENTAL LAW 185 (Roger E. Meiners and Andrew P. Morris eds. 2000).

*Finding the Constitution: An Economic Analysis of Tradition's Role in Constitutional Decision-Making* (with A.C. Pritchard) 77 N. C. L. REV. 409 (1999).

*Constitutions and Spontaneous Orders: A Response to McGinnis's "In Praise of Decentralized Traditions and their Preconditions"* (with A.C. Pritchard), 77 N. C. L. REV. 537 (1999).

*Environmental Externalities and Political Externalities: The Political Economy of Environmental Regulation and Reform*, 73 TULANE L. REV. 845 (1999).

*Rewrite the Bankruptcy Code, Not the Scriptures: Protecting a Debtor's Right to Tithe in Bankruptcy*, 1998 WISCONSIN L. REV. 1223 (1998).

*It's Time for Means Testing* (with Judge Edith H. Jones), 1999 BYU L. REV. 177 (1999).

*The Nature of the State and the State of Nature: A Comment on Grady and McGuire's "The Nature of Constitutions,"* 1 J. BIOECONOMICS 241 (1999) (The State and the Ethnic Group: The Bioeconomics of Economic Organizations).

*Mend It, Don't End It: The Case for Retaining the Disinterestedness Requirement for Debtor in Possession's Counsel*, 18 MISS. COL L. REV. 291 (1998) (Symposium on Bankruptcy Law).

*Of Bubbling Pots and Bankruptcy Conflicts: A Reply to Smith and Wolfram*, 18 MISS. COL L. REV. 399 (1998).

*Beyond the Shell and Husk of History: The History of the Seventeenth Amendment and Its Implications for Current Reform Proposals*, 45 CLEVELAND ST. L. REV. 165 (1997) (solicited article).

*Epstein & Polanyi on Simple Rules, Complex Systems, and Decentralization*, 9 CONST. POL. ECON. 143 (1998).

*A Unanimity-Reinforcing Model of Efficiency in the Common Law: An Institutional Comparison of Common Law and Legislative Solutions to Large-Number Externality Problems*, 46 CASE WESTERN RESERVE L. REV. 961 (1996).

*Senators and Special Interests: A Public Choice Analysis of the Seventeenth Amendment*, 73 OREGON L. REV. 1007 (1994).

*Federal Judicial Review of State Ballot Access Regulation: Escape from the Political Thicket*, 20 T. MARSHALL L. REV. 87 (1994).

*Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code*, 19 T. MARSHALL L. REV. 241 (1994).

*Foreword to Symposium on Bankruptcy Law*, 18 MISS. COL. L. REV. 281 (1998).

*The Bankruptcy Rules: 1994, in* 1995-96 ANNUAL SURVEY OF BANKRUPTCY LAW 1111 (William L. Norton, Jr. ed., 1995) (co-authored with Matthew W. Levin).

Book Review, ROBERT WRIGHT, NONZERO: THE LOGIC OF HUMAN DESTINY, 51 IDEAS ON LIBERTY 61 (2001).

Book Review, GREGORY S. ALEXANDER, COMMODITY AND PROPRIETY: COMPETING VISIONS OF PROPERTY IN AMERICAN LEGAL THOUGHT, 4 INDEPENDENT REV. 147 (1999).

Book Review, JEREMY SHEARMUR, BEYOND HAYEK, 11 CONST. POL. ECON. 205 (2000).

Book Review, BRUCE YANDLE, COMMON LAW AND COMMON SENSE FOR THE ENVIRONMENT, 9 CONST. POL. ECON. 349 (1998).

Book Review, CASS R. SUNSTEIN, LEGAL REASONING AND POLITICAL CONFLICT, 8 CONST. POL. ECON. 355 (1997).

Book Review, C.H. HOEBEKE, THE ROAD TO MASS DEMOCRACY: ORIGINAL INTENT AND THE SEVENTEENTH AMENDMENT, 1 INDEPENDENT REVIEW 439 (1996).

