**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **STATE OF GEORGIA** | **Case Number:** |
| v. | 1:23-cv-03720-SCJ |
| **DAVID J. SHAFER** | |
| **Defendant.** | |

**REPLY TO STATE'S OPPOSITION TO DAVID J. SHAFER'S NOTICE OF REMOVAL AND REQUST FOR HABEAS OR EQUITABLE RELIEF**

Section 1442 removal is to be construed broadly and from the perspective of the removing party. In its Opposition ("State Resp.") to Mr. Shafer's Notice of Removal and Request for Habeas or Equitable Relief ("Notice"), the State demands that this Court ignore the plain language of the Constitution and the Electoral Count Act ("ECA") to deny Mr. Shafer the federal forum to which he is entitled under Section 1442. In doing so, the State invites the Court to evaluate the Shafer Notice under the State's theory of the case instead of Mr. Shafer's and to adjudicate the merits of Mr. Shafer's federal defenses at the removal stage, both of which are improper. When this Court assesses Mr. Shafer's removal notice under the applicable law and facts and considers the broad sweep of Section 1442 removal, it is clear that the State's requested remand should be denied.

In addition or in the alternative, Mr. Shafer asks this Court for immediate federal jurisdiction under either pretrial habeas jurisdiction or through equitable relief. This

1

requested jurisdictional relief is equally necessary and timely, and it should be considered in conjunction with and/or as an alternative to Section 1442 removal jurisdiction.

### I.     ARGUMENT AND CITATION OF AUTHORITY

**A.     Under the ECA, Shafer Was Not A "Fake" Elector.**

*1. The State's "Fake Elector" Theory Is Foreclosed By the ECA.*

The State's foundational argument is that the contingent Republican Presidential Elector nominees were "fake electors" who were "impersonating" the "real" Presidential Electors, s*ee* State Resp.. at 3-5, 9-11, 15, 18-19, 23-24, and that they, therefore, are not federal officers entitled to removal under Section 1442. *Id.* at 8-12.[1] The State arrives at this position by declaring that the Governor's certification of the election results on Nov, 20, 2021 and Dec. 7, 2021 conclusively and finally determined, as a matter of law, who Georgia's legitimate Presidential Electors were (i.e., the Democrat electors). *Id.* at 2-3, 11.   Ergo, all actions taken by the Republican presidential electors after these certifications are fake, false, or fraudulent.  Problematically, however, the State's foundational position is flatly foreclosed by the unambiguous language of the ECA.

---

[1] Remarkably, the State boldly contends that "Defendant directs this Court to no relevant legal authority that would substantiate the argument that the losing candidate's nominees have any recognized status after the counting is complete and the results are certified." *See* State Resp. at 4.  In his Notice, however, Shafer explained in *painstaking detail* how the plain language of the ECA does *just that*.  *See* Notice at 10-14, 31-50.

2

Under the ECA, a State only has *one way* to conclusively decide for Congress who the State's legitimate Presidential Electors are – and it is *not* the Governor's certification. Instead, a *state court* must *issue a final ruling on or before the safe harbor date* (i.e., six days before the Presidential Electors are required to meet and ballot). *See* 3 U.S.C. §§ 5, 15; *see also* Notice at 40-50. When the State fails to meet the ECA's safe harbor (as Georgia failed to do in 2020), *the State loses its sole opportunity to determine for Congress who the State's valid Presidential Electors are*. *Id*. At that point, the sole and exclusive venue and authority to decide disputes about a State's Presidential Electors is *Congress*, and Congress is *not bound* by the State Governor's certification.[2] *Id.*

Because the Governor's certification has *no legal or binding effect on Congress* in its adjudication of ballots and purported ballots, it could not and did not settle the dispute, as the State claims. As a result, *neither slate of Presidential Electors* was presumptively, much less conclusively, valid as of December 14, 2020. Indeed, under these facts, *both slates* of Presidential Electors were *contingent as a matter of law* until Congress made its decision on January 6, 2021. *Id*.[3]

---

[2] The Governor's certification becomes relevant, if at all, at the *end* of Congress' adjudication of multiple ballots: if both houses cannot agree which is the correct one, Congress defaults in the end to the one certified by the Governor. *See* 3 U.S.C. § 15

[3] In resolving such disputes, the ECA anticipates and permits submission of *both ballots and purported ballots* for it to consider. *See* 3 U.S.C. § 15. The State has no authority to obstruct Congress in receiving and adjudicating these ballots and purported ballots.