## WORKING PAPERS

*Wine Wars: The 21st Amendment and Discriminatory Bans to Direct Shipment of Wine*,
available in http://papers.ssrn.com/sol3/papers.cfm?abstract_id=604803.

*Why So Many Bankruptcies and What to Do About It: An Economic Analysis of
Consumer Bankruptcy Law and Bankruptcy Reform*, available at:
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=454121

## EXPERIENCE

CHAIR, CONSUMER FINANCIAL PROTECTION BUREAU TASKFORCE ON FEDERAL
CONSUMER FINANCIAL LAW, WASHINGTON, DC 2020-21
Chaired a federal taskforce that produced a 2 volume, 900 page comprehensive report on
the consumer financial protection system and recommendations for reforms.

ANTONIN SCALIA LAW SCHOOL, GEORGE MASON UNIVERSITY, ARLINGTON, VA 1998-
PRESENT.
Executive Director, Law and Economics Center, 2015-2017. George Mason University
Foundation Professor of Law, 2009-present; Professor of Law, 2002-2009; Associate
Professor, 2000-2002; Assistant Professor, 1998-2000. Editor, *Supreme Court Economic
Review*, 2006-present, 2002-2003. Senior Scholar, Mercatus Center; Senior Fellow, F.A.
Hayek Program for Advanced Study in Philosophy, Politics, and Economics.

SENIOR FELLOW, CATO INSTITUTE, WASHINGTON, DC (2018-PRESENT).

VANDERBILT UNIVERSITY LAW SCHOOL, NASHVILLE, TN 2007.
Visiting Professor of Law.

GEORGETOWN UNIVERSITY LAW CENTER, WASHINGTON, DC 2004-2005.
Visiting Professor of Law, August 2004-May 2005.

DIRECTOR, OFFICE OF POLICY PLANNING, FEDERAL TRADE COMMISSION,
WASHINGTON, DC MAY 2003-JULY 2004.
Director of Federal Trade Commission's policy office (SES Appointment). Responsible
for helping to conceive and execute policies and priorities of Commission on issues of
Consumer Protection, Competition, and Competition Advocacy.

BOSTON COLLEGE SCHOOL OF LAW, BOSTON, MA 2002.
Visiting Professor.

MISSISSIPPI COLLEGE SCHOOL OF LAW, JACKSON, MISSISSIPPI, 1996-1998.
Assistant Professor of Law.

ALSTON & BIRD, ATLANTA, GEORGIA, 1994-1996.
Representations included SportsTown, Inc., Chapter 11 Debtor in Possession; Sonic
Communications, Inc., Chapter 11 Operating and Chapter 7 Trustee; Krystal Corp.,

Unsecured Creditors Committee; and a variety of secured and unsecured creditors in federal bankruptcy and state collection proceedings.

**LAW CLERK TO HON. JUDGE JERRY E. SMITH, UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT, HOUSTON, TEXAS, 1993-1994.**

**SUMMER LAW CLERK FOR HON. JUDGE ALEX KOZINSKI, UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT, PASADENA, CALIFORNIA, 1991.**

## HONORS AND AWARDS

Chair, Section on Law & Economics, Association of American Law Schools (2019).

Winner (with Edward Stringham), 2012 Society for Development of Austrian Economics Prize for Best Article in Austrian Economics.

Invited Lecture, Dean Lindsey Cowen Lecture in Business Law and Regulation Presented by the Center for Business Law and Regulation at Case Western Reserve University School of Law (March 3, 2011).

George Mason Foundation Professor of Law (2009-present).

Institute for Humane Studies Charles G. Koch Outstanding IHS Alum Award (2009).

Searle Fellow, George Mason University (Fall 2008).

Senior Fellow, Goldwater Institute (2008-2015).

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow and the Arch W. Shaw National Fellow at the Hoover Institution on War, Revolution and Peace (Fall 2008).

Senior Scholar, Mercatus Center at George Mason University (2005-present).