By falsely claiming that the Governor's certification is legally conclusive as to the State's presidential electors, the State seeks to rewrite the ECA and to usurp from Congress its sole authority to decide presidential elector disputes after a State fails to do so by the safe harbor through final judicial decision. Simply put, there are no such things as "fake electors" as a matter of law, and the fictional house of cards that the State has built around this legally invalid foundation collapses.

2. *The State's Attempt to Distinguish the Hawaii Precedent Fails.*

Instead of embracing the virtually identical 1960 presidential election in Hawaii, the State struggles (but fails) to distinguish it. The State first asks that this precedent simply be ignored because it happened 60 years ago, and Hawaii is a different jurisdiction than Georgia. *See* State Resp. at 13. But valid precedent is valid precedent. And because the actions of the presidential electors in balloting is governed entirely by *federal* law (the ECA), not state law, any differences between Georgia and Hawaii law are irrelevant.[4]

The State next argues that the Hawaii precedent is different because there, the recount ultimately went for Kennedy, the court declared Kennedy the winner, and the Governor re-certified the vote for Kennedy. *See* State Resp. at 14. But *all of these events*

---

[4] The State also claims that the fact that recounts were ongoing in Hawaii but not in Georgia distinguishes the two. In his expert declaration, Professor Zywicki has already explained the absurdity of this attempted distinction. *See* Notice, Ex. D at ¶ 28.

happened in Hawaii *after* the contingent presidential electors had *already met and cast their alternative ballots* and sent them to Congress. At the time that the contingent Kennedy electors executed their ballots, they could not have known whether these events *would ever* occur. As such, these attempted distinctions are just silly.

> *3. The Assertion That There Was No Way For The Georgia Election Results to Be "Flipped" Is Contrary to Georgia Law, the ECA, and the Hawaii Precedent.*

The State claims that "there was no legal mechanism for a slate of electors to be "flipped" to the losing candidate. *See* State Resp. at 7, n. 1 and 11. Citing O.C.G.A. § 21-2-527(d), the State claims that the "only lawful remedy that could be imposed by a court is a new election, not the 'flipping' of one slate of electors for another." *Id.* at 7 n.1. But subsection (a) of that very statute makes clear that this assertion is incorrect:

> After hearing the allegations and evidence in the contest, **the court shall declare** as nominated, **elected**, or as eligible to compete in a run-off primary or election **that qualified candidate who received the requisite number of votes and shall pronounce judgment accordingly**; and the clerk of the superior court shall certify such determination to the proper authority.

O.C.G.A. § 21-2-527(a) (emphasis added). Additionally, while neither the Governor's certification nor any post-safe harbor day state judicial decision is *binding* on Congress under the ECA, Congress can *consider* them in deciding between competing ballots on January 6, and Congress itself could "flip" the presidential elector results. Indeed, this is *precisely* what Congress did in 1960 with the Hawaii presidential electors.

5

### B. When Presidential Electors Meet and Ballot, They Are Federal Officers For Purposes of Section 1442.

The State's argument that Presidential Electors are state officers is incorrect, and it fails to account for the hybrid nature of Presidential Elector authority under the Constitution. As explained in detail in the Shafer Notice, Presidential Electors are created by the Constitution, elected by the States, but serve a federal function when balloting for President.[5] *See* Notice at 17-18, 36, 40-50. State legislatures are given authority under the Constitution to set the *manner and qualifications* of Presidential Electors' *appointment*, but the State's authority *stops there*. *Id.* at 40-46. After Presidential Electors are appointed in accord with state law (which, in Georgia, happens in March before a presidential election), they exercise *federal* authority in meeting and balloting for President. *See* Notice at 44-45 (quoting *Burroughs,* 290 U.S. at 545 ("[P]residential electors . . . exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States.") and *Ray*, 343 U.S. at 224–25 ("Presidential electors exercise *a federal function* in *balloting for*

---

[5] The State contends that Mr. Shafer "does nothing to grapple with the State's unquestionable ability to determine which electors are authorized to submit votes." *See* State Resp. at 23. But Shafer's Notice examines that very issue in detail, *see* Notice at 40-50, and demonstrates conclusively that, under the Constitution and the ECA, the State *does **not** have the authority to determine "which electors are authorized to submit votes"* outside of a final judicial decision on or before the ECA's safe harbor day.