Senior Fellow, James M. Buchanan Center for the Study of Political Economy (2005-present).

Honorable Mention American College of Consumer Financial Services Lawyers 2006 writing competition for *An Economic Analysis of the Consumer Bankruptcy Crisis*, 99 NORTHWESTERN L. REV. 1463 (2005).

Recipient of 2001 "Win Whittaker Award for Student Development" as Professor of the Year at George Mason University School of Law.

Recipient of grant from The John Templeton Foundation Freedom Project to teach a course on "The Rule of Law, Freedom, and Prosperity." (Co-taught with Peter Boettke, Department of Economics, George Mason University). Fall 2001.

Recipient of grant from The John Templeton Foundation Freedom Project to teach a course on "The Rule of Law and the Legal Foundations of a Free Society." (Co-taught with Peter Boettke, Department of Economics, George Mason University). Fall 1999.

## TEACHING INTERESTS

Bankruptcy, Contracts, Secured Transactions, Business Associations, Mergers and Acquisitions, Corporate Finance, Commercial Law, Electronic Commerce, Payment Systems, Consumer Law, Law & Economics, Public Choice & The Law, Evolutionary Analysis of Law, Law & Behavioral Economics. *Currently Teaching (2002-03):* Bankruptcy, Contracts, Law & Behavioral Economics.

## RESEARCH INTERESTS

Bankruptcy, Contracts, Law and Economics, Evolutionary Analysis of Law, Law & Behavioral Economics, Consumer Law, Environmental Law and Economics, Public Choice, Constitutional Economics, Business Associations, Electronic Commerce.

## LAW SCHOOL AND UNIVERSITY SERVICE

Member of Dean Search Committee (2014-2015).
Editor, *Supreme Court Economic Review* Volume 1 (2001-2002), Volume 17-23 (2011-2017).
Member of Dean Retention Committee (Spring 2001).
Member of Faculty Appointments Committee (1999-2002, 2004-current); Clerkship Committee (2000-02, 2005-current).
Faculty Advisor, St. Thomas More Catholic Law Students Society (1999-2007).
Member of several dissertation committees for Economics Department PhD Candidates.

## EDUCATION

### University of Virginia School of Law
J.D., 1993
Executive Editor, Virginia Tax Review.
John M. Olin Scholar in Law and Economics.

### Clemson University
M.A. Economics, 1990.
H.W. Close Fellow in College of Commerce and Industry.
Only Student Member of Clemson Law and Economics Workshop.
Training in Statistics, Econometrics, and Computer Analysis.

### Dartmouth College
A.B. cum Laude with High Honors in Government Major, 1988.
Rufus Choate Scholar.
Three Citations for Exceptional Class Performance.

## CONGRESSIONAL TESTIMONY

Testimony before the Senate Committee on Banking, Housing and Urban Affairs, "Assessing the Effects of Consumer Credit Regulations" (Apr. 5, 2016).

Testimony before the House Committee on Financial Services, "The Dodd-Frank Act Five Years Later: Are We Freer?" (Sept. 17, 2015).

Testimony before the House Committee on Financial Services, "The Dodd-Frank Act Five Years Later: Are We More Stable?" (July 9, 2015).

Testimony before the House Committee on Oversight and Government Relations, Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs, "The Administration's Auto Bailouts and the Delphi Pension Decisions: Who Picked the Winners and Losers?" (July 10, 2012).

Testimony before the House Committee on Oversight and Government Relations, Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs, "Who's Watching the Watchmen?" (May 24, 2011).

Testimony before United States House of Representatives, Committee on Financial Services and Committee on Small Business, "The Condition of Small Business and Commercial Real Estate Lending in Local Markets," (Feb. 26, 2010).

Testimony before United States House of Representatives, Committee on Financial Services, "Banking Industry Perspectives on the Obama Administration's Financial Regulatory Reform Proposals" (July 15, 2009).