6

*President and Vice-President*[.]") (emphasis added)).  In *this federal* process, the State has *no prescribed role or authority*.  *Id.* at 40-50.

The language in the cases upon which the State relies (*Ray v. Blair, Chiafalo v. Washington*, and *In re Green*) is inapposite:  in each one, the Court was specifically addressing the State's *appointment power* for presidential electors (in which the State has a Constitutionally prescribed role), *not* the meeting and balloting of Presidential Electors pursuant to exclusive federal authority (in which the State has *no* Constitutionally prescribed role).  *See* Notice at 44-45 and FN 23.[6]

Thus, the Supreme Court's *dicta* in this materially distinct context of presidential elector *appointment* (in which States have a constitutionally granted role) has no application to or bearing on the question before this Court, which is whether Presidential Electors, when they meet and cast their ballots (a context in which States have *no* role) were federal officers for the broad purposes of Section 1442. Addressing Presidential Electors in *this federal* aspect of their hybrid roles, the Supreme Court has made plain that presidential electors "exercise federal functions under, and discharge duties in virtue

---

[6] The *Chiafalo* Cout did not state that presidential electors are state actors.  Instead, the Court affirmed the Washington Supreme Court's decision in which that court noted that "[t]he State *does not dispute that presidential electors perform a federal function when casting a vote in the Electoral College."  Matter of Guerra*, 193 Wash. 2d 380, 393 (2019) (emphasis added), *aff'd sub nom. Chiafalo v. Washington*, 140 S. Ct. 2316 (2020).

of authority conferred by, the Constitution of the United States." *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *Ray v. Blair*, 343 U.S. 214, 224-25 (1952) ("Presidential electors exercise *a federal function* in *balloting for President and Vice-President*[.]") (emphasis added)).

Because the Indictment charges the Presidential Electors for actions taken in their federal, not state, roles, they are federal officers for purposes of removal. But even if this Court were to determine that because of their hybrid nature, Presidential Electors are both state *and* federal officers, removal is nonetheless required. *See Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1322 (N.D. Ga. 2022) (removing case to federal court where removing party was both federal and state officer but acted in the scope of his federal duties).

### C.   At a Minimum, Shafer Satisfies the "Acting Under" Prong.

The State contends that Shafer was not "acting under" a federal official because he was acting under "candidate Trump" not "President Trump." *See* State Resp. at 16-18. But the President's duties and executive authority simply are not and cannot be artificially segregated in this manner. *Trump v. Mazars USA, LLP,* 140 S. Ct. 2019, 2034 (2020) ("[T]he President is the only person who alone composes a branch of government. As a result, there is not always a clear line between his personal and official affairs. 'The interest of the man' is often 'connected with the constitutional rights of the place.'.")

8

(quotations omitted1, at 349); *cf. Nixon v. Fitzgerald,* 457 U.S. 731, 756 (1982) (rejecting argument that President's official acts lose immunity if motivated by improper or personal purpose). Additionally, when President Trump's executive authority is evaluated, as it must be, based upon *his* theory of the case, his actions are at least *connected to* his official authority as the President, which is all that is required under Section 1442.[7]

Regardless, the State ignores that Mr. Shafer was also acting under a federal official by "*working hand-in-hand with the federal government* to *achieve a task that furthers an end of the federal government.*" *See* Notice at 18-20 (quoting *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1181 (7th Cir.2012)) (emphasis added).

### D. Shafer's Charges Are Directly Connected to The Performance of His Federal Duties as a Contingent Presidential Elector.

The State (again) argues that Mr. Shafer was impersonating a federal officer and had no federal duties. State Resp. at 18-21. As established above, the State's "fake elector" theory is affirmatively foreclosed by the ECA. And, of course, it is the removing party's theory of the case that is accepted for purposes of the removal analysis, not the

---

[7] President Trump has indicated that he will also file Notice of Removal. Mr. Shafer adopts and relies upon any arguments made in that Notice relevant to the scope of the President's executive power.

State's theory of the State. *See Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999) (federal courts credit the removing party's theory of the case for purposes of removal).