Testimony before United States House of Representatives, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, "Circuit City Unplugged: Why Did Chapter 11 Fail to Save 34,000 Jobs?" (March 11, 2009).

Testimony before the United State Senate Committee on Banking, Housing, and Urban Affairs, "Modernizing Consumer Protection in the financial Regulatory System: Strengthening Credit Card Protections" (February 12, 2009).

Testimony before the United States House of Representatives, Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, "Credit Card Practices: Current Consumer and Regulatory Issues" (April 26, 2007).

Testimony before the United States House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Hearing on Working Families in Financial Crisis: Medical Debt and Bankruptcy" (July 17, 2007).

Testimony before United States Senate, Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts, "Oversight of the Implementation of the Bankruptcy Abuse Prevention and Consumer Protection Act" (December 5, 2006).

Testimony before United States Senate, Committee on the Judiciary, "Bankruptcy Reform" (February 10, 2005).

Testimony before United States House of Representatives, Committee on Commerce, Trade, and Consumer Protection, "E-Commerce: The Case of Online Wine Sales and Direct Shipment" (October 30, 2003).

Testimony before Federal Judicial Conference Committee on Bankruptcy Rules, "Proposed Amendments to the Bankruptcy Rules" (January 26, 2001).

Testimony before United States House of Representatives, Committee on Government Reform, Subcommittee on Government Management, Information, and Technology, on "Transitioning to a New Administration: Can the Next President Be Ready?" (December 4, 2000).

Testimony before United States House of Representatives, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law on "Perspectives on Consumer Bankruptcy and the Bankruptcy Reform Act of 1999" (March 17, 1999).

Testimony before Joint Hearing of the United States Senate, Committee on the Judiciary, Judiciary Subcommittee on Administrative Oversight and the Courts and House of Representatives, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law on "The Bankruptcy Reform Act of 1999" (March 11, 1999).

Testimony before United States Senate, Committee on the Judiciary, Judiciary Subcommittee on Administrative Oversight and the Courts on " Bankruptcy Issues in Review: The Bankruptcy Code's Effect on Religious Freedom and A Review of the Need for Additional Bankruptcy Judgeships" (September 22, 1997).

## PROFESSIONAL ACTIVITIES

Consumer Representative, Debt Buyers Association Certification Council (2013-2015).

Board of Directors, Competitive Enterprise Institute (2013-2016; 2019-present), Chairman (2014-2016).

Senior Fellow, F.A. Hayek Program on Politics, Philosophy, and Economics (2012-present).

Board of Trustees, Center for Excellence in Higher Education (2010-present).

Board of Trustees, Yorktown University (2009-2016).

Board of Trustees, Institute for Humane Studies (2009-present).

Editor, *Supreme Court Economic Review* (2001-2003, 2006-present).

Board of Directors (2007-2015) and Advisory Council (2006-2015), Financial Services Research Program.

Board of Directors (2008-present) and Chair of Academic Advisory Council (2000-present), The Bill of Rights Institute.

Senior Fellow, Goldwater Institute (2007-2012).

Board of Trustees, Foundation for Research on Economics and the Environment (2009-present).

Member, United States Department of Justice Study Group on "Identifying Fraud, Abuse and Errors in America's Bankruptcy System" (2006-2007).

Alumni Trustee, Dartmouth College Board of Trustees (2005-2009).

Chair, Academic Advisory Panel, McCormick-Tribune Foundation Freedom Museum, Chicago, Illinois (August 2004-present).

Advisory Board, *American Bankruptcy Institute Law Review* (2003-present).

Chair, Academic Advisory Panel, "We the People in IMAX," IMAX Film with accompanying educational material.

Referee, *American Political Science Review; Contemporary Economic Policy; Review of Austrian Economics; Journal of Institutional and Theoretical Economics; Philosophy, Politics, and Economics; Journal of Bioeconomics; Public Choice; Supreme Court Economic Review* (2000-present).

Research Fellow, International Center for Economic Research (ICER), Turin, Italy (May-June, 2002).