Mr. Shafer's theory is obviously *not* that he was a fake elector – instead, he was a legitimate contingent Presidential Elector acting pursuant to federal authority (the Constitution and ECA) to cast an alternate presidential ballot for Congress to consider if the judicial contest in Georgia were successful. A plain reading of the Indictment itself establishes that it is precisely this conduct for which Mr. Shafer was charged. *See* Notice, Ex. A, at pp. 14, 16, 21, 29, 32-33, 36-43, 57, 70, 77, 78-82. *Res ipsa loquitor.*

### E.   Mr. Shafer Has Articulated Several Plausible Federal Defenses.

In his Notice, Mr. Shafer articulated numerous plausible federal defenses in detail, including federal officer immunity, supremacy clause immunity, federal preemption, and Due Process and First Amendment defenses. *See* Notice at 22-30, 33-50. The State again argues that as a "fake elector," Shafer had no federal role, and, therefore, no federal defenses. As demonstrated, that position is legally unsustainable.

The State then attempts to discredit Mr. Shafer's federal defenses on the merits. *See* State Resp. at 22-24. But adjudication of the *merits* of Mr. Shafer's federal defenses based upon the State's theory of the case is improper in this context. "[R]equiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute, . . . so would demanding an airtight case on the merits in order to

show the required causal connection." *Acker*, 527 U.S. at 432 (citations omitted); *see also Heinze,* 637 F. Supp. 3d at 1324 (State's arguments on the merits of the removing party's federal defenses were "*irrelevant to whether the Defendant acted under color of federal authority for removal purposes*") (emphasis added) (citations omitted). Analyzing Shafer's federal defenses based upon his theory of the case, as the Court must, he has plainly articulated numerous plausible federal defenses.

## II. ALTERNATIVE BASES FOR IMMEDIATE FEDERAL JURISDICTION: PRETRIAL HABEAS AND INJUNCTIVE RELIEF.

### A. This Court Should Consider Mr. Shafer's Request for These Alternative Bases of Immediate Jurisdiction Now.

In addition to and as an alternative to Section 1442 removal, Mr. Shafer has requested that this Court assert immediate jurisdiction under its pretrial habeas and/or injunctive powers. *See* Notice at 30-50. There is no cause to delay the adjudication of these viable alternative bases for immediate federal jurisdiction here.

Here, Mr. Shafer's grounds for immediate federal jurisdiction would, if accepted, terminate this unconstitutional prosecution against him. Allowing those matters to be adjudicated immediately is paramount: fundamental fairness necessitates that Mr. Shafer's challenge to the State's authority and jurisdiction be resolved at the earliest possible time in this matter. If the State has no authority or jurisdiction to bring or

prosecute its charges in *any* court because of federal supremacy and preemption, it serves the interests of *all* parties to establish that fact now.[8]

### B. Pretrial Federal Habeas Jurisdiction Does Not Require Exhaustion of State Remedies.

Pre-trial federal habeas relief from State criminal indictments is available when the State "lacks jurisdiction, under the Supremacy Clause… to bring any criminal charges against the petitioner." *Braden v. 30th Jud. Cir. Ct. of Kentucky*, 410 U.S. 484, 508 (1973) (Rehnquist, J., dissenting) (citations omitted)**.** It is also available when the State attempts to criminalize actions that interfere with the authority and operations of the federal government. *See U.S. ex rel. Noia v. Fay*, 300 F.2d 345, 354-55 (2d Cir. 1962), *aff'd sub nom. Fay v. Noia*, 83 S. Ct. 822 (1963) (noting Supreme Court has upheld issuance of pre-trial federal writ in State prosecutions where the State court had "no jurisdiction to entertain an action so inseparably connected with the functioning of the National Government"); *see also* Notice at 30-33 and FN 18 (collecting cases).

---

[8] Decisions regarding federal removal under Section 1442 are immediately appealable under Section 1447(d). In *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542-43 (2021), the Supreme Court clarified that those appeals encompass the district court's full remand order. The Court noted that litigants often raise multiple grounds for removing to federal court and that permitting such broader review would serve efficiency. *Id.* at 1542.

Importantly, state exhaustion requirements in habeas *do not apply* when, like here, the State lacks authority or jurisdiction to bring any criminal charges against the petitioner or when the State attempts to criminalize actions that interfere with the authority and operations of the federal government. *See Wade v. Mayo*, 334 U.S. 672, 692–93 (1948) (noting that courts do not apply exhaustion requirements when habeas relief is sought to prevent state interference with the Federal Government) (citations omitted) (internal parentheticals omitted); *Sanderlin v. Smyth*, 138 F.2d 729, 731 (4th Cir. 1943) (habeas exhaustion rules have no application to a prisoner in custody for an act done or omitted pursuant to a law of the United States). In circumstances such as those in this case, then, "the courts of the United States have *frequently interposed by writs of habeas corpus and discharged prisoners* who were held in custody under state authority." *See People of State of New York v. Eno*, 155 U.S. 89, 94 (1894) (quotations omitted) (emphasis added).