Advisory Council, Centro para el Analisis de law Decisiones Publicas, Universidad de Francisco Marroquin, Guatemala City, Guatemala (2000-c.2008).

Consejo Consultivo of the Centro de Opcion Publica, Universidad de Francisco Marroquin, Guatemala (Academic Advisory Council of Public Choice Center at University of Francisco Marroquin in Guatemala) (2000-c.2008).

Senior Research Fellow, Program on Markets and Institutions, James Buchanan Center for Political Economy at George Mason University (2001-2012).

Contributing Editor, NORTON BANKRUPTCY TREATISE Chapter 51, Property of the Estate (1997-present).

Co-Chair, Bankruptcy Subcommittee, Federalist Society Financial Services and E-Commerce Practice Group (1999-present).

Co-Authored several proposals and position papers for the National Bankruptcy Review Commission (1997).

Member, American Bankruptcy Institute (1999-present).

**SELECTED MEDIA**

**TELEVISION**

"The Larry Parks Show" (June 7, 2012) discussing "The Rule of Law."

Fox Business, Freedom Watch with Andrew Napolitano (January 13, 2012) discussing "Food Advertising Regulation."

Fox Business, "The Willis Report" (Oct. 5, 2011) discussing "The Dick Durbin Bank Fees."

Fox Business, "The Willis Report" (Jan. 4, 2011) discussing "Dodd-Frank and the Return of the Loan Shark."

Fox News, John Stosell's "Top 10 Politicians' Promises Gone Wrong" (Dec. 17, 2010).

NBC Nightly News (Oct. 17, 2010) discussing public employee pensions.

ABC World News Tonight (June 3, 2009) discussing General Motors bankruptcy.

Fox Business, "Neil Caputo Show" (May 14, 2009) to discuss "Chrysler and the Rule of Law."

Fox News, "Fox and Friends" (December 19, 2008) discussing reorganization of automotive industry.

PBS, "The Newshour with Jim Lehrer" (October 17, 2005) discussing bankruptcy reform legislation.

CNN, "Lou Dobbs Tonight" (March 2005) discussing bankruptcy reform legislation.

CNBC, (July 2002) discussing WorldCom Bankruptcy.

CNBC, "Business Center" (February 6, 2002) discussing Congressional Hearings on Enron matter.

CNBC, "Business Center" (February 1, 2002) discussing Enron bankruptcy.

ABC World News Tonight, "Bankruptcy Reform" (February 2001).

Bloomberg News, "Bankruptcy Reform" (February 2001).

CNNfn, "Bankruptcy Reform" (February 2001).

Bloomberg News (November 2000).

**RADIO**

The Bob Zadek Show, "Repeal the 17th Amendment?" (June 24, 2012), listen here.

WTOP Radio, "Obama Acts Alone in Picking Head of Consumer Protection Bureau" (Jan 4, 2011), listen here.

John Batchelor Show, "The Auto Bailouts and the Rule of Law"  (April 25, 2011), listen here.

"To The Point," NPR, "The Supreme Court and the Bankrupt: Is Debt the American Way?" (Jan. 14, 2011), listen here.

"On Point," NPR, "Pension Envy, Pension Crisis" (July 28, 2010) discussing public employee pensions, listen here.

Lou Dobbs Show to Discuss "Chrysler and the Rule of Law" (May 14, 2009).

Jerry Doyle Show to discuss "Chrysler and the Rule of Law" (May 13, 2009).

The Diane Rehm Show to discuss "Credit Card Holders' Bill of Rights" (May 5, 2009).

California Commerce (with John McCauley), "Regulation of Consumer Credit," listen here.

California Commerce (with John McCauley), "Modifying Mortgages in Bankruptcy," listen here.

Econtalk (with Russ Roberts), "Zywicki on Debt and Bankruptcy," Podcast, listen here.

The Exchange, New Hampshire Public Radio, "Bankruptcy Law Reform," listen here.