**C. This Court Has Jurisdiction to Enter Equitable Relief, And *Younger* Abstention Does Not Apply.**

The State suggests that injunctive relief is unavailable here because of the Anti-Injunction Act and *Younger* abstention principles. *See* State Resp. at 25-26. But, like habeas exhaustion principles, those doctrines have no applicability here: *"[I]t is clear that the federal courts have both the jurisdiction and competence to enjoin*

*unconstitutional prosecutorial decisionmaking of **state** officials."* Smith v. Meese, 821 F.2d 1484, 1491 (11th Cir. 1987) (bold emphasis in the original).

In 2015, the Supreme Court reaffirmed its "long established rule" that *Younger* abstention does not apply to *claims that federal authority immunizes an individual*, like Mr. Shafer, *from state prosecution*: "[I]f an individual claims federal law immunizes him from state regulation, *the court may issue an injunction* upon finding the *state regulatory actions preempted*." *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) (citing *Ex parte Young,* 209 U.S. 123, 155–156 (1908) (emphasis added); *see also Meese*, 821 F.2d at 1491 ("In light of *United States v. McLeod,* approving a broad injunction against unconstitutional pattern of state prosecutions, and cases such as *Fitzgerald v. Peek* and *Wilson v. Thompson,* enjoining specific state prosecutions, *it is clear that the federal courts have both the jurisdiction and competence to enjoin unconstitutional prosecutorial decisionmaking of **state** officials."*) (bold emphasis in the original).

### D. The Presumption Against Preemption Does Not Apply.

The presumption against preemption that is sometimes invoked in Supremacy Clause cases does not apply in this context. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 13-14 (2013) ("We have never mentioned [the presumption against preemption] in our Election Clause cases [.]"). Even if the Court started with this

presumption, the plain language of the Constitution and applicable ECA provisions more than overcome it. *See* Notice at 33-40. This case is exactly the type of unlawful, federally preempted state prosecution in which federal courts have intervened pretrial, and this Court should do so here for these same reasons. *See* Shafer's Notice at 30-50.

Respectfully submitted, this 15th day of September, 2023.

| | |
|---|---|
| */s/ Craig A. Gillen* <br> Craig A. Gillen <br> Georgia Bar No. 294838 <br> Anthony C. Lake <br> Georgia Bar No. 431149 <br> GILLEN & LAKE LLC <br> 400 Galleria Parkway <br> Suite 1920 <br> Atlanta, Georgia 30339 <br> (404) 842-9700 <br> cgillen@gwllawfirm.com | */s/ Holly A. Pierson* <br> Holly A. Pierson <br> Georgia Bar No. 579655 <br> PIERSON LAW LLC <br> 2851 Piedmont Road NE <br> Suite 200 <br> Atlanta, Georgia 30305 <br> (404) 353-2316 <br> hpierson@piersonlawllc.com <br><br> *Counsel for David J. Shafer* |

## CERTIFICATE OF SERVICE
## AND COMPLIANCE WITH LOCAL RULE 5.1

The undersigned hereby certifies that on the date set forth below, a true and accurate copy of the foregoing, which has been prepared using 14-point Times New Roman font, was filed electronically with the clerk of the United States District Court for the Northern District of Georgia. Notice of this filing will be sent by operation of the Court's electronic filing system to all ECF-registered parties. Parties may access this filing through the Court's CM/ECF system.

| | |
|---|---|
| */s/ Craig A. Gillen* _____<br>Craig A. Gillen<br>Georgia Bar No. 294838<br>Anthony C. Lake<br>Georgia Bar No. 431149<br>GILLEN & LAKE LLC<br>400 Galleria Parkway<br>Suite 1920<br>Atlanta, Georgia 30339<br>(404) 842-9700<br>cgillen@gwllawfirm.com | */s/ Holly A. Pierson* _____<br>Holly A. Pierson<br>Georgia Bar No. 579655<br>PIERSON LAW LLC<br>2851 Piedmont Road NE<br>Suite 200<br>Atlanta, Georgia 30305<br>(404) 353-2316<br>hpierson@piersonlawllc.com<br><br>*Counsel for David J. Shafer* |