American Radioworks Documentary, "Bankrupt: Maxed Out in America," listen here.

Appearance on "The Conversation" to discuss "New Consumer Bankruptcy Laws," KUOW Radio Seattle (Sept. 20, 2005), Audio available here.

Regular Commentator on "The Laura Ingraham Show"

Appearance on "The Connection," National Public Radio, to discuss Bankruptcy Reform (March 2002).

Appearance on NPR "The Diane Rehm Show" to discuss Bankruptcy Reform (May 25, 2000).

Appearance on CNN "Burden of Proof" to discuss AOL-Time Warner merger (March 2000).

Appearance on PBS "The Newshour with Jim Lehrer" to discuss bankruptcy reform (June 14, 1999).

**PRINT**

*The CFPB Could Be a Force For Good*, WALL ST. J. (Feb. 19, 2018).

*Durbin's Debit-Card Price Controls Hit the Poor Hardest* (with Julian Morris), WALL ST. J. (May 1, 2017).

*The Constitution Says Nothing About Behavioral Economics* (with Geoffrey A. Manne), WALL ST. J. (Man. 9, 2017).

*Credit is a Powerful Tool for American Families* (with Thomas A. Durkin), WASHINGTON POST (April 17, 2015).

*Overdraft Protection Rules Could Hurt Consumers More Than They Help* (with G. Michael Flores), AMERICAN BANKER (November 24, 2014).

*A Nobel Economist's Caution About Government: Friedrich Hayek Warned that Intervening can Make Things Worse. ObamaCare and Dodd-Frank, Anyone?* (with Donald J. Boudreaux), WALL STREET JOURNAL, page A15 (Oct. 13, 2014).

*The new EU price controls that will hold back a cashless future--and hit the poor* (with Geoffrey Manne and Julian Morris), CITY A.M. (London, England) (June 9, 2014).

*If you want to whiten the economy, payments should be made electronically*, ZIARUL FINANCIAR (Bucharest, Romania) (May 13, 2014).

*America's Taxpayers Lost Big in UAW Bailout* (with James Sherk), DETROIT NEWS (June 26, 2012).

*Obama's United Auto Workers Bailout* (with James Sherk), WALL STREET JOURNAL, page A19 (June 13, 2012).

*Spongebob Squarepants' Last Stand*, WALL STREET JOURNAL, page A11 (April 13, 2012).

*Set Interac Free: Burdensome Federal Regulations Discourage Innovation*, NATIONAL POST (Dec. 19, 2011).

*The Dick Durbin Bank Fees*, WALL STREET JOURNAL, page A15 (Sept. 30, 2011).

*Lender Punishment Mustn't Reward Defaulters: Forced Principal Reduction is the Wrong Solution to the Foreclosure Fiasco*, WASHINGTON TIMES, p. B3 (June 9, 2011).

*Bureau of Consumer Protection Must Put Consumers First*, WASHINGTON TIMES, page B3 (May 6, 2011).

*Roar of the Lion Father: Parenting for Creativity Beats Parenting for Performance*, WASHINGTON TIMES, page B1 (Jan. 25, 2011).

*Anna Nicole Smith Case Offers Court Opportunity to Limit Forum-Shopping in Bankruptcy Cases*, NATIONAL LAW JOURNAL (Jan. 11, 2011).

*Dodd-Frank and the Return of the Loan Shark*, WALL STREET JOURNAL, page A17 (Jan. 4, 2011).

*Repeal the Seventeenth Amendment*, NATIONAL REVIEW 20 (Nov. 15, 2010).

*The Next Hot Ticket in Financial Reform* (with John Morrall and Richard Williams), REUTERS (Oct. 8, 2010).

*In Elizabeth Warren We Trust?*, WALL STREET JOURNAL, page A25 (Sept. 30, 2010).

*How Public Employee Pensions are Too Rich for New York's--and America's--Blood*, NEW YORK DAILY NEWS (Aug. 8, 2010).

*Durbin's Antitrust Fantasies: Flawed Economics Behind Democrats Price Control Plan* (with Josh Wright), WASHINGTON TIMES, page B4 (June 17, 2010).

*Why Aren't Banks Lending? Because Bureaucrats and Politicians Won't Let Them*, WASHINGTON TIMES, page B1 (June 10, 2010).

*Durbin Regulations are Aimed at Your Wallet: They'll Cost us **All** Money and Convenience*, WASHINGTON TIMES, page B1 (June 3, 2010).

*Stripper Searches for Loot Loophole*, WASHINGTON TIMES, page B3 (Feb. 26, 2010).

*Complex Loans Didn't Cause the Crisis*, WALL STREET JOURNAL, page A18 (Feb. 18, 2010).

*Will Congress Take Another Swipe at Credit Cards?*, WALL STREET JOURNAL, page A17 (Jan. 5, 2010).

*America's Debt Paranoia*, 59(8) THE FREEMAN (October 2009).

*Check that Checkbook: A Guide to Smarter Alumni Giving*, NATIONAL REVIEW, page A43 (Oct. 5, 2009),

*Let's Treat Borrowers Like Adults: The Problems with a Financial Products Safety Panel*, WALL STREET JOURNAL, page A17 (July 8, 2009),

*Chrysler and the Rule of Law*, WALL STREET JOURNAL, page A19 (May 13, 2009).

*Low Rates Led to ARMs*, WALL STREET JOURNAL, page A18, (March 26, 2009).

*Bankruptcy is the Perfect Remedy for Detroit*, WALL STREET JOURNAL, page A21 (December 16, 2008).

*The Two-Income Tax Trap*, WALL STREET JOURNAL (August 2007).

*Junk Social Science Index* (with Gail Heriot), WASHINGTON TIMES, page A16 (July 26, 2007), *available* here.

*A Great Mind?  Miers Might Vote Right, But What the Court Truly Needs Is Intellectual Leadership*, LEGAL TIMES (October 10, 2005).

*Reforming Bankruptcy Laws: Changes Will Help Everyone*, SAN DIEGO UNION-TRIBUNE (March 17, 2005).

Op-Ed, "Deadbeats Cost All of Us Dearly," USA TODAY, page 17A (June 22, 2000).

I have also been quoted regularly in major media outlets on issues of bankruptcy law and consumer credit, including *Forbes, Fortune, Business Week, The New York Times, The Wall Street Journal, Washington Post, Washington Times, Chronicle of Higher Education, Boston Globe, Christian Science Monitor, Houston Chronicle, Dallas Morning News, Toronto Star,* and many other leading newspapers and magazines. Quoted in "Washington Whispers," *U.S. News & World Report* (Aug. 5, 2002).  I have also been quoted in several foreign publications, including the BBC (Britain), the *Daily Yomiuri* (Japan), and *RP Online* (Germany).

I have been profiled in *The Daily Deal* for my views on Bankruptcy Reform and other bankruptcy-related issues, as well as a recurrent commentator for *The Daily Deal.  See* http://www.thedeal.com/NASApp/cs/ContentServer?pagename=FutureTense/Apps/Xcele rate/Render&c=TDDArticle&cid=TDD6A64S8MC

**INTERNET**

Member of the "Volokh Conspiracy," www.volokh.com

*From* Kelo *With Love: Revisiting* Kelo's *Flawed Economics and Vacuous Constitutionalism*, LIBERTY FORUM (Nov. 4, 2012), *available* here.

*The Banality of Bailouts, Special-Interests, and Political Corruption*, LIBERTY LAW (Oct. 29, 2012), *available* here.

*The Revenge of Richard Nixon: The Consumer Financial Protection Bureau Spreads Its Tentacles*, LIBERTY LAW (Oct. 20, 2012), *available* here.

*The Rule of Law and the Auto Bailouts: A Conversation with Todd G Zywicki*, LIBERTY LAW TALK PODCAST (June 3, 2012), *available* here.

*Milton Friedman and Friedrich Hayek: Fifty Years Later*, LIBERTY LAW (May 4, 2012), *available* here.

*Upholding the Rule of Law, In Season and Out of Season*, LIBERTY LAW (Apr. 20, 2012), *available* here.

*The Robo-Signing Settlement: Seeds of Recovery or Chaos?*, FORBES.COM (Feb. 20, 2012), *available* <u>here</u>.

*It's Time to Finalize the Robo-Signing Settlement*, FORBES.COM (OCT. 17, 2011), *available* <u>here</u>.

*The Truth About the Auto Bailouts*, REAL CLEAR POLITICS (July 13, 2011), *available* <u>here</u>.

*Durbin's Innovation Killer: The Durbin Amendment would Raise Costs for Consumers, Increase Fraud, and Kill Innovation*, THE AMERICAN (June 11, 2011), *available* <u>here</u>.

*Deutsche Bank a Scapegoat for Bad Housing Policy*, FORBES.COM (May 11, 2011), *available* <u>here</u>.

Reason.tv, "The Next Great Leap Backwards for Consumer 'Rights'" (August 2009), *available* <u>here</u>.

*Obama's Ailing Popularity*, FORBES.COM (August 21, 2009), *available* <u>here</u>.

*My Favorite President: Calvin Coolidge*, NATIONAL REVIEW ON-LINE (February 16, 2009), *available* <u>here</u>.

*Rebalancing the Bankruptcy Code*, JURIST, August 18, 2005, *available* <u>here</u>.

*Credit Worthy*, NATIONAL REVIEW ON-LINE (March 16, 2005), *available* <u>here</u>.

*Bankrupt Criticisms*, NATIONAL REVIEW ON-LINE (March 15, 2005), *available* <u>here</u>.

## EXPERT TESTIMONY

*Hawkins v. First Tennessee Bank*, Shelby County Circuit Court, Tennessee, 13th Judicial District, Case No. CT-004085-11, Div. VII (2011).

*Consumer Financial Protection Bureau v. CashCall, Inc., et al.*, United States District Court for the Central District of California, Case No. 2:15-cv-07522-JFW (RAOx) (2015).

*In re: HSBC USA, N.A., Debit Card Overdraft Fee Litigation*, Civil Action No. 2:13-MD-02451 (2013).

*James v. National Financial*, Delaware Court of Chancery, C.A. No. 8931-VCL (2014).

*Morgan Drexen, Inc. and Kimberly A. Pisinski v. Consumer Financial Protection Bureau*, United States District Court for the District of Columbia, Civil Action No. 13-01112 (CKK) (2013).

*Cox v. Community Loans of America*, United States District Court, Middle District of Georgia, Case No. 4:11-cv-177 (CDL) (2013)

*Hammer v. Sam's East, Inc.*, United States District Court, Western District of Missouri, Case No. Case No. 4:08-cv-00788-HFS (2012).

*Experian Information Solutions, Inc. v. Lifelock, Inc.*, United States District Court, Central District of California, Case No. SACV08-00165 AB (2009).

*Anthony V. Valaitis v. Third Federal Saving & Loan Association of Cleveland*, Court of Common Pleas, Lake County, OH, Case No. 07 CV 002329 (2008).

*Bhandari v. Nilsestuen, et al.*, Dane County, Wisconsin, Case No. 07-CV-2226 (2008).

*Charles Brown, et al. v. David Hovatter, et al.*, United States District Court for the District of Maryland, Case No. 1:06-CV-00524-RDB (2007).

*Smith v. PNC Mortgage Corp. of America (In re Smith)*, United States Bankruptcy Court, Southern District of Alabama, Southern Division, Case No. 98-11129, Adv. No. 99-1138 (2002).

*Rocky Dwayne Sheffield v. Homeside Lending, Inc. (In re Sheffield)*, United States Bankruptcy Court for the Southern District of Alabama, Southern Division, Case No. 97-10511-MAM (2000).