EXHIBIT 1

## <u>SUPPLEMENTAL EXPERT DECLARATION OF PROFESSOR TODD ZYWICKI</u>

1.

My name is Todd Zywicki.  This supplemental expert declaration incorporates and adds to my previous expert declaration that I executed on July 11, 2023, attached hereto as **Exhibit 1**.

2.

Under the Electoral Count Act ("ECA") as it existed at the time of the 2020 presidential election, Congress had delegated to the states only one way to decide for themselves in the first instance who their rightful presidential electors were in the event of a dispute.  3 U.S.C. §§ 5, 15.

3.

Specifically, Section 5 provided that if a state had set up an adjudicative process to resolve disputes about presidential electors, and that adjudicative body issued a final decision on the dispute on or before the ECA's safe harbor date, then that final judicial decision would be binding on Congress when it opened, adjudicated, and counted the presidential ballots on January 6.

4.

In Georgia, the state legislature long ago created such a process – a judicial challenge to the election results.  *See* O.C.G.A. § 21-2-521.  This

statute set forth the process by which a dispute about, among other things, the state's rightful presidential electors is to be resolved.

5.

On December 4, 2020, presidential elector nominee David Shafer invoked this judicial dispute resolution process by filing a lawsuit challenging the results of the presidential election in Georgia in Fulton County Superior Court. *See Trump et al. v. Raffensperger et al.*, Case No. 2020CV343255.

6.

A review of the docket in that case reveals that no final judicial decision was rendered in that case by the ECA's safe harbor date of December 8, 2020. *See* Shafer Notice of Removal and Request for Habeas and Injunctive Relief, Case No. 1:23-cv-03720-SCJ,ECF No. 1, Ex. E.

7.

Because the Fulton County Superior Court did not issue a final decision in the judicial contest by December 8, 2020 and it remained pending, the State of Georgia failed to satisfy the necessary requirements in Section 5 of the ECA. As a result, Georgia missed its one opportunity under the ECA to conclusively decide the presidential elector dispute for itself. 3 U.S.C. §§ 5, 15.

SUPPLEMENT ZYWICKI DECLARATION

8.

The certification of Georgia's vote by the Secretary of State and the Governor is not relevant to and has no legal weight or authority over the resolution of the presidential elector dispute at this point in Congress' adjudication of the presidential elector dispute (after the safe harbor date through Congress' adjudication on January 6). 3 U.S.C. §§ 5, 6, 15.[1]

9.

Section 6 of the ECA (as it existed in 2020) addressed the Governor's certification of the election and the presidential electors, and it required the Governor, as soon as practicable after a presidential election, to provide certificates of ascertainment to the presidential electors whose candidate is

---

[1] The argument that the Governor's certification of the State's vote has any role, much less a conclusive role, in deciding a dispute about a state's valid or rightful presidential electors is not only be incorrect as a matter of law, but also is unprecedented. I have not been able to find a single case, scholar, or commentator that has ever made that argument in the past. Under the 2020 ECA, when there is *no dispute* in Congress regarding *who the state's valid presidential electors are*, the Governor's certification of the vote does have some significance. Specifically, under Section 15 of the ECA as it existed in 2020, when a state sends a *single presidential elector ballot* to Congress and that single ballot is certified as the legitimate vote of the state by the Governor, then Congress may not reject that ballot *unless* both houses of Congress agree that such certified votes were not lawfully given. This provision, however, has no application when more than one slate of presidential elector ballots is submitted from a state and there is a dispute about which slate of a State's presidential electors are the valid ones, as there was in Georgia in 2020.

SUPPLEMENT ZYWICKI DECLARATION

the winner (or apparent winner, in the event that the results of the election are challenged) and to transmit those also to Congress.  3 U.S.C. § 6. Section 6 also clarifies, however, that the Governor's certificates of ascertainment do not settle any pending dispute about which slate of presidential ballots are the State's valid ones.  Unlike Section 5 of the ECA that explicitly states that a final judicial determination by the state on or before the safe harbor date is conclusive on Congress when it adjudicates and counts the ballots on January 6, 3 U.S.C. § 5, Section 6 addressing the Governor's certification contains no such language.  3 U.S.C. § 6.  Indeed, it specifically provides that if there is a state judicial contest to the election (and, therefore, to the rightful slate of presidential electors), and the court resolves that dispute after the initial certificates of ascertainment are issued, the Governor must transmit *that result* to Congress as well.  *Id.*

10.

And this makes sense.  At this point in the process under the ECA, where there is a challenge to the State's presidential electors, after a state has failed to meet the safe harbor requirements of Section 5 by not issuing a final judicial decision by or on the safe harbor date, Congress is the exclusive adjudicative body for that dispute.  And even though Congress is not bound by any later judicial decision *or* the Governor's certification,

Congress sought to ensure, through the provisions of the ECA, that it would have this potentially relevant evidence before it to consider in adjudicating that dispute, including the Governor's certification and any later judicial determination.

11.

The ECA does give the Governor's certification of the presidential electors a potentially binding role to play in Congress' adjudication of competing presidential elector slates, but that role comes only at the *very end* of Congress' process on January 6.  In particular, under Section 15, when Congress is adjudicating between two competing presidential ballots from a state on January 6, Congress can consider whatever it believes to be the best evidence of a state's lawful vote, including (but not limited to) any post-safe harbor judicial decision and a Governor's certification(s).  After going through that process, however, if the House and the Senate cannot agree about which of the competing presidential elector slates is the valid one, Congress agrees *at the end* to default to the presidential elector slate certified by the state's Governor. 3 U.S.C. § 15.  Prior to this default at the very end of Congress' process on January 6, however, Congress is in no way bound by the Governor's certification (or by any post-safe harbor date judicial decision).

SUPPLEMENT ZYWICKI DECLARATION

12.

In other words, the fact that a Governor has certified an election and/or presidential electors under Section 6 of the ECA cannot and does not settle a dispute about which slate of presidential electors are the valid ones for the state as a matter of law.  *See* 3 U.S.C. §§ 5, 6, 15.  Instead, when that dispute goes back to Congress because it was not resolved by a final judicial decision by the safe harbor date, the Governor's certification is evidence that Congress may consider, but is not bound by, when it is adjudicating that dispute.  *See* 3 U.S.C. §§ 5, 6, 15.  Congress is not required to defer to it unless and until, at the end of its process on January 6, the House and the Senate cannot otherwise agree on the rightful ballot from a state.  *See* 3 U.S.C. § 15.

13.

Applying these legal principles to the 2020 presidential election in Georgia, no final judicial decision was issued by Section 5 of the ECA's safe harbor date of December 8, 2020, at which time the dispute moved backed to Congress to adjudicate under Section 15 of the ECA.  *See* 3 U.S.C. §§ 5, 15.  The fact that the Governor fulfilled his obligations under Section 6 of the ECA to certify the apparent winner and apparent presidential electors

SUPPLEMENT ZYWICKI DECLARATION

before December 14 when the electors were required to meet and vote was evidence that Congress *could* consider in adjudicating between competing presidential electors slates, but Congress was *not bound* by the Governor's certification in its adjudication of the dispute.  *See* 3 U.S.C. §§ 5, 6, 15.  Had both the House and Senate agreed, for example, that the Republican slate of presidential electors were the valid ones from Georgia, then Congress was free to accept and count the ballots from the Republican presidential electors regardless of the fact that the Democrat presidential electors had been certified by the Governor.  *See* 3 U.S.C. § 15.  *Only if and when* the House and Senate could not agree about which presidential elector slate was the valid one from Georgia on January 6 *after* going through its adjudication process did the ECA require Congress, *in the end*, to default to the slate certified by the Governor.  3 U.S.C. § 15.

## 14.

As a matter of law, then, the Governor's certification of Georgia's vote and presidential electors in December 2020 had no authority to end and did not end the pending dispute regarding the presidential electors for Georgia.  After December 8, that dispute was Congress' alone to decide, and Congress could accept or reject that certification as it saw fit based upon what it considered to be the best evidence of the State's lawful vote.  *See* 3

U.S.C. § 15.   Because the dispute regarding the presidential electors in Georgia was fully vested in Congress as of at least December 9, the State of Georgia had no authority to interfere with or obstruct Congress' receipt of any information or evidence that it wanted to consider in adjudicating that dispute, including "all the *certificates and papers purporting to be certificates of the electoral votes*" that Congress has expressly stated in the ECA that it would receive and consider. *Id.*

15.

The significant amendments made to the ECA in 2022 drive home these points.  In 2022, Congress amended Section 5 of the ECA to diminish the role it had previously given the states' judicial processes to resolve disputes about presidential electors in the first instance by the safe harbor date.  In the new Section 5, Congress provides that the Governor of a state must certify the election and the presidential electors by the safe harbor date. *See* 2022 Amended ECA at § 5 (the 2022 ECA is attached hereto as **Exhibit 2**).   Under new Section 5, the Governor's certification is now binding on Congress unless a federal or state court issues judicial relief requiring a different slate of presidential electors to be certified as the valid electors before the date that the presidential electors are required to meet and cast their votes. *Id.*  In that case, the new court-ordered certificates to

SUPPLEMENT ZYWICKI DECLARATION

the presidential electors "shall replace and supersede any other certificate[,]"[2] *Id.*

### 16.

While Congress amended Section 5 of the ECA in 2022 to make the Governor's certification of the vote and the presidential electors legally material and, under most circumstances, binding on Congress, these amendments bring into sharp focus the lack of legal weight or conclusive authority that the Governor's certification held under the version of Section 5 the ECA in effect in 2020.

### 17.

Regarding the precedent from the Hawaii presidential election in 1960 discussed in my initial July 2023 Expert Declaration, attempts to distinguish it from the situation faced in Georgia in the 2020 presidential election based upon supposed differences between Hawaii law and Georgia law miss the most critical point.  Whether the actions of both sets of presidential electors in Hawaii in 1960 and Georgia in 2020 were legally

---

[2] Further truncating the States' roles in adjudicating presidential elector disputes, the 2022 Amended ECA provides that "[a]ny action brought by an aggrieved candidate for President or Vice President that arises under the Constitution or laws of the United States with respect to the issuance of the certification [of presidential electors]" shall be heard in the federal district court in the federal district where the State capitol is location.  *See* 2022 Amended ECA at § 5.

Supplement Zywicki Declaration

permissible or not turns solely on the provisions of the ECA, and the states' laws have no bearing on the inquiry.

18.

Specifically, in both Hawaii 1960 and Georgia 2020, the states failed to meet the safe harbor of Section 5 of the ECA because neither state issued a final judicial decision in the presidential elector contest by the safe harbor date. 3 U.S.C. § 5, 15. At that point, the dispute could only be adjudicated by Congress, and Congress' adjudication of that dispute was governed by the provisions of the ECA. As established, the ECA explicitly permitted the submission of more than one presidential elector ballot from a state in its resolution of the dispute. 3 U.S.C. § 15. Thus, neither factual differences in the post-safe harbor date judicial resolution by either state nor any differences in the states' laws have any relevance to the legality and propriety of the presidential electors executing presidential elector ballots and/or contingent ballots in Hawaii in 1960 or in Georgia in 2020.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that both my initial July 11, 2023 Expert Declaration (Exhibit 1) and the foregoing Supplemental Expert Declaration are true and correct.

[signature on following page]

SUPPLEMENT ZYWICKI DECLARATION

This the 18th day of September, 2023.

Todd Zywicki
George Mason Foundation of Profession
of Law
Antonin Scalia School of Law
George Mason University
3301 Fairfax Drive
Arlington, VA 22201

EXHIBIT 1

## EXPERT DECLARATION OF PROFESSOR TODD ZYWICKI

1.

My name is Todd Zywicki.  I am the George Mason Foundation Professor of Law at the Antonin Scalia Law School at George Mason University in Arlington, Virginia.  I have published academic papers on a range of subjects, including specifically laws governing presidential elections and transitions.  *See* Todd Zywicki, *The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. Rev. 1573 (2001), available at https://digitalcommons.law.byu.edu/lawreview/vol2001/iss4/3/.[1]   On December 4, 2000, while the Bush-Gore election dispute was ongoing, I was invited to testify before Congress on the law governing presidential elections and transitions.[2]  I have also practiced law in the State of Georgia. My full curriculum vitae is attached hereto as **Exhibit A.**

2.

I have been asked to render an expert opinion with respect to the reasonableness and propriety of the casting of contingent presidential electoral votes when a judicial contest to a Presidential election has been filed under the Georgia Election Code but has not been decided as of the date that the Presidential Electors are required by the federal Electoral Count Act ("ECA") to meet and cast their votes. I have also been asked to

---

[1] *See also* Michael T. Morley, *Ascertaining the President-Elect Under the Presidential Transition Act*, 74 STAN. L. REV. May 2022), *available in* https://www.stanfordlawreview.org/online/ascertaining-the-president-elect-under-the-presidential-transition-act/ (referring to my article as "the most comprehensive analysis of the issue" of the process to "ascertain" the results of a presidential election).

[2] Testimony before United States House of Representatives, Committee on Government Reform, Subcommittee on Government Management, Information, and Technology, on "Transitioning to a New Administration: Can the Next President Be Ready?" (Dec. 4, 2000).

render an expert opinion with respect to the reasonableness and propriety of actions taken by the 2020 Republican nominees for Presidential Elector when confronted with an unresolved judicial contest to a presidential election on the date that the Presidential Electors were required to meet.

3.

The Georgia Election Code provides that the Georgia Presidential Electors be elected in 1964 and every four years thereafter in the General Election, which is held the first Tuesday after the first Monday in November. *See* O.C.G.A. § 21-2-10.

4.

The U.S. Constitution provides that "[t]he Congress may determine the time of choosing the [presidential] electors, and the day on which they shall give their votes; which day shall be the same throughout the United States." *See* U.S. CONST. art. II, § 1; U.S. CONST, Amendment 12.  The Electoral Count Act ("ECA"), in turn, requires Presidential Electors to meet in their respective states on the first Monday after the second Wednesday in December of each Presidential election year and cast their votes for President and Vice President.[3]  *See* 3 U.S.C. §§ 7-8.

5.

The date set by the ECA for the Presidential Electors to meet and vote was presumably selected by Congress with the intent of allowing sufficient time for States to count their votes in the Presidential election and then certify the appropriate slate of Presidential Electors (i.e., the Presidential Electors for the party whose candidate received the most votes for President).

---

[3] In the 2020 presidential election, this date was December 14, 2020.

6.

When election results have been certified but a judicial contest to that election is still pending, Georgia law provides that contingent commissions may be issued to the person who was apparently elected and that such person may take office. O.C.G.A. § 21-2-503(a) (permitting the issuance of a commission to a person who appears to have been elected to office "notwithstanding the fact that the election of such person to any office may be contested in the manner provided by this chapter."); *see also* O.C.G.A. § 21-2-503(c) ("Upon the certification of the results of the election, a person elected to a federal, state, or county office may be sworn into office notwithstanding that the election of such person may be contested in the manner provided by this chapter.")

7.

That same Code section just as explicitly makes the validity of such a commission contingent on the ultimate outcome of the judicial contest. Specifically, O.C.G.A. § 21-2-503(a) provides that "[w]henever it shall appear, by the final judgment of the proper tribunal having jurisdiction of a contested election, *that the person to whom such commission shall have been issued has not been elected legally to the office for which he or she has been commissioned, then a commission shall be issued to the person who shall appear to be elected legally to such office.*" (Emphasis added). The statute goes on to state that "[t]he issuing of such commission *shall nullify the commission already issued.*" *Id.* (Emphasis added).[4]

---

[4] Additionally, O.C.G.A. § 21-2-503(c) further provides that "[u]pon the final judgment of the proper tribunal having jurisdiction of a contested election which orders a second election or declares that another person was legally elected to the office, *the person sworn into such office shall cease to hold the office and shall cease to exercise the powers, duties, and privileges of the office immediately.*" (Emphasis added).

8.

Upon the filing of an action contesting a Presidential election under the Georgia Election Code, then, *both* the certified (but contested) Presidential Electors and the uncertified (but contesting) Presidential Electors become contingent Presidential Electors by operation of law. Where litigation is still pending and will not be resolved by a "final judgment of the proper tribunal" by the time the Presidential Electors are required to meet and vote by the ECA, the state faces a dilemma. If the state attempts to short-circuit the election contest before final resolution of the claims in the case, it would deny the candidates, the voters, and the public an opportunity to have disputes regarding the election adjudicated, which is contrary to Georgia and federal law. If the state certifies the contingent winner as the actual and final winner on or before the date set forth in the ECA for presidential electors to cast their ballots it would deprive the state of all of its electoral votes should the contesting candidate ultimately prevail in his or her judicial contest, which is also contrary to Georgia and federal law.  In such circumstances, and to avoid these unlawful and unintended consequences, both sets of Presidential Electors could execute their respective ballots on the date required by federal law, with the State ultimately certifying the election for whichever candidate prevails in the judicial election contest.

9.

When faced with this dilemma, the best and most prudent way to ensure that Georgia has valid presidential electoral ballots for Congress to count would be for both sets of contingent Presidential Electors to meet and cast their votes for President and Vice President in the required format. Both sets should fulfill their duties and complete, execute, and submit the required paperwork as prescribed by the Constitution and the ECA as though the election contest had been adjudicated in each of their favor. Given the disagreeable nature of the first two alternatives (either short-circuiting electoral challenges or risking being unrepresented in the Presidential election), this option of certifying contingent slates of electors offers a reasonable, proper and lawful solution to the problem. Both sets of contingent Presidential Electors performing their duties as though the unresolved judicial contest had been (or will be) adjudicated in their favor is entirely consistent with both federal and Georgia law, and it is the only way to assure that the State of Georgia would have valid presidential electoral votes available to be counted by Congress regardless of the ultimate outcome of the judicial election challenge. The lawfulness, reasonableness and propriety of this solution is supported by state and federal law[5] and further evidenced by a review of historical precedent where that solution has been offered.

_____

[5] In addition to the Georgia law outlined herein, the ECA specifically anticipates that Congress may, at times, receive two competing presidential electoral ballots from one state.  The federal statute is plain that there is nothing improper about the submission of two slates and that the decision of which of these two competing slates is to be counted must be resolved solely by Congress.  *See* 3 U.S.C. § 15 ("If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate*, those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of

10.

In several presidential elections throughout history, including most recently in the contested elections of 1960, 2000, and 2020, judicial challenges to the presidential election had not been finally adjudicated either on or immediately prior to the date that the ECA requires the Presidential Electors to cast their votes.  In each of these elections, the question has arisen as to the appropriate and lawful actions that must be taken to preserve the ability of both presidential candidates and the state itself to have valid presidential electoral votes available to be ultimately counted by Congress regardless of the ultimate outcome of the vote count or judicial challenge.  The clear (and historically uncontroversial) legal answer in each of these circumstances is that both sets of the Presidential Electors should meet, vote, and transmit ballots to Congress to preserve the ability of that state to have valid electoral votes that can be counted by Congress.

11.

---

a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law; and in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by lawful electors appointed in accordance with the laws of the State*, unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof, shall be counted.*) (emphasis added).

In the 1960 presidential election, for example, Richard Nixon, the Republican candidate, was initially certified by the State of Hawaii as having carried the state. Supporters of John F. Kennedy, the Democrat presidential candidate, filed a legal action contesting the election and charging voting irregularities in 198 of Hawaii's 240 precincts, including the claim that there were more votes counted in the presidential election contest than were actually cast and that 1,283 ballots were unaccounted for in the final tabulation.    That election contest was still pending and unresolved on December 19, 1960, when the Presidential Electors were required by the ECA to meet and cast their votes. Accordingly, both sets of Presidential Electors -- the certified (but contested) Republican/Nixon electors and the uncertified (but contesting) Democratic/Kennedy electors -- met separately at the Hawaii state capitol building and each cast their votes for their respective candidates in the same manner and form as though their candidate had won the state.

12.

Ultimately, on December 30, 1960, John F. Kennedy prevailed in the judicial contest, and the election was re-certified in his favor. On January 4, 1961, the Governor of Hawaii transmitted a second Certificate of Ascertainment on behalf of the state reporting that as a result of the lawsuit, the electoral votes of Hawaii were to be recorded for Kennedy rather than Nixon. Because the Democratic Presidential Electors had cast ballots back on December 19, 1960 in the precise form required by the Constitution and the ECA, Congress was able to and did count the votes from Hawaii when it met on January 6, 1961 to count the votes and certify the result. A copy of the paperwork completed and executed by the Hawaii Democratic Presidential Electors on December

19, 1960 and mailed to the Administrator of General Services of the United States of America on December 20, 1960 is attached as **Exhibit B.**[6]

13.

In the contested Presidential election of 2000, the concept of two contingent elector slates specifically relying on the Hawaii precedent was actively promoted by advocates for the Democratic presidential candidate, Al Gore, drawing support from noted constitutional scholars.[7]

14.

Democrat Congresswoman Patsy Mink of Hawaii publicly advocated for the submission of two elector slates from Florida to Congress in the 2000 election as follows:

> The [Hawaii] precedent of 40 years ago suggests the means for resolving the electoral dispute in Florida: ...both slates of electors meet on December 18 and send their certificates to Congress; the Governor of Florida send a subsequent certificate of election based on ... the decision of the court; and Congress accepts the slate of electors named by the Governor in his final certification.

*See* Statement of Representative Patsy Mink, CONGRESSIONAL RECORD, December 13, 2000 (emphasis added), available at https://www.govinfo.gov/content/pkg/CRECB-2000-pt18/html/CRECB-2000-pt18-Pg26609-2.htm.

---

[6] Two of the three Democratic Presidential Electors who executed the Hawaii electoral documents, William Heen and Gilbert Metzger, were retired federal judges and noted constitutional scholars.

[7] The judicial challenges to the 2000 election in Florida were finally adjudicated before December 18, 2020, the date the Presidential Electors were required by the ECA that year to meet and vote, so two electoral ballots were not executed and submitted from Florida in that election.

15.

In anticipation of the likelihood of a close and contested presidential election in 2020, electoral college scholars openly and publicly advocated for both sets of Presidential Electors to each cast their ballots for their respective candidates on the date required by the ECA and submit both ballots to Congress in any state where the vote count was not yet final or was subject to a pending, unresolved judicial contest. Michael Rosin and Jason Harrow argued, for example, that Hawaii's approach to dealing with the issue by having both sets of electors meet and case votes for their candidate *should serve as a model for a close election this year or in any year.* Michael L. Rosin and Jason Harrow, *How to Decide a Very Close Election/or Presidential Electors: Part 2* (Oct. 23, 2020), available at https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-2 (emphasis added); *see id.* (stating "the way the recount was handled by all involved [in the 1960 election in Hawaii] provides a model for how a very close election should be determined"). Rosin and Harrow went on to note that when the judicial contest eventually resulted in Kennedy being declared the winner, the state re-issued its certification: "Fortunately, because both slates of electors had voted on the proper day, there was still a chance to tell Congress which slate was actually appointed by the voters." *Id.*

16.

Rosin and Harrow further explain that although the process "feels disorderly," "in fact the dueling certificates, with the Governor later telling Congress who really won, was an excellent way to navigate a system that, for no good reason, occasionally provides too short a time to conduct a full recount in a very close election." *Id.* The authors also

point out that both sets of presidential electors executing contingent ballots in these circumstances eliminates the risk that the state could lose its presidential electoral votes altogether: "[I]f, by elector voting day, a result is still uncertain and no presidential electors from a particular state cast votes, then Congress probably cannot count any electoral votes from that state for that particular election. . . . That means if a state wants to have its electoral votes counted, but which presidential electors were appointed by the voters on election day remains uncertain . . . . *there is only one possible solution: both potentially-winning slates of electors should case elector votes  on the day required while the recount continues.*" *Id.* (emphasis added).

### 17.

Harrow and Rosin subsequently argue that the 1960 Hawaii precedent of casting two sets of contingent electoral votes provides not only one reasonable solution to the difficulty of squaring the ECA's purported deadlines with a fair and accurate vote count, but actually provides the *best* solution to a difficult problem.[8] Even if one disagrees with that considered judgment, it makes plain that the State of Hawaii was not violating the law in 1960 by doing so, nor would subsequent sets of presidential electors be doing so by following this precedent: Harrow and Rosin were obviously not advocating for or urging some sort of criminal conspiracy in holding 1960 Hawaii up as a model for future close elections.

---

[8] Jason Harrow and Michael L. Rosin, *How To Decide a Very Close Election for Presidential Electors: Part 3*, TAKECARE (Oct. 28, 2020), *available in* https://takecareblog.com/blog/how-to-decide-a-very-close-election-for-presidential-electors-part-3.

18.

While the 2020 presidential election was in process, former CNN host Van Jones, an attorney, and Professor Larry Lessing of Harvard Law School similarly advocated that Presidential Electors should follow the Hawaii precedent if the election was not finally decided in their state by the date the ECA required Presidential Electors to meet and cast their votes. As they write, "Even though Richard Nixon said it should not be a precedent, what he did in 1960 *should be the model for this election* in 2020." Doing so would allow the state to take its time "to have an orderly and complete vote count." In particular, they described the execution of both sets of presidential ballots a "genius legal insight," noting that "*the only way their votes could matter was if they were cast on the day that Congress had set." See* Van Jones and Larry Lessing, "WHY PENNSYLVANIA SHOULD TAKE ITS TIME COUNTING VOTES," https://www.cnn.com/2020/11/04/opinions/pennsylvania-take-time-counting-votes-opinion-jones-lessig/index.html (Nov. 4, 2020) (citing favorably to the 1960 Hawaii precedent and noting that "[t]he key – *and this is the critical fact for 2020 as well* – is that the Democratic slate had also met on December 19 and had also cast their ballots in the manner specified by the Constitution. *When they voted, no one knew whether their votes would matter. But at least someone recognized that the only way their votes could matter was if they were cast on the day that Congress had set.* History does not record who had that *genius legal insight*.") (Emphasis added).

19.

The actions taken by both sets of Presidential Electors in Hawaii in 1960 that have been lauded and advocated by elected officials and legal scholars in 2000 and 2020 are supported by and consistent with federal and Georgia law. Specifically, federal law expressly anticipates and permits the submission of more than one slate of Presidential Electors from a State, and the Constitution gives Congress exclusive jurisdiction to adjudicate the validity of those competing slates within the parameters set in the ECA and through their own internal procedures. *See* 3 U.S.C.A. § 15 and U.S. CONST. art. II, § 1.[9] *See also* COUNTING ELECTORAL VOTES: AN OVERVIEW OF PROCEDURES AT THE JOINT SESSION, INCLUDING OBJECTIONS BY MEMBERS OF CONGRESS, Congressional Research Service at pp. 8-9 (explaining Congress'

---

[9] That statute states, in pertinent part, as follows:

> If *more than one return or paper purporting to be a return from a State shall have been received by the President of the Senate,* those votes, and those only, shall be counted which shall have been regularly given by the electors who are shown by the determination mentioned in section 5 of this title to have been appointed, if the determination in said section provided for shall have been made, or by such successors or substitutes, in case of a vacancy in the board of electors so ascertained, as have been appointed to fill such vacancy in the mode provided by the laws of the State; *but in case there shall arise the question which of two or more of such State authorities determining what electors have been appointed, as mentioned in section 5 of this title, is the lawful tribunal of such State, the votes regularly given of those electors, and those only, of such State shall be counted whose title as electors the two Houses, acting separately, shall concurrently decide is supported by the decision of such State so authorized by its law;* and *in such case of more than one return or paper purporting to be a return from a State, if there shall have been no such determination of the question in the State aforesaid, then those votes, and those only, shall be counted which the two Houses shall concurrently decide were cast by Lawful electors appointed in accordance with the laws of the State,* unless the two Houses, acting separately, shall concurrently decide such votes not to be the lawful votes of the legally appointed electors of such State. *But if the two Houses shall disagree in respect of the counting of such votes, then, and in that case, the votes of the electors whose appointment shall have been certified by the executive of the State, under the seal thereof shall be counted.*

3   U.S.C.A. § 15 (emphasis added).

process to adjudicate between two sets of presidential elector ballots from the same state), available at https://crsreports.congress.gov/product/details?prodcode=RL32717; Todd Zywicki, *The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. Rev. 1573, 1609 n. 110 (2001) ("Hawaii's situation in 1960 is also important in that it provides the primary congressional precedent for congressional procedures for resolving disputes over two competing Certificates of Ascertainment."), available at https://digitalcommons.law.byu.edu/lawreview/vol2001/iss4/3/.

20.

In 2020, Georgia was confronted with the identical dilemma as Hawaii in 1960, except that in Georgia, the Democratic candidate for President had been certified as having carried the state, and it was the Republican candidate who filed a legal action contesting the election. That judicial contest was still pending on December 14, 2020 when the Presidential Electors were required by the ECA to meet and cast their votes. Indeed, no hearing or other proceeding had even been had in that contest.

21.

Based upon the materials that I have reviewed, the contingent Georgia Republican Presidential Electors received advice of legal counsel to take the actions they took on December 14, 2020, and they followed the Hawaii precedent precisely, using materially identical forms and the same procedures as the contingent 1960 Hawaii Democratic Presidential Electors. At the same time, the contingent Georgia Republican Presidential Electors publicly announced that the votes they cast and related actions they took were expressly contingent on the outcome of the pending election contest and were cast only to protect and preserve the remedies for that contest and the ability of the

State of Georgia to have a valid electoral ballot for Congress to count on January 6, 2021 regardless of the ultimate outcome that contest.

22.

Legally, the Georgia Democratic Presidential Electors were also acting contingently in casting their votes, as their status as Presidential Electors was directly contingent on the outcome of the pending judicial contest to the election. Despite this fact, the Georgia Democratic Presidential Electors made no similar announcement that their votes and actions on December 14, 2020 were contingent on the outcome of the election contest. They, however, have come under no criticism or scrutiny for having not done so.

23.

Based upon the Hawaii precedent as well as federal and Georgia law, when contingent Presidential Electors execute contingent electoral ballots under these circumstances, they are not required to insert into those ballots any reference to the pending election contest or that they are executing their ballots provisionally or contingently. Indeed, the insertion of such additional or surplus language into the Presidential Elector's ballots could render them subject to validity challenges. And by operation of Georgia and federal law, their contingent nature is obvious on their face.

24.

Tellingly, the contingent 1960 Hawaii Democratic Electors included no such reference in the certificates they executed. Instead, in their documents, they declared themselves to be "duly and legally appointed and qualified" and "certified by the Executive" even though they had not been so certified as of the date the certificates were executed. Additionally, they stated in those documents that "We hereby certify that the

lists of all the votes of the state of Hawaii given for President, and of all the votes given for Vice President, are contained herein." *See* Exhibit B.  As noted, those ballots were ultimately the ones that Congress officially counted as the official electoral votes of Hawaii for the 1960 presidential election.

### 25.

Accordingly, the fact that the 2020 electoral ballots cast by the contingent Georgia Republican Presidential Electors did not include any explicit reference to the pending election challenge or the contingent nature of the ballots does not render them false or invalid.  Instead, these ballots, which were prepared by and in the specific form advised by legal counsel, were in exactly the correct and necessary format for the contingent Georgia Republican Electors to perform their duties legally and validly as prescribed by the Constitution, federal and Georgia law.

### 26.

As noted, the 2020 Georgia Democratic Electors were also acting contingently when they met and voted. The Democrats also (appropriately) did not include any reference to the pending judicial election contest or the contingent nature of the ballots they were executing in their documents. Instead, both sets of contingent Presidential Electors by necessity completed and executed the requisite paperwork as prescribed by law and as though they possessed uncontested certificates at that time of execution.

### 27.

Additionally, transmission of the contingent Republican electoral ballots to Congress (and to the other entities required to receive them) at the time that they are executed is part of the legally required process under federal law to ensure that the ballots are valid and available to be counted by Congress if the judicial contest changes

the outcome of the election.  In the 1960 Hawaii example, the contingent Democratic Presidential Electors not only executed their ballots as provided by federal law, but they also transmitted them to Congress and as otherwise required by federal law at the time that they executed them.  Failure to transmit the ballots as required by law would put the validity of the electoral ballots at issue.

28.

The fact that there was a recount ordered by the court in the 1960 Hawaii election is irrelevant and does not distinguish the 1960 Hawaii situation from the 2020 presidential election in Georgia in any legally material way.  The legally relevant point is that a judicial challenge was filed in Hawaii in 1960, that challenge was pending and unresolved at the time federal law required the presidential electors to cast their ballots. As a result, to preserve Hawaii's ability to have their electoral votes counted regardless of the ultimate outcome of the judicial challenge, both sets of presidential electors lawfully, prudently, and appropriately cast their ballots. In Hawaii, the court took action in response to that challenge, and the court ultimately entered judgment for the challenger, John Kennedy, and declared him the winner of the election.  One of the steps to that result happened to be a recount, but that fact specific to the Hawaii situation has no legal relevance to the 2020 election challenge in Georgia that was pending when the electors were required to act on December 14, 2020.  In Georgia, unlike in Hawaii (and contrary to Georgia law requiring a timely consideration), the court took *no* action on the pending election challenge – it did not even schedule a timely hearing, much less assess any of the evidence to determine what steps (such as a recount) may be necessary to adjudicate the challenge. Georgia's court could have ordered a recount, assessed the merits of the evidence submitted with the complaint in that case, or taken any number

of other actions to adjudicate the matter, up to and including declaring Trump as the actual winner of the Georgia election. The fact that the Hawaii court acted rapidly to resolve the pending issues and the Georgia court dragged its feet bears no legal or logical relevance as to the precedential value of the 1960 Hawaii election or to the propriety of the actions taken by Georgia s presidential electors on December 14, 2020, the date mandated by the ECA. And regardless, because the result of the litigation and any subsequent remedy the court might order remained unresolved as of that date, neither set of Georgia's 2020 presidential electors could have known on December 14, 2020 what actions the court would or would not take (including but not limited to ordering a recount) in adjudicating the election challenge or what the ultimate outcome of that challenge would be.

29.

In light of the 1960 Hawaii precedent and the widespread support from elected officials and legal scholars that the execution and submission of both presidential electoral ballots in a close election has received since then, reasonable attorneys could not have predicted that a presidential elector in 2020 taking the same actions taken in Hawaii in 1960 could or would be viewed anything but entirely proper; certainly they could not have reasonably predicted that any law enforcement official would ever suggest that any or all of these actions were criminal. Given the difficulties presented under current laws, the actions taken by the state of Georgia were the best available means for addressing extended electoral challenges that remain unresolved by the relevant deadlines. Once the challenges are resolved, the appropriate response should be for the State to disregard the losing slate of electors and certify the winning slate; there is no basis to criminally prosecute those who acted to ensure the state's electoral votes

would be counted in the event that known but unresolved election contests remain pending as of the deadline.[10]

30.

Based on my analysis of the historical record, particularly the example of the 1960 Hawaii election, it is my expert opinion that the contingent Republican Presidential Electors in Georgia in 2020 acted in a reasonable, proper, and lawful manner. Moreover, it is my opinion, shared by a consensus of experts who have considered the issue over the past several decades, that the casting of contingent electoral votes is not only reasonable, proper and lawful, but the best approach available to enable the resolution of election contests while preserving the ability of a state to have its electoral votes counted by Congress should a judicial contest change the outcome of the election.  In conclusion, it is my opinion that the actions taken by the contingent Georgia Republican Presidential Electors *were* lawful, reasonable, proper, and necessary, and any suggestion that they could be "criminal" ignores legal and historical precedent, the reasoned advice of legal counsel received, and the plain language of the Constitution, federal and Georgia law.

---

[10] Although a full discussion of the constitutional implications of any State taking such action against its Presidential Electors is beyond the scope of this declaration, it is worth noting that the actions taken by the Republican presidential elector nominees in Georgia in 2020 enjoy broad constitutional protection, regardless of the Hawaii precedent.

Signed this day ___ July, 2023.

Todd Zywicki
George Mason Foundation of Profession of Law
Antonin Scalia School of Law
George Mason University
3301 Fairfax Drive
Arlington, VA 22201

EXHIBIT A

# PROFESSOR TODD J. ZYWICKI

GEORGE MASON UNIVERSITY FOUNDATION PROFESSOR OF LAW
ANTONIN SCALIA LAW SCHOOL, GEORGE MASON UNIVERSITY
3301 N. FAIRFAX DR.
ARLINGTON, VA 22201
703-993-9484
tzywick2@gmu.edu
Web Page: http://mason.gmu.edu/~tzywick2/

## PUBLICATIONS

### BOOKS

Editor, UNPROFITABLE SCHOOLING: EXAMINING CAUSES OF, AND FIXES FOR, AMERICA'S BROKEN IVORY TOWER (with Neal McCluskey), (Cato Press, 2019).

LAW AND ECONOMICS: PRIVATE AND PUBLIC (with Maxwell Stearns and Tom Micelli), (West, 2018).

TEACHERS MANUAL TO LAW AND ECONOMICS: PRIVATE AND PUBLIC PUBLIC (with Maxwell Stearns and Tom Micelli), (West, 2018).

Editor, RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS (with Peter J. Boettke), (Edward Elgar, 2017).

CONSUMER CREDIT AND THE AMERICAN ECONOMY (with Thomas Durkin, Gregory Elliehausen, and Michael Staten), (Oxford University Press, 2014).

PUBLIC CHOICE CONCEPTS AND APPLICATIONS IN LAW (with Maxwell Stearns) (West Publishing, 2009).

Editor, *The Rule of Law, Freedom, and Prosperity*, 10 SUPREME COURT ECONOMIC REVIEW (Chicago: University of Chicago Press, 2003). 278 pp. ISBN: 0-226-99962-9).

- Reviewed by Professor William A. Fischel, 14(6) LAW AND POLITICS BOOK REV. 493-97 (June 2004).

### ARTICLES AND BOOK CHAPTERS

*Simple Rules for a Complex Regulatory World: The Case of Financial Regulation* (with Christopher Mufarrige), __ EUROPEAN J. OF L. & ECON. __ (Forthcoming 2020), working paper *available* here.

*Bruce Yandle and the Art of Economic Communication*, in THE LEGACY OF BRUCE YANDLE 67-98 (Donald J. Boudreaux and Roger Meiners, eds., 2020), *available* here.

*Friedrich A. Hayek* (with Edward Peter Stringham), *in* ENCYCLOPEDIA OF LAW & ECONOMICS (Alain Marciano and Giovanni Battista Ramello, eds.) (2019).

*A Chip Off the Old Block or a New Direction for Payment Card Security? The Law and Economics of the U.S. Transition to EMV* (with James Cooper), 2018 MICH. ST. L. REV. 869 (2018).

*The Behavioral Economics of Behavioral Law & Economics*, 5 REVIEW OF BEHAVIORAL ECONOMICS 439 (2018).

*The Chrysler and General Motors Bankruptcies, in* RESEARCH HANDBOOK ON CHAPTER 11 REORGANIZATION 298 (Barry Adler, ed., 2020).

*The Changing of the Guard: The Political Economy of Administrative Bloat in Higher Education* (with Christopher Koopman), *in* UNPROFITABLE SCHOOLING: EXAMINING CAUSES OF, AND FIXES FOR, AMERICA'S BROKEN IVORY TOWER 147 (Todd J. Zywicki and Neal McCluskey, eds., 2019).

*Introduction* (with Neal McCluskey), *in* UNPROFITABLE SCHOOLING: EXAMINING CAUSES OF, AND FIXES FOR, AMERICA'S BROKEN IVORY TOWER 1 (Todd J. Zywicki and Neal McCluskey, eds., 2019).

*Law and Economics: The Contributions of the Austrian School of Economics* (with Peter J. Boettke), *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 3 (Todd J. Zywicki and Peter J. Boettke, eds., 2017).

*Austrian Law and Economics and Efficiency in the Common Law, in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 192 (Todd J. Zywicki and Peter J. Boettke, eds. 2017).

*Bankruptcy Judge as Central Planner* (with Shruti Rajagopalan), *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 371 (Todd J. Zywicki and Peter J. Boettke, eds., 2017).

*Conclusion: The Future of "Austrian" Law and Economics* (with Peter J. Boettke), *in* RESEARCH HANDBOOK ON AUSTRIAN LAW AND ECONOMICS 423 (Todd J. Zywicki and Peter J. Boettke, eds., 2017).

*Behavioral Law & Economics Goes to Court: The Fundamental Flaws in the Behavioral Law & Economics Arguments Against No-Surcharge Laws*, 82 MISSOURI L. REV. 770 (2017) (Symposium on behavioral law & economics).

*Punishing Rewards: How Clamping Down on Credit Card Interchange Fees Can Hurt the Middle Class* (with Julian Morris, Geoffrey A. Manne, and Ian Lee), Macdonald-Laurier Institute (Nov. 2017).

*Unreasonable and Disproportionate: How the Durbin Amendment Harms Poorer Americans and Small Businesses* (with Geoffrey A. Manne and Julian Morris), International Center for Law & Economics Working Paper (April 25, 2017).

*Dodd-Frank at Five Years: Its Impact on Freedom and the Rule of Law*, 43 J. OF FINANCIAL TRANSFORMATION 62 (2016).

*Do Americans Really Save Too Little and Should We Nudge Them to Save More? The Ethics of Nudging Retirement Savings*, 16 GEORGETOWN J. OF LAW & PUBLIC POLICY 877 (2017).

*Market-Reinforcing versus Market-Replacing Consumer Finance Regulation*, in REFRAMING FINANCIAL MARKET REGULATION: ENHANCING STABILITY AND PROTECTING CONSUMERS (Hester Peirce and Benjamin Klutsey eds. 2016).

*Market Based Nudges: How Financial Markets Improve Their Own Choice Architecture*, in NUDGE THEORY IN ACTION: BEHAVIORAL DESIGN IN POLICY AND MARKETS (2016).

*The Rule of Law During Times of Economic Crisis*, in ECONOMIC AND POLITICAL CHANGE AFTER CRISIS: PROSPECTS FOR GOVERNMENT, LIBERTY, AND THE RULE OF LAW 36 (Stephen H. Balch and Ben Powell, eds., 2016).

*Rent-Seeking, Crony Capitalism, and the Crony Constitution*, 23 SUPREME CT. ECON. REV. 77 (2016).

*The Law and Economics of Consumer Debt Collection and Its Regulation*, 28 LOYOLA CONSUMER L. J. 167 (2016).

*The CFPB's Arbitration Study: A Summary and Critique* (with Jason Scott Johnston), 35(5) BANKING AND FINANCIAL SERVICES POLICY REPORT 9 (May 2016).

*Consumer Credit and the American Economy: An Overview* (with Thomas A. Durkin and Gregory Elliehausen), 11 J. L. ECON. & POL'Y 279 (2015).

*Dodd-Frank at Five Years: Implications for Consumers and the Economy*, 34(11) BANKING AND FINANCIAL SERVICES POLICY REPORT 1 (Nov. 2015).

*The Consumer Financial Protection Bureau and the Return of Paternalistic Command-and-Control Regulation*, 16(2) ENGAGE 48 (2015).

*Hayek's Jurisprudence: And Ratnapala's Hayek*, 33(2) UNIVERSITY OF QUEENSLAND LAW JOURNAL 311 (2015).

*Bruno Leoni's Legacy and Continued Relevance*, 30(1) J. OF PRIVATE ENTERPRISE 131-41 (2015).

*Behavior, Paternalism, and Policy: Evaluating Consumer Financial Protection* (with Adam C. Smith), 9 NYU J. OF LAW & LIBERTY 201 (2015).

*An Assessment of Behavioral Law and Economics Contentions and What We Know Empirically About Credit Card Use by Consumers* (with Thomas A. Durkin and Gregory Elliehausen), 22 SUPREME COURT ECON. REV. 1 (2014).

*Commentary on CFPB Report: Data Point: Checking Account Overdraft* (with G. Michael Flores) (2014).

*Price Controls on Payment Card Interchange Fees: The U.S. Experience* (with Geoffrey Manne and Julian Morris), ICLE Financial Regulatory Research Program White Paper 2014-2 (2014).

*Keynote Address: Is There a George Mason School of Law and Economics?* 10 J. LAW, ECONOMICS & POLICY 543 (2014).

*Uncertainty, Evolution, and Behavioral Economic Theory* (with Geoffrey Manne), 10 J. OF LAW, ECONOMICS & POLICY 555 (2014).

*Overdraft Protection and Consumer Protection: A Critique of the CFPB's Analysis of Overdraft Programs* (with G. Michael Flores and Brian M. Deignan), 33(3) BANKING AND FINANCIAL SERVICES POLICY REPORT 10 (March 2014).

*The Consumer Financial Protection Bureau, in* PERSPECTIVES ON DODD-FRANK AND FINANCE (2014, MIT Press).

*The Behavioral Law and Economics of Fixed-Rate Mortgages (And Other Just-So Stories)*, 21 SUPREME COURT ECON. REV. 157 (2014).

*Payday Lending, Bank Overdraft Protection, and Fair Competition at the Consumer Financial Protection Bureau* (with Robert L. Clarke), 33 REVIEW OF BANKING AND FINANCIAL LAW 235 (2013-2014).

*Commentary: CFPB Study of Overdraft Programs* (with G. Michael Flores), MERCATUS RESEARCH (Nov. 4, 2013).

*Credit Where It's Due: How Payment Cards Benefit Canadian Merchants and Consumers, and How Regulation Can Harm Them* (with Ian Lee, Geoffrey A. Manne, and Julian Morris), MacDonald-Laurier Institute (Oct. 2013).

*The Economics and Regulation of Network Branded Prepaid Cards*, 65 FLORIDA L. REV. 1477 (2013).

~~*The Consumer Financial Protection Bureau: Savior or Menace?*, 81 GEORGE~~ WASHINGTON L. REV. 856 (2013).

*Libertarianism, Law and Economics, and The Common Law*, 16 CHAPMAN L. REV. 309 (2013) (symposium on "Libertarian Legal Theory").

*The Bankruptcy Clause, in* THE HERITAGE GUIDE TO THE CONSTITUTION (2d ed. 2013).

*The Coinage Clause, in* THE HERITAGE GUIDE TO THE CONSTITUTION (2d ed. 2013).

*Senate Vacancies, in* THE HERITAGE GUIDE TO THE CONSTITUTION  (2d ed. 2013).

*Auto Bailout or UAW Bailout? Taxpayer Losses Came from Subsidizing Union Compensation*, HERITAGE FOUNDATION BACKGROUNDER #2700 (June 13, 2012).

*The Senate and Hyper-Partisanship: Would the Constitution Look Different if the Framers Had Known that Senators Would be Elected in Partisan Elections?* 10 GEORGETOWN J. L. & PUB. POL'Y 375 (2012).

*The Economics and Regulation of Bank Overdraft Protection*, 69 WASHINGTON & LEE L. REV. 1141 (2012).

*Economic Uncertainty, The Courts, and The Rule of Law*, 35 HARVARD J. OF L. & PUB. POL'Y 195 (2012).

*The Balancing of Markets, Litigation, and Regulation*, 7 J. OF LAW, ECONOMICS, AND POL'Y 351 (2010).

*Perspectives on Dodd-Frank Wall Street Reform and Consumer Protection Act*, 7 J. OF LAW, ECONOMICS, AND POL'Y 307 (2010).

*Protecting the Public Health: Litigation and Obesity*, 7 J. OF LAW, ECONOMICS, AND POL'Y 259 (2010).

*The Auto Bailout and the Rule of Law*, NATIONAL AFFAIRS, Issue 7, p. 66 (Spring 2011).

*Does Increased Litigation Increase Justice in a Second-Best World?*, *in* THE AMERICAN ILLNESS (Frank Buckley, ed., 2013, Yale University Press).

*Hayekian Anarchism* (with Edward Peter Stringham), 78 J. ECON. BEHAVIOR & ORGANIZATION 290 (2011).

*Rivalry and Superior Dispatch: An Analysis of Competing Courts in Medieval and Early Modern England* (with Edward Peter Stringham), 147 PUBLIC CHOICE 497 (2011).

*Common Law and Economic Efficiency* (with Edward Peter Stringham), *in* 7 ENCYCLOPEDIA OF LAW AND ECONOMICS: THE PRODUCTION OF LEGAL RULES (2d ed., Francesco Parisi, ed., 2012).

*The Economics of Payment Card Interchange Fees and the Limits of Regulation*, ICLE FINANCIAL REGULATORY PROGRAM WHITE PAPER SERIES (June 2, 2010).

*Expansion of Liability Under Public Nuisance* (with Henry N. Butler), 18 SUPREME COURT ECONOMIC REVIEW 1 (2010).

*Money To Go*, 33(2) REGULATION 32 (2010).

*Subprime Mortgages: What We Have Learned From a New Class of Homeowners* (with Satya Thallam), *in* LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE 181 (2010).

*Anna Nicole Smith Goes Shopping: The New Forum Shopping Problem in Bankruptcy*, 2010 UTAH L. REV. 511 (2010).

*Consumer Use and Government Regulation of Title Pledge Lending*, 22 LOYOLA CONSUMER L. REV. 425 (2010).

*Three Problematic Truths About the Consumer Financial Protection Agency Act of 2009* (with Joshua D. Wright), 1 LOMBARD STREET, No. 12 (2009).

*The Market for Information and Credit Card Regulation*, 28(1) BANKING AND FINANCIAL SERVICES POLICY REPORT 13 (2009).

*The Law and Economics of Subprime Lending* (with Joseph Adamson), 80 UNIVERSITY OF COLORADO L. REV. 1 (2009).

*Spontaneous Order and the Common Law: Gordon Tullock's Critique*, 135 PUBLIC CHOICE 35 (2008).

*Posner, Hayek, and the Economic Analysis of Law* (with Anthony B. Sanders), 93 IOWA L. REV. 559 (2008).

*Bankruptcy*, in THE CONCISE ENCYCLOPEDIA OF ECONOMICS (2d ed., David Henderson ed. 2008).

*Consumer Bankruptcy, Doctrinal Issues in*, in ENCYCLOPEDIA OF LAW AND SOCIETY: AMERICAN AND GLOBAL PERSPECTIVES (2008).

*Evolutionary Psychology*, in ENCYCLOPEDIA OF LAW AND SOCIETY: AMERICAN AND GLOBAL PERSPECTIVES (2008).

*Institutional Review Boards as Academic Bureaucracies: An Economic and Experiential Analysis*, 101 NORTHWESTERN L. REV. 861 (2007).

*The U.S. Federal Trade Commission and Competition Advocacy: Lessons for Latin American Competition Policy* (with James C. Cooper), in LATIN AMERICAN ANTITRUST DEVELOPMENTS (D. Daniel Sokol ed.) (2007).

~~*Group Selection*, in INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL SCIENCES, 2ND ED. (2007).~~

*Institutional Review Boards and Academic Bureaucracies*, 101 NORTHWESTERN L. REV. 861 (2007).

*Is Forum-Shopping Corrupting America's Bankruptcy Courts?* 94 GEORGETOWN L. J. 1141 (2006) (Review essay of Lynn M. LoPucki, *Courting Failure: How Competition for Big Cases is Corrupting the Bankruptcy Courts*).

*Institutions, Incentives, and Consumer Bankruptcy Reform*, 62 WASHINGTON & LEE L. REV. 1071 (2005).

*An Economic Analysis of the Consumer Bankruptcy Crisis*, 99 NORTHWESTERN L. REV. 1463 (2005).

*Wine, Commerce, and the Constitution* (with Asheesh Agarwal), 1 NYU J. LAW & LIBERTY 609 (2005).

*The Original Meaning of the 21st Amendment* (with Asheesh Agarwal), 8 GREEN BAG 2d 135 (2005).

*Wine Wars: Uncorking E-Commerce?* (with Asheesh Agarwal and Jerry Ellig, 27(4) REGULATION 10 (Winter 2004-2005).

*Obesity and Advertising Policy* (with Debra Holt and Maureen Ohlhausen), 12 GEORGE MASON L. REV. 979 (2004) (Symposium on Obesity, Health Claims, and Advertising).

*The Theory and Practice of Competition Advocacy at the FTC* (with James Cooper and Paul Pautler), 72 ANTITRUST L. J. 1091 (2005) (Symposium on 90th Anniversary of FTC).

*The FTC and State Action: Evolving Views on the Proper Role of Government* (with John T. Delacourt), 72 ANTITRUST L.J. 1075(2005) (Symposium on 90th Anniversary of FTC).

*The Bankruptcy Clause*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 112 (2005).

*The Coinage Clause*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 114 (2005).

*Senate Vacancies*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 415 (2005).

*Reconciling Group Selection and Methodological Individualism*, 7 ADVANCES IN AUSTRIAN ECONOMICS 267 (2004).

*The Past, Present, and Future of Bankruptcy Law in America*, 101 MICHIGAN L. REV. 2016 (2003).

*The Rise and Fall of Efficiency in the Common Law: A Supply-Side Analysis*, 97 NORTHWESTERN L. REV. 1551 (2003).

~~*The Rule of Law, Freedom, and Prosperity*, 10 SUPREME COURT ECONOMIC REVIEW 1 (2003),~~ *reprinted and translated* El Estado De Derecho, La Libertad y La Prosperidad, 4(2) APUNTES DE ECONOMIA Y POLITICA: ANALISIS ECONOMICO DE LAS DECISIONES PUBLICAS 2 (2005).

*Baptists?  The Political Economy of Environmental Interest Groups*, 53 CASE WESTERN RESERVE LAW REVIEW 315 (2002) (symposium on BJORN LOMBORG, THE SKEPTICAL ENVIRONMENTALIST: MEASURING THE REAL STATE OF THE WORLD (2001)).

*Competition Policy and Regulatory Reforms: Means and Ends*, *in* HOW SHOULD COMPETITION POLICY TRANSFORM ITSELF? DESIGNING THE NEW COMPETITION POLICY (2003).

*Corporate Law Practice*, *in* THE OXFORD COMPANION TO AMERICAN LAW (Kermit Hall ed.) (2002).

*Bankruptcy Law As Social Legislation*, 5 TEX. REV. L. & POLITICS 393 (2001).

*The Law of Presidential Transitions and the 2000 Election*, 2001 BYU L. REV. 1573 (2001).

*Evolutionary Psychology and the Social Sciences*, 13 *Humane Studies Review*, Issue 1 (Fall 2000) (On-Line Journal available at http://www.humanestudiesreview.org/index.html)

*With Apologies to Screwtape: A Response to Professor Alexander*, 9 J. BANKR. L. & PRACTICE 613 (2000).

Book Review Essay, BRUCE G. CARRUTHERS & TERENCE C. HALLIDAY, RESCUING BUSINESS: THE MAKING OF CORPORATE BANKRUPTCY LAW IN ENGLAND AND THE UNITED STATES, 16 BANKR. DEV. J. 361 (2000).

*The Economics of Credit Cards* 3 CHAPMAN L. REV.  79 (2000) (Selected to participate in Chapman Law School "Rising Stars in Bankruptcy" symposium).

*Talk is Cheap: The Existence Value Fallacy* (with Donald J. Boudreaux and Roger E. Meiners), 29 ENVIRONMENTAL LAW 765 (1999).

*Was Hayek Right about Group Selection After All?* 13 REV. OF AUSTRIAN ECON. 81 (2000).

*Industry and Environmental Lobbyists: Enemies or Allies? in* THE COMMON LAW AND THE ENVIRONMENT: RETHINKING THE STATUTORY BASIS FOR MODERN ENVIRONMENTAL LAW 185 (Roger E. Meiners and Andrew P. Morris eds. 2000).

*Finding the Constitution: An Economic Analysis of Tradition's Role in Constitutional Decision-Making* (with A.C. Pritchard) 77 N. C. L. REV. 409 (1999).

*Constitutions and Spontaneous Orders: A Response to McGinnis's "In Praise of Decentralized Traditions and their Preconditions"* (with A.C. Pritchard), 77 N. C. L. REV. 537 (1999).

*Environmental Externalities and Political Externalities: The Political Economy of Environmental Regulation and Reform*, 73 TULANE L. REV. 845 (1999).

*Rewrite the Bankruptcy Code, Not the Scriptures: Protecting a Debtor's Right to Tithe in Bankruptcy*, 1998 WISCONSIN L. REV. 1223 (1998).

*It's Time for Means Testing* (with Judge Edith H. Jones), 1999 BYU L. REV. 177 (1999).

*The Nature of the State and the State of Nature: A Comment on Grady and McGuire's "The Nature of Constitutions,"* 1 J. BIOECONOMICS 241 (1999) (The State and the Ethnic Group: The Bioeconomics of Economic Organizations).

*Mend It, Don't End It: The Case for Retaining the Disinterestedness Requirement for Debtor in Possession's Counsel*, 18 MISS. COL L. REV. 291 (1998) (Symposium on Bankruptcy Law).

*Of Bubbling Pots and Bankruptcy Conflicts: A Reply to Smith and Wolfram*, 18 MISS. COL L. REV. 399 (1998).

*Beyond the Shell and Husk of History: The History of the Seventeenth Amendment and Its Implications for Current Reform Proposals*, 45 CLEVELAND ST. L. REV. 165 (1997) (solicited article).

*Epstein & Polanyi on Simple Rules, Complex Systems, and Decentralization*, 9 CONST. POL. ECON. 143 (1998).

*A Unanimity-Reinforcing Model of Efficiency in the Common Law: An Institutional Comparison of Common Law and Legislative Solutions to Large-Number Externality Problems*, 46 CASE WESTERN RESERVE L. REV. 961 (1996).

*Senators and Special Interests: A Public Choice Analysis of the Seventeenth Amendment*, 73 OREGON L. REV. 1007 (1994).

*Federal Judicial Review of State Ballot Access Regulation: Escape from the Political Thicket*, 20 T. MARSHALL L. REV. 87 (1994).

*Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code*, 19 T. MARSHALL L. REV. 241 (1994).

*Foreword to Symposium on Bankruptcy Law*, 18 MISS. COL. L. REV. 281 (1998).

*The Bankruptcy Rules: 1994, in* 1995-96 ANNUAL SURVEY OF BANKRUPTCY LAW 1111 (William L. Norton, Jr. ed., 1995) (co-authored with Matthew W. Levin).

Book Review, ROBERT WRIGHT, NONZERO: THE LOGIC OF HUMAN DESTINY, 51 IDEAS ON LIBERTY 61 (2001).

Book Review, GREGORY S. ALEXANDER, COMMODITY AND PROPRIETY: COMPETING VISIONS OF PROPERTY IN AMERICAN LEGAL THOUGHT, 4 INDEPENDENT REV. 147 (1999).

Book Review, JEREMY SHEARMUR, BEYOND HAYEK, 11 CONST. POL. ECON. 205 (2000).

Book Review, BRUCE YANDLE, COMMON LAW AND COMMON SENSE FOR THE ENVIRONMENT, 9 CONST. POL. ECON. 349 (1998).

Book Review, CASS R. SUNSTEIN, LEGAL REASONING AND POLITICAL CONFLICT, 8 CONST. POL. ECON. 355 (1997).

Book Review, C.H. HOEBEKE, THE ROAD TO MASS DEMOCRACY: ORIGINAL INTENT AND THE SEVENTEENTH AMENDMENT, 1 INDEPENDENT REVIEW 439 (1996).

**WORKING PAPERS**

*Wine Wars: The 21ˢᵗ Amendment and Discriminatory Bans to Direct Shipment of Wine*, available in http://papers.ssrn.com/sol3/papers.cfm?abstract_id=604803.

*Why So Many Bankruptcies and What to Do About It: An Economic Analysis of Consumer Bankruptcy Law and Bankruptcy Reform*, available at: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=454121

**EXPERIENCE**

**CHAIR, CONSUMER FINANCIAL PROTECTION BUREAU TASKFORCE ON FEDERAL CONSUMER FINANCIAL LAW, WASHINGTON, DC 2020-21**
Chaired a federal taskforce that produced a 2 volume, 900 page comprehensive report on the consumer financial protection system and recommendations for reforms.

**ANTONIN SCALIA LAW SCHOOL, GEORGE MASON UNIVERSITY, ARLINGTON, VA 1998-PRESENT.**
Executive Director, Law and Economics Center, 2015-2017. George Mason University Foundation Professor of Law, 2009-present; Professor of Law, 2002-2009; Associate Professor, 2000-2002; Assistant Professor, 1998-2000. Editor, *Supreme Court Economic Review*, 2006-present, 2002-2003. Senior Scholar, Mercatus Center; Senior Fellow, F.A. Hayek Program for Advanced Study in Philosophy, Politics, and Economics.

**SENIOR FELLOW, CATO INSTITUTE, WASHINGTON, DC (2018-PRESENT).**

**VANDERBILT UNIVERSITY LAW SCHOOL, NASHVILLE, TN 2007.**
Visiting Professor of Law.

**GEORGETOWN UNIVERSITY LAW CENTER, WASHINGTON, DC 2004-2005.**
Visiting Professor of Law, August 2004-May 2005.

**DIRECTOR, OFFICE OF POLICY PLANNING, FEDERAL TRADE COMMISSION, WASHINGTON, DC MAY 2003-JULY 2004.**
Director of Federal Trade Commission's policy office (SES Appointment). Responsible for helping to conceive and execute policies and priorities of Commission on issues of Consumer Protection, Competition, and Competition Advocacy.

**BOSTON COLLEGE SCHOOL OF LAW, BOSTON, MA 2002.**
Visiting Professor.

**MISSISSIPPI COLLEGE SCHOOL OF LAW, JACKSON, MISSISSIPPI, 1996-1998.**
Assistant Professor of Law.

**ALSTON & BIRD, ATLANTA, GEORGIA, 1994-1996.**
Representations included SportsTown, Inc., Chapter 11 Debtor in Possession; Sonic Communications, Inc., Chapter 11 Operating and Chapter 7 Trustee; Krystal Corp.,

Unsecured Creditors Committee; and a variety of secured and unsecured creditors in federal bankruptcy and state collection proceedings.

**LAW CLERK TO HON. JUDGE JERRY E. SMITH, UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT, HOUSTON, TEXAS, 1993-1994.**

**SUMMER LAW CLERK FOR HON. JUDGE ALEX KOZINSKI, UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT, PASADENA, CALIFORNIA, 1991.**

## HONORS AND AWARDS

Chair, Section on Law & Economics, Association of American Law Schools (2019).

Winner (with Edward Stringham), 2012 Society for Development of Austrian Economics Prize for Best Article in Austrian Economics.

Invited Lecture, Dean Lindsey Cowen Lecture in Business Law and Regulation Presented by the Center for Business Law and Regulation at Case Western Reserve University School of Law (March 3, 2011).

George Mason Foundation Professor of Law (2009-present).

Institute for Humane Studies Charles G. Koch Outstanding IHS Alum Award (2009).

Searle Fellow, George Mason University (Fall 2008).

Senior Fellow, Goldwater Institute (2008-2015).

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow and the Arch W. Shaw National Fellow at the Hoover Institution on War, Revolution and Peace (Fall 2008).

Senior Scholar, Mercatus Center at George Mason University (2005-present).

Senior Fellow, James M. Buchanan Center for the Study of Political Economy (2005-present).

Honorable Mention American College of Consumer Financial Services Lawyers 2006 writing competition for *An Economic Analysis of the Consumer Bankruptcy Crisis*, 99 NORTHWESTERN L. REV. 1463 (2005).

Recipient of 2001 "Win Whittaker Award for Student Development" as Professor of the Year at George Mason University School of Law.

Recipient of grant from The John Templeton Foundation Freedom Project to teach a course on "The Rule of Law, Freedom, and Prosperity." (Co-taught with Peter Boettke, Department of Economics, George Mason University). Fall 2001.

Recipient of grant from The John Templeton Foundation Freedom Project to teach a course on "The Rule of Law and the Legal Foundations of a Free Society." (Co-taught with Peter Boettke, Department of Economics, George Mason University). Fall 1999.

**TEACHING INTERESTS**
Bankruptcy, Contracts, Secured Transactions, Business Associations, Mergers and Acquisitions, Corporate Finance, Commercial Law, Electronic Commerce, Payment Systems, Consumer Law, Law & Economics, Public Choice & The Law, Evolutionary Analysis of Law, Law & Behavioral Economics. *Currently Teaching (2002-03):* Bankruptcy, Contracts, Law & Behavioral Economics.

**RESEARCH INTERESTS**
Bankruptcy, Contracts, Law and Economics, Evolutionary Analysis of Law, Law & Behavioral Economics, Consumer Law, Environmental Law and Economics, Public Choice, Constitutional Economics, Business Associations, Electronic Commerce.

**LAW SCHOOL AND UNIVERSITY SERVICE**
Member of Dean Search Committee (2014-2015).
Editor, *Supreme Court Economic Review* Volume 1 (2001-2002), Volume 17-23 (2011-2017).
Member of Dean Retention Committee (Spring 2001).
Member of Faculty Appointments Committee (1999-2002, 2004-current); Clerkship Committee (2000-02, 2005-current).
Faculty Advisor, St. Thomas More Catholic Law Students Society (1999-2007).
Member of several dissertation committees for Economics Department PhD Candidates.

**EDUCATION**

**UNIVERSITY OF VIRGINIA SCHOOL OF LAW**
J.D., 1993
Executive Editor, Virginia Tax Review.
John M. Olin Scholar in Law and Economics.

**CLEMSON UNIVERSITY**
M.A. Economics, 1990.
H.W. Close Fellow in College of Commerce and Industry.
Only Student Member of Clemson Law and Economics Workshop.
Training in Statistics, Econometrics, and Computer Analysis.

**DARTMOUTH COLLEGE**
A.B. cum Laude with High Honors in Government Major, 1988.
Rufus Choate Scholar.
Three Citations for Exceptional Class Performance.

**CONGRESSIONAL TESTIMONY**

Testimony before the Senate Committee on Banking, Housing and Urban Affairs, "Assessing the Effects of Consumer Credit Regulations" (Apr. 5, 2016).

Testimony before the House Committee on Financial Services, "The Dodd-Frank Act Five Years Later: Are We Freer?" (Sept. 17, 2015).

Testimony before the House Committee on Financial Services, "The Dodd-Frank Act Five Years Later: Are We More Stable?" (July 9, 2015).

Testimony before the House Committee on Oversight and Government Relations, Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs, "The Administration's Auto Bailouts and the Delphi Pension Decisions: Who Picked the Winners and Losers?" (July 10, 2012).

Testimony before the House Committee on Oversight and Government Relations, Subcommittee on TARP, Financial Services and Bailouts of Public and Private Programs, "Who's Watching the Watchmen?" (May 24, 2011).

Testimony before United States House of Representatives, Committee on Financial Services and Committee on Small Business, "The Condition of Small Business and Commercial Real Estate Lending in Local Markets," (Feb. 26, 2010).

Testimony before United States House of Representatives, Committee on Financial Services, "Banking Industry Perspectives on the Obama Administration's Financial Regulatory Reform Proposals" (July 15, 2009).

Testimony before United States House of Representatives, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law, "Circuit City Unplugged: Why Did Chapter 11 Fail to Save 34,000 Jobs?" (March 11, 2009).

Testimony before the United State Senate Committee on Banking, Housing, and Urban Affairs, "Modernizing Consumer Protection in the financial Regulatory System: Strengthening Credit Card Protections" (February 12, 2009).

Testimony before the United States House of Representatives, Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, "Credit Card Practices: Current Consumer and Regulatory Issues" (April 26, 2007).

Testimony before the United States House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Hearing on Working Families in Financial Crisis: Medical Debt and Bankruptcy" (July 17, 2007).

Testimony before United States Senate, Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts, "Oversight of the Implementation of the Bankruptcy Abuse Prevention and Consumer Protection Act" (December 5, 2006).

Testimony before United States Senate, Committee on the Judiciary, "Bankruptcy Reform" (February 10, 2005).

Testimony before United States House of Representatives, Committee on Commerce, Trade, and Consumer Protection, "E-Commerce: The Case of Online Wine Sales and Direct Shipment" (October 30, 2003).

Testimony before Federal Judicial Conference Committee on Bankruptcy Rules, "Proposed Amendments to the Bankruptcy Rules" (January 26, 2001).

Testimony before United States House of Representatives, Committee on Government Reform, Subcommittee on Government Management, Information, and Technology, on "Transitioning to a New Administration: Can the Next President Be Ready?" (December 4, 2000).

Testimony before United States House of Representatives, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law on "Perspectives on Consumer Bankruptcy and the Bankruptcy Reform Act of 1999" (March 17, 1999).

Testimony before Joint Hearing of the United States Senate, Committee on the Judiciary, Judiciary Subcommittee on Administrative Oversight and the Courts and House of Representatives, Committee on the Judiciary, Subcommittee on Commercial and Administrative Law on "The Bankruptcy Reform Act of 1999" (March 11, 1999).

Testimony before United States Senate, Committee on the Judiciary, Judiciary Subcommittee on Administrative Oversight and the Courts on " Bankruptcy Issues in Review: The Bankruptcy Code's Effect on Religious Freedom and A Review of the Need for Additional Bankruptcy Judgeships" (September 22, 1997).

## PROFESSIONAL ACTIVITIES

Consumer Representative, Debt Buyers Association Certification Council (2013-2015).

Board of Directors, Competitive Enterprise Institute (2013-2016; 2019-present), Chairman (2014-2016).

Senior Fellow, F.A. Hayek Program on Politics, Philosophy, and Economics (2012-present).

Board of Trustees, Center for Excellence in Higher Education (2010-present).

Board of Trustees, Yorktown University (2009-2016).

Board of Trustees, Institute for Humane Studies (2009-present).

Editor, *Supreme Court Economic Review* (2001-2003, 2006-present).

Board of Directors (2007-2015) and Advisory Council (2006-2015), Financial Services Research Program.

Board of Directors (2008-present) and Chair of Academic Advisory Council (2000-present), The Bill of Rights Institute.

Senior Fellow, Goldwater Institute (2007-2012).

Board of Trustees, Foundation for Research on Economics and the Environment (2009-present).

Member, United States Department of Justice Study Group on "Identifying Fraud, Abuse and Errors in America's Bankruptcy System" (2006-2007).

Alumni Trustee, Dartmouth College Board of Trustees (2005-2009).

Chair, Academic Advisory Panel, McCormick-Tribune Foundation Freedom Museum, Chicago, Illinois (August 2004-present).

Advisory Board, *American Bankruptcy Institute Law Review* (2003-present).

Chair, Academic Advisory Panel, "We the People in IMAX," IMAX Film with accompanying educational material.

Referee, *American Political Science Review; Contemporary Economic Policy; Review of Austrian Economics; Journal of Institutional and Theoretical Economics; Philosophy, Politics, and Economics; Journal of Bioeconomics; Public Choice; Supreme Court Economic Review* (2000-present).

Research Fellow, International Center for Economic Research (ICER), Turin, Italy (May-June, 2002).

Advisory Council, Centro para el Analisis de law Decisiones Publicas, Universidad de Francisco Marroquin, Guatemala City, Guatemala (2000-c.2008).

Consejo Consultivo of the Centro de Opcion Publica, Universidad de Francisco Marroquin, Guatemala (Academic Advisory Council of Public Choice Center at University of Francisco Marroquin in Guatemala) (2000-c.2008).

Senior Research Fellow, Program on Markets and Institutions, James Buchanan Center for Political Economy at George Mason University (2001-2012).

Contributing Editor, NORTON BANKRUPTCY TREATISE Chapter 51, Property of the Estate (1997-present).

Co-Chair, Bankruptcy Subcommittee, Federalist Society Financial Services and E-Commerce Practice Group (1999-present).

Co-Authored several proposals and position papers for the National Bankruptcy Review Commission (1997).

Member, American Bankruptcy Institute (1999-present).

## SELECTED MEDIA

### TELEVISION

"The Larry Parks Show" (June 7, 2012) discussing "The Rule of Law."

Fox Business, Freedom Watch with Andrew Napolitano (January 13, 2012) discussing "Food Advertising Regulation."

Fox Business, "The Willis Report" (Oct. 5, 2011) discussing "The Dick Durbin Bank Fees."

Fox Business, "The Willis Report" (Jan. 4, 2011) discussing "Dodd-Frank and the Return of the Loan Shark."

Fox News, John Stosell's "Top 10 Politicians' Promises Gone Wrong" (Dec. 17, 2010).

NBC Nightly News (Oct. 17, 2010) discussing public employee pensions.

ABC World News Tonight (June 3, 2009) discussing General Motors bankruptcy.

Fox Business, "Neil Caputo Show" (May 14, 2009) to discuss "Chrysler and the Rule of Law."

Fox News, "Fox and Friends" (December 19, 2008) discussing reorganization of automotive industry.

PBS, "The Newshour with Jim Lehrer" (October 17, 2005) discussing bankruptcy reform legislation.

CNN, "Lou Dobbs Tonight" (March 2005) discussing bankruptcy reform legislation.

CNBC, (July 2002) discussing WorldCom Bankruptcy.

CNBC, "Business Center" (February 6, 2002) discussing Congressional Hearings on Enron matter.

CNBC, "Business Center" (February 1, 2002) discussing Enron bankruptcy.

ABC World News Tonight, "Bankruptcy Reform" (February 2001).

Bloomberg News, "Bankruptcy Reform" (February 2001).

CNNfn, "Bankruptcy Reform" (February 2001).

Bloomberg News (November 2000).

### RADIO

The Bob Zadek Show, "Repeal the 17th Amendment?" (June 24, 2012), listen here.

WTOP Radio, "Obama Acts Alone in Picking Head of Consumer Protection Bureau" (Jan 4, 2011), listen here.

John Batchelor Show, "The Auto Bailouts and the Rule of Law"  (April 25, 2011), listen here.

"To The Point," NPR, "The Supreme Court and the Bankrupt: Is Debt the American Way?" (Jan. 14, 2011), listen here.

"On Point," NPR, "Pension Envy, Pension Crisis" (July 28, 2010) discussing public employee pensions, listen here.

Lou Dobbs Show to Discuss "Chrysler and the Rule of Law" (May 14, 2009).

Jerry Doyle Show to discuss "Chrysler and the Rule of Law" (May 13, 2009).

The Diane Rehm Show to discuss "Credit Card Holders' Bill of Rights" (May 5, 2009).

California Commerce (with John McCauley), "Regulation of Consumer Credit," listen here.

California Commerce (with John McCauley), "Modifying Mortgages in Bankruptcy," listen here.

Econtalk (with Russ Roberts), "Zywicki on Debt and Bankruptcy," Podcast, listen here.

The Exchange, New Hampshire Public Radio, "Bankruptcy Law Reform," listen here.

American Radioworks Documentary, "Bankrupt: Maxed Out in America," listen here.

Appearance on "The Conversation" to discuss "New Consumer Bankruptcy Laws," KUOW Radio Seattle (Sept. 20, 2005), Audio available here.

Regular Commentator on "The Laura Ingraham Show"

Appearance on "The Connection," National Public Radio, to discuss Bankruptcy Reform (March 2002).

Appearance on NPR "The Diane Rehm Show" to discuss Bankruptcy Reform (May 25, 2000).

Appearance on CNN "Burden of Proof" to discuss AOL-Time Warner merger (March 2000).

Appearance on PBS "The Newshour with Jim Lehrer" to discuss bankruptcy reform (June 14, 1999).

**PRINT**

*The CFPB Could Be a Force For Good*, WALL ST. J. (Feb. 19, 2018).

*Durbin's Debit-Card Price Controls Hit the Poor Hardest* (with Julian Morris), WALL ST. J. (May 1, 2017).

*The Constitution Says Nothing About Behavioral Economics* (with Geoffrey A. Manne), WALL ST. J. (Man. 9, 2017).

*Credit is a Powerful Tool for American Families* (with Thomas A. Durkin), WASHINGTON POST (April 17, 2015).

*Overdraft Protection Rules Could Hurt Consumers More Than They Help* (with G. Michael Flores), AMERICAN BANKER (November 24, 2014).

*A Nobel Economist's Caution About Government: Friedrich Hayek Warned that Intervening can Make Things Worse. ObamaCare and Dodd-Frank, Anyone?* (with Donald J. Boudreaux), WALL STREET JOURNAL, page A15 (Oct. 13, 2014).

*The new EU price controls that will hold back a cashless future--and hit the poor* (with Geoffrey Manne and Julian Morris), CITY A.M. (London, England) (June 9, 2014).

*If you want to whiten the economy, payments should be made electronically*, ZIARUL FINANCIAR (Bucharest, Romania) (May 13, 2014).

*America's Taxpayers Lost Big in UAW Bailout* (with James Sherk), DETROIT NEWS (June 26, 2012).

*Obama's United Auto Workers Bailout* (with James Sherk), WALL STREET JOURNAL, page A19 (June 13, 2012).

*Spongebob Squarepants' Last Stand*, WALL STREET JOURNAL, page A11 (April 13, 2012).

*Set Interac Free: Burdensome Federal Regulations Discourage Innovation*, NATIONAL POST (Dec. 19, 2011).

*The Dick Durbin Bank Fees*, WALL STREET JOURNAL, page A15 (Sept. 30, 2011).

*Lender Punishment Mustn't Reward Defaulters: Forced Principal Reduction is the Wrong Solution to the Foreclosure Fiasco*, WASHINGTON TIMES, p. B3 (June 9, 2011).

*Bureau of Consumer Protection Must Put Consumers First*, WASHINGTON TIMES, page B3 (May 6, 2011).

*Roar of the Lion Father: Parenting for Creativity Beats Parenting for Performance*, WASHINGTON TIMES, page B1 (Jan. 25, 2011).

*Anna Nicole Smith Case Offers Court Opportunity to Limit Forum-Shopping in Bankruptcy Cases*, NATIONAL LAW JOURNAL (Jan. 11, 2011).

*Dodd-Frank and the Return of the Loan Shark*, WALL STREET JOURNAL, page A17 (Jan. 4, 2011).

*Repeal the Seventeenth Amendment*, NATIONAL REVIEW 20 (Nov. 15, 2010).

*The Next Hot Ticket in Financial Reform* (with John Morrall and Richard Williams), REUTERS (Oct. 8, 2010).

*In Elizabeth Warren We Trust?*, WALL STREET JOURNAL, page A25 (Sept. 30, 2010).

*How Public Employee Pensions are Too Rich for New York's--and America's--Blood*, NEW YORK DAILY NEWS (Aug. 8, 2010).

*Durbin's Antitrust Fantasies: Flawed Economics Behind Democrats Price Control Plan* (with Josh Wright), WASHINGTON TIMES, page B4 (June 17, 2010).

*Why Aren't Banks Lending? Because Bureaucrats and Politicians Won't Let Them*, WASHINGTON TIMES, page B1 (June 10, 2010).

*Durbin Regulations are Aimed at Your Wallet: They'll Cost us **All** Money and Convenience*, WASHINGTON TIMES, page B1 (June 3, 2010).

*Stripper Searches for Loot Loophole*, WASHINGTON TIMES, page B3 (Feb. 26, 2010).

*Complex Loans Didn't Cause the Crisis*, WALL STREET JOURNAL, page A18 (Feb. 18, 2010).

*Will Congress Take Another Swipe at Credit Cards?*, WALL STREET JOURNAL, page A17 (Jan. 5, 2010).

*America's Debt Paranoia*, 59(8) THE FREEMAN (October 2009).

*Check that Checkbook: A Guide to Smarter Alumni Giving*, NATIONAL REVIEW, page A43 (Oct. 5, 2009),

*Let's Treat Borrowers Like Adults: The Problems with a Financial Products Safety Panel*, WALL STREET JOURNAL, page A17 (July 8, 2009),

*Chrysler and the Rule of Law*, WALL STREET JOURNAL, page A19 (May 13, 2009).

*Low Rates Led to ARMs*, WALL STREET JOURNAL, page A18, (March 26, 2009).

*Bankruptcy is the Perfect Remedy for Detroit*, WALL STREET JOURNAL, page A21 (December 16, 2008).

*The Two-Income Tax Trap*, WALL STREET JOURNAL (August 2007).

*Junk Social Science Index* (with Gail Heriot), WASHINGTON TIMES, page A16 (July 26, 2007), *available* here.

*A Great Mind? Miers Might Vote Right, But What the Court Truly Needs Is Intellectual Leadership*, LEGAL TIMES (October 10, 2005).

*Reforming Bankruptcy Laws: Changes Will Help Everyone*, SAN DIEGO UNION-TRIBUNE (March 17, 2005).

Op-Ed, "Deadbeats Cost All of Us Dearly," USA TODAY, page 17A (June 22, 2000).

I have also been quoted regularly in major media outlets on issues of bankruptcy law and consumer credit, including *Forbes, Fortune, Business Week, The New York Times, The Wall Street Journal, Washington Post, Washington Times, Chronicle of Higher Education, Boston Globe, Christian Science Monitor, Houston Chronicle, Dallas Morning News, Toronto Star*, and many other leading newspapers and magazines. Quoted in "Washington Whispers," *U.S. News & World Report* (Aug. 5, 2002). I have also been quoted in several foreign publications, including the BBC (Britain), the *Daily Yomiuri* (Japan), and *RP Online* (Germany).

I have been profiled in *The Daily Deal* for my views on Bankruptcy Reform and other bankruptcy-related issues, as well as a recurrent commentator for *The Daily Deal. See* http://www.thedeal.com/NASApp/cs/ContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=TDDArticle&cid=TDD6A64S8MC

**INTERNET**

Member of the "Volokh Conspiracy," www.volokh.com

*From Kelo With Love: Revisiting Kelo's Flawed Economics and Vacuous Constitutionalism*, LIBERTY FORUM (Nov. 4, 2012), *available* here.

*The Banality of Bailouts, Special-Interests, and Political Corruption*, LIBERTY LAW (Oct. 29, 2012), *available* here.

*The Revenge of Richard Nixon: The Consumer Financial Protection Bureau Spreads Its Tentacles*, LIBERTY LAW (Oct. 20, 2012), *available* here.

*The Rule of Law and the Auto Bailouts: A Conversation with ToddG Zywicki*, LIBERTY LAW TALK PODCAST (June 3, 2012), *available* here.

*Milton Friedman and Friedrich Hayek: Fifty Years Later*, LIBERTY LAW (May 4, 2012), *available* here.

*Upholding the Rule of Law, In Season and Out of Season*, LIBERTY LAW (Apr. 20, 2012), *available* here.

*The Robo-Signing Settlement: Seeds of Recovery or Chaos?*, FORBES.COM (Feb. 20, 2012), *available* <u>here</u>.

*It's Time to Finalize the Robo-Signing Settlement*, FORBES.COM (OCT. 17, 2011), *available* <u>here</u>.

*The Truth About the Auto Bailouts*, REAL CLEAR POLITICS (July 13, 2011), *available* <u>here</u>.

*Durbin's Innovation Killer: The Durbin Amendment would Raise Costs for Consumers, Increase Fraud, and Kill Innovation*, THE AMERICAN (June 11, 2011), *available* <u>here</u>.

*Deutsche Bank a Scapegoat for Bad Housing Policy*, FORBES.COM (May 11, 2011), *available* <u>here</u>.

Reason.tv, "The Next Great Leap Backwards for Consumer 'Rights'" (August 2009), *available* <u>here</u>.

*Obama's Ailing Popularity*, FORBES.COM (August 21, 2009), *available* <u>here</u>.

*My Favorite President: Calvin Coolidge*, NATIONAL REVIEW ON-LINE (February 16, 2009), *available* <u>here</u>.

*Rebalancing the Bankruptcy Code*, JURIST, August 18, 2005, *available* <u>here</u>.

*Credit Worthy*, NATIONAL REVIEW ON-LINE (March 16, 2005), *available* <u>here</u>.

*Bankrupt Criticisms*, NATIONAL REVIEW ON-LINE (March 15, 2005), *available* <u>here</u>.

## EXPERT TESTIMONY

*Hawkins v. First Tennessee Bank*, Shelby County Circuit Court, Tennessee, 13th Judicial District, Case No. CT-004085-11, Div. VII (2011).

*Consumer Financial Protection Bureau v. CashCall, Inc., et al.*, United States District Court for the Central District of California, Case No. 2:15-cv-07522-JFW (RAOx) (2015).

*In re: HSBC USA, N.A., Debit Card Overdraft Fee Litigation*, Civil Action No. 2:13-MD-02451 (2013).

*James v. National Financial*, Delaware Court of Chancery, C.A. No. 8931-VCL (2014).

*Morgan Drexen, Inc. and Kimberly A. Pisinski v. Consumer Financial Protection Bureau*, United States District Court for the District of Columbia, Civil Action No. 13-01112 (CKK) (2013).

*Cox v. Community Loans of America*, United States District Court, Middle District of Georgia, Case No. 4:11-cv-177 (CDL) (2013)

*Hammer v. Sam's East, Inc.*, United States District Court, Western District of Missouri, Case No. Case No. 4:08-cv-00788-HFS (2012).

*Experian Information Solutions, Inc. v. Lifelock, Inc.*, United States District Court, Central District of California, Case No. SACV08-00165 AB (2009).

*Anthony V. Valaitis v. Third Federal Saving & Loan Association of Cleveland*, Court of Common Pleas, Lake County, OH, Case No. 07 CV 002329 (2008).

*Bhandari v. Nilsestuen, et al.*, Dane County, Wisconsin, Case No. 07-CV-2226 (2008).

*Charles Brown, et al. v. David Hovatter, et al.*, United States District Court for the District of Maryland, Case No. 1:06-CV-00524-RDB (2007).

*Smith v. PNC Mortgage Corp. of America (In re Smith)*, United States Bankruptcy Court, Southern District of Alabama, Southern Division, Case No. 98-11129, Adv. No. 99-1138 (2002).

*Rocky Dwayne Sheffield v. Homeside Lending, Inc. (In re Sheffield)*, United States Bankruptcy Court for the Southern District of Alabama, Southern Division, Case No. 97-10511-MAM (2000).

EXHIBIT B

Democratic
Electors
→

# S T A T E   O F   H A W A I I

WE, the undersigned, Electors of President and Vice-President of the United States of America, for the respective terms beginning on the twentieth day of January, in the year of our Lord one thousand nine hundred and sixty-one, being electors duly and legally appointed and qualified by and for the State of Hawaii, as appears by the annexed list of electors, made, certified, and delivered to us by the Executive of the State, having met and convened at the Capitol, in Honolulu, in said State, in pursuance of the Constitution and laws of the United States, and in the manner provided by the laws of the State of Hawaii, on the first Monday after the second Wednesday, being the nineteenth day of December, in the year of our Lord one thousand nine hundred and sixty.

DO HEREBY CERTIFY, That being so assembled and duly organized, we proceeded to vote by ballot, and balloted first for such President and then for such Vice-President, by distinct ballots.

AND WE FURTHER CERTIFY, That the following are two distinct lists; one, of the votes for President, and the other, of the votes for Vice-President, so cast as aforesaid:
List of all Persons Voted for as President, with the Number of Votes for Each.

| NAME OF PERSON VOTED FOR | NUMBER OF VOTES |
|---|---|
| JOHN F. KENNEDY OF MASSACHUSETTS | THREE |

Copy

List of all Persons Voted for as Vice-President, with the
Number of Votes for Each.

| NAME OF PERSON VOTED FOR | NUMBER OF VOTES |
|---|---|
| LYNDON B. JOHNSON OF TEXAS | THREE |

IN WITNESS WHEREOF, we have hereunto set our hands.
Done at the Capitol, in the City of Honblulu, and State of
Hawaii, on the first Monday after the second Wednesday, being
the nineteenth day of December, in the year of our Lord one
thousand nine hundred and sixty.

/s/ Jannie K. Wilson )
/s/ William H. Heen ) Electors
Gilbert E. Metzger )

-2-

We hereby certify that the lists of all the votes of the State of Hawaii given for President, and of all the votes given for Vice President, are contained herein.

*James F. Wilson*

*William Allen*

*Delbert Metzger*



From:

Jennie K. Wilson
Delbert E. Metzger
William H. Heen
Honolulu, Hawaii

WM. H. HEEN
602 Trustco Bldg.
Honolulu 13, Hawaii

AIRMAIL

RETURN RECEIPT REQUESTED

REGISTERED
9946

VIA AIR MAIL

The Administrator of General Services
        Of the United States of America
Washington, 25
D.C.

VIA AIR MAIL



Received NA - A

DEC 2 3 1960

COLUMBIAN NATURAL CLASP NO. 90 N
® UNITED STATES ENVELOPE COMPaay
9 X 12

EXHIBIT 2

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 1

§ 1. Time of appointing electors

Effective: December 29, 2022
Currentness

The electors of President and Vice President shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day.

**CREDIT(S)**

(Added Pub.L. 117-328, Div. P, Title I, § 102(a), Dec. 29, 2022, 136 Stat. 5233.)

Notes of Decisions (5)

3 U.S.C.A. § 1, 3 USCA § 1
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 3

§ 3. Number of electors

Currentness

The number of electors shall be equal to the number of Senators and Representatives to which the several States are by law entitled at the time when the President and Vice President to be chosen come into office; except, that where no apportionment of Representatives has been made after any enumeration, at the time of choosing electors, the number of electors shall be according to the then existing apportionment of Senators and Representatives.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 672.)

3 U.S.C.A. § 3, 3 USCA § 3
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 4

§ 4. Vacancies in electoral college

Effective: December 29, 2022
Currentness

Each State may, by law enacted prior to election day, provide for the filling of any vacancies which may occur in its college of electors when such college meets to give its electoral vote.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 673; Pub.L. 117-328, Div. P, Title I, § 103, Dec. 29, 2022, 136 Stat. 5234.)

3 U.S.C.A. § 4, 3 USCA § 4
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                                  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 5

§ 5. Certificate of ascertainment of appointment of electors

Effective: December 29, 2022
Currentness

**(a) In general.**--

**(1) Certification.**--Not later than the date that is 6 days before the time fixed for the meeting of the electors, the executive of each State shall issue a certificate of ascertainment of appointment of electors, under and in pursuance of the laws of such State providing for such appointment and ascertainment enacted prior to election day.

**(2) Form of certificate.**--Each certificate of ascertainment of appointment of electors shall--

**(A)** set forth the names of the electors appointed and the canvass or other determination under the laws of such State of the number of votes given or cast for each person for whose appointment any and all votes have been given or cast;

**(B)** bear the seal of the State; and

**(C)** contain at least one security feature, as determined by the State, for purposes of verifying the authenticity of such certificate.

**(b) Transmission.**--It shall be the duty of the executive of each State--

**(1)** to transmit to the Archivist of the United States, immediately after the issuance of a certificate of ascertainment of appointment of electors and by the most expeditious method available, such certificate of ascertainment of appointment of electors; and

**(2)** to transmit to the electors of such State, on or before the day on which the electors are required to meet under section 7, six duplicate-originals of the same certificate.

**(c) Treatment of certificate as conclusive.**--For purposes of section 15:

**(1) In general.**--

**(A) Certificate issued by executive.**--Except as provided in subparagraph (B), a certificate of ascertainment of appointment of electors issued pursuant to subsection (a)(1) shall be treated as conclusive in Congress with respect to the determination of electors appointed by the State.

**(B) Certificates issued pursuant to court orders.**--Any certificate of ascertainment of appointment of electors required to be issued or revised by any State or Federal judicial relief granted prior to the date of the meeting of electors shall replace and supersede any other certificates submitted pursuant to this section.

**(2) Determination of Federal questions.**--The determination of Federal courts on questions arising under the Constitution or laws of the United States with respect to a certificate of ascertainment of appointment of electors shall be conclusive in Congress.

**(d) Venue and expedited procedure.**--

**(1) In general.**--Any action brought by an aggrieved candidate for President or Vice President that arises under the Constitution or laws of the United States with respect to the issuance of the certification required under section (a)(1), or the transmission of such certification as required under subsection (b), shall be subject to the following rules:

**(A) Venue.**--The venue for such action shall be the Federal district court of the Federal district in which the State capital is located.

**(B) 3-Judge Panel.**--Such action shall be heard by a district court of three judges, convened pursuant to section 2284 of title 28, United States Code, except that--

**(i)** the court shall be comprised of two judges of the circuit court of appeals in which the district court lies and one judge of the district court in which the action is brought; and

**(ii)** section 2284(b)(2) of such title shall not apply.

**(C) Expedited procedure.**--It shall be the duty of the court to advance on the docket and to expedite to the greatest possible extent the disposition of the action, consistent with all other relevant deadlines established by this chapter and the laws of the United States.

**(D) Appeals.**--Notwithstanding section 1253 of title 28, United States Code, the final judgment of the panel convened under subparagraph (B) may be reviewed directly by the Supreme Court, by writ of certiorari granted upon petition of any party to the case, on an expedited basis, so that a final order of the court on remand of the Supreme Court may occur on or before the day before the time fixed for the meeting of electors.

**(2) Rule of construction.**--This subsection--

**(A)** shall be construed solely to establish venue and expedited procedures in any action brought by an aggrieved candidate for President or Vice President as specified in this subsection that arises under the Constitution or laws of the United States; and

**(B)** shall not be construed to preempt or displace any existing State or Federal cause of action.

### CREDIT(S)

(June 25, 1948, c. 644, 62 Stat. 673; Pub.L. 117-328, Div. P, Title I, § 104(a), Dec. 29, 2022, 136 Stat. 5234.)

Notes of Decisions (10)

3 U.S.C.A. § 5, 3 USCA § 5
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   3

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 6

§ 6. Duties of Archivist

Effective: December 29, 2022
Currentness

The certificates of ascertainment of appointment of electors received by the Archivist of the United States under section 5 shall--

**(1)** be preserved for one year;

**(2)** be a part of the public records of such office; and

**(3)** be open to public inspection.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 673; Oct. 31, 1951, c. 655, § 6, 65 Stat. 711; Pub.L. 98-497, Title I, § 107(e)(1), (2)(A), Oct. 19, 1984, 98 Stat. 2291; Pub.L. 117-328, Div. P, Title I, § 105(a), Dec. 29, 2022, 136 Stat. 5236.)

Notes of Decisions (4)

3 U.S.C.A. § 6, 3 USCA § 6
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 7

§ 7. Meeting and vote of electors

Effective: December 29, 2022
Currentness

The electors of President and Vice President of each State shall meet and give their votes on the first Tuesday after the second Wednesday in December next following their appointment at such place in each State in accordance with the laws of the State enacted prior to election day.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 673; Pub.L. 117-328, Div. P, Title I, § 106(a), Dec. 29, 2022, 136 Stat. 5236.)

Notes of Decisions (2)

3 U.S.C.A. § 7, 3 USCA § 7
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 8

§ 8. Manner of voting

Currentness

The electors shall vote for President and Vice President, respectively, in the manner directed by the Constitution.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 674.)

3 U.S.C.A. § 8, 3 USCA § 8
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 9

§ 9. Certificates of votes for President and Vice President

Effective: December 29, 2022
Currentness

The electors shall make and sign six certificates of all the votes given by them, each of which certificates shall contain two distinct lists, one of the votes for President and the other of the votes for Vice President, and shall annex to each of the certificates of votes one of the certificates of ascertainment of appointment of electors which shall have been furnished to them by direction of the executive of the State.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 674; Pub.L. 117-328, Div. P, Title I, § 104(c)(1), Dec. 29, 2022, 136 Stat. 5236.)

3 U.S.C.A. § 9, 3 USCA § 9
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 3. The President (Refs & Annos)
     Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 10

§ 10. Sealing and endorsing certificates

Effective: December 29, 2022
Currentness

The electors shall seal up the certificates of votes so made by them, together with the annexed certificates of ascertainment of appointment of electors, and certify upon each that the lists of all the votes of such State given for President, and of all the votes given for Vice President, are contained therein.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 674; Pub.L. 117-328, Div. P, Title I, § 106(b), Dec. 29, 2022, 136 Stat. 5236.)

3 U.S.C.A. § 10, 3 USCA § 10
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 3. The President (Refs & Annos)
      Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 11

§ 11. Transmission of certificates by electors

Effective: December 29, 2022
Currentness

The electors shall immediately transmit at the same time and by the most expeditious method available the certificates of votes so made by them, together with the annexed certificates of ascertainment of appointment of electors, as follows:

**(1)** One set shall be sent to the President of the Senate at the seat of government.

**(2)** Two sets shall be sent to the chief election officer of the State, one of which shall be held subject to the order of the President of the Senate, the other to be preserved by such official for one year and shall be a part of the public records of such office and shall be open to public inspection.

**(3)** Two sets shall be sent to the Archivist of the United States at the seat of government, one of which shall be held subject to the order of the President of the Senate and the other of which shall be preserved by the Archivist of the United States for one year and shall be a part of the public records of such office and shall be open to public inspection.

**(4)** One set shall be sent to the judge of the district in which the electors shall have assembled.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 674; Oct. 31, 1951, c. 655, § 7, 65 Stat. 712; Pub.L. 98-497, Title I, § 107(e)(1), Oct. 19, 1984, 98 Stat. 2291; Pub.L. 117-328, Div. P, Title I, § 107(a), Dec. 29, 2022, 136 Stat. 5236.)

3 U.S.C.A. § 11, 3 USCA § 11
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| Title 3. The President (Refs & Annos) |
| Chapter 1. Presidential Elections and Vacancies (Refs & Annos) |

3 U.S.C.A. § 12

§ 12. Failure of certificates of electors to reach President of the Senate
or Archivist of the United States; demand on State for certificate

Effective: December 29, 2022
Currentness

When, after the meeting of the electors shall have been held, no certificate of vote mentioned in sections 9 and 11 of this title from any State shall have been received by the President of the Senate or by the Archivist of the United States by the fourth Wednesday in December, the President of the Senate or, if the President of the Senate be absent from the seat of government, the Archivist of the United States shall request, by the most expeditious method available, the chief election officer of the State to send up the certificate lodged with such officer by the electors of such State; and it shall be the duty of such chief election officer of the State upon receipt of such request immediately to transmit same by the most expeditious method available to the President of the Senate at the seat of government.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 674; Oct. 31, 1951, c. 655, § 8, 65 Stat. 712; Pub.L. 98-497, Title I, § 107(e)(1), (2)(B), Oct. 19, 1984, 98 Stat. 2291; Pub.L. 117-328, Div. P, Title I, § 108(a), Dec. 29, 2022, 136 Stat. 5237.)

3 U.S.C.A. § 12, 3 USCA § 12
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

End of Document                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 13

§ 13. Same; demand on district judge for certificate

Effective: December 29, 2022
Currentness

When, after the meeting of the electors shall have been held, no certificates of votes from any State shall have been received at the seat of government on the fourth Wednesday in December, the President of the Senate or, if the President of the Senate be absent from the seat of government, the Archivist of the United States shall send a special messenger to the district judge in whose custody one certificate of votes from that State has been lodged, and such judge shall forthwith transmit that certificate by the hand of such messenger to the seat of government.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 674; Oct. 31, 1951, c. 655, § 9, 65 Stat. 712; Pub.L. 98-497, Title I, § 107(e)(1), Oct. 19, 1984, 98 Stat. 2291; Pub.L. 117-328, Div. P, Title I, § 108(b), Dec. 29, 2022, 136 Stat. 5237.)

3 U.S.C.A. § 13, 3 USCA § 13
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

United States Code Annotated
  Title 3. The President (Refs & Annos)
    Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 15

§ 15. Counting electoral votes in Congress

Effective: December 29, 2022
Currentness

**(a) In general.**--Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall meet in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.

**(b) Powers of the President of Senate.**--

**(1) Ministerial in nature.**--Except as otherwise provided in this chapter, the role of the President of the Senate while presiding over the joint session shall be limited to performing solely ministerial duties.

**(2) Powers explicitly denied.**--The President of the Senate shall have no power to solely determine, accept, reject, or otherwise adjudicate or resolve disputes over the proper certificate of ascertainment of appointment of electors, the validity of electors, or the votes of electors.

**(c) Appointment of tellers.**--At the joint session of the Senate and House of Representatives described in subsection (a), there shall be present two tellers previously appointed on the part of the Senate and two tellers previously appointed on the part of the House of Representatives by the presiding officers of the respective chambers.

**(d) Procedure at joint session generally.**--

**(1) In general.**--The President of the Senate shall--

**(A)** open the certificates and papers purporting to be certificates of the votes of electors appointed pursuant to a certificate of ascertainment of appointment of electors issued pursuant to section 5, in the alphabetical order of the States, beginning with the letter A; and

**(B)** upon opening any certificate, hand the certificate and any accompanying papers to the tellers, who shall read the same in the presence and hearing of the two Houses.

**(2) Action on certificate.**--

**(A) In general.**--Upon the reading of each certificate or paper, the President of the Senate shall call for objections, if any.

**(B) Requirements for objections or questions.**--

**(i) Objections.**--No objection or other question arising in the matter shall be in order unless the objection or question--

**(I)** is made in writing;

**(II)** is signed by at least one-fifth of the Senators duly chosen and sworn and one-fifth of the Members of the House of Representatives duly chosen and sworn; and

**(III)** in the case of an objection, states clearly and concisely, without argument, one of the grounds listed under clause (ii).

**(ii) Grounds for objections.**--The only grounds for objections shall be as follows:

**(I)** The electors of the State were not lawfully certified under a certificate of ascertainment of appointment of electors according to section 5(a)(1).

**(II)** The vote of one or more electors has not been regularly given.

**(C) Consideration of objections and questions.**--

**(i) In general.**--When all objections so made to any vote or paper from a State, or other question arising in the matter, shall have been received and read, the Senate shall thereupon withdraw, and such objections and questions shall be submitted to the Senate for its decision; and the Speaker of the House of Representatives shall, in like manner, submit such objections and questions to the House of Representatives for its decision.

**(ii) Determination.**--No objection or any other question arising in the matter may be sustained unless such objection or question is sustained by separate concurring votes of each House.

**(D) Reconvening.**--When the two Houses have voted, they shall immediately again meet, and the presiding officer shall then announce the decision of the questions submitted. No vote or paper from any other State shall be acted upon until the objections previously made to any vote or paper from any State, and other questions arising in the matter, shall have been finally disposed of.

**(e) Rules for tabulating votes.**--

**(1) Counting of votes.--**

**(A) In general.**--Except as provided in subparagraph (B)--

**(i)** only the votes of electors who have been appointed under a certificate of ascertainment of appointment of electors issued pursuant to section 5, or who have legally been appointed to fill a vacancy of any such elector pursuant to section 4, may be counted; and

**(ii)** no vote of an elector described in clause (i) which has been regularly given shall be rejected.

**(B) Exception.**--The vote of an elector who has been appointed under a certificate of ascertainment of appointment of electors issued pursuant to section 5 shall not be counted if--

**(i)** there is an objection which meets the requirements of subsection (d)(2)(B)(i); and

**(ii)** each House affirmatively sustains the objection as valid.

**(2) Determination of majority.**--If the number of electors lawfully appointed by any State pursuant to a certificate of ascertainment of appointment of electors that is issued under section 5 is fewer than the number of electors to which the State is entitled under section 3, or if an objection the grounds for which are described in subsection (d)(2)(B)(ii)(I) has been sustained, the total number of electors appointed for the purpose of determining a majority of the whole number of electors appointed as required by the Twelfth Amendment to the Constitution shall be reduced by the number of electors whom the State has failed to appoint or as to whom the objection was sustained.

**(3) List of votes by tellers; declaration of winner.**--The tellers shall make a list of the votes as they shall appear from the said certificates; and the votes having been ascertained and counted according to the rules in this subchapter provided, the result of the same shall be delivered to the President of the Senate, who shall thereupon announce the state of the vote, which announcement shall be deemed a sufficient declaration of the persons, if any, elected President and Vice President of the United States, and, together with a list of the votes, be entered on the Journals of the two Houses.

## CREDIT(S)

(June 25, 1948, c. 644, 62 Stat. 675; Pub.L. 117-328, Div. P, Title I, § 109(a), Dec. 29, 2022, 136 Stat. 5237.)

Notes of Decisions (17)

3 U.S.C.A. § 15, 3 USCA § 15
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| Title 3. The President (Refs & Annos) |
| Chapter 1. Presidential Elections and Vacancies (Refs & Annos) |

3 U.S.C.A. § 16

§ 16. Same; seats for officers and Members of two Houses in joint session

Effective: December 29, 2022
Currentness

At such joint session of the two Houses seats shall be provided as follows: For the President of the Senate, the Speaker's chair; for the Speaker, immediately upon his left; the Senators, in the body of the Hall upon the right of the presiding officer; for the Representatives, in the body of the Hall not provided for the Senators; for the tellers, Secretary of the Senate, and Clerk of the House of Representatives, at the Clerk's desk; for the other officers of the two Houses, in front of the Clerk's desk and upon each side of the Speaker's platform. Such joint session shall not be dissolved until the count of electoral votes shall be completed and the result declared; and no recess shall be taken unless a question shall have arisen in regard to counting any such votes, or otherwise under this subchapter, in which case it shall be competent for either House, acting separately, in the manner hereinbefore provided, to direct a recess of such House not beyond the next calendar day, Sunday excepted, at the hour of 10 o'clock in the forenoon. But if the counting of the electoral votes and the declaration of the result shall not have been completed before the fifth calendar day next after such first session of the two Houses, no further or other recess shall be taken by either House.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 676; Pub.L. 117-328, Div. P, Title I, § 110(c)(1), Dec. 29, 2022, 136 Stat. 5240.)

Notes of Decisions (2)

3 U.S.C.A. § 16, 3 USCA § 16
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 17

§ 17. Same; limit of debate in each House

Effective: December 29, 2022
Currentness

When the two Houses separate to decide upon an objection pursuant to section 15(d)(2)(C)(i) that may have been made to the counting of any electoral vote or votes from any State, or other question arising in the matter--

**(1)** all such objections and questions permitted with respect to such State shall be considered at such time;

**(2)** each Senator and Representative may speak to such objections or questions for up to five minutes, and not more than once;

**(3)** the total time for debate for all such objections and questions with respect to such State shall not exceed two hours in each House, equally divided and controlled by the Majority Leader and Minority Leader, or their respective designees; and

**(4)** at the close of such debate, it shall be the duty of the presiding officer of each House to put each of the objections and questions to a vote without further debate.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 676; Pub.L. 117-328, Div. P, Title I, § 110(a), Dec. 29, 2022, 136 Stat. 5240.)

Notes of Decisions (2)

3 U.S.C.A. § 17, 3 USCA § 17
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 18

§ 18. Same; parliamentary procedure at joint session

Effective: December 29, 2022
Currentness

While the two Houses shall be in session as provided in this chapter, the President of the Senate shall have power to preserve order; and no debate shall be allowed and no question shall be put by the presiding officer except to either House on a motion to withdraw under section 15(d)(2)(C)(i).

**CREDIT(S)**

  (June 25, 1948, c. 644, 62 Stat. 676; Sept. 3, 1954, c. 1263, § 3, 68 Stat. 1227; Pub.L. 117-328, Div. P, Title I, § 110(b), (c)(2), Dec. 29, 2022, 136 Stat. 5240.)

3 U.S.C.A. § 18, 3 USCA § 18
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

| United States Code Annotated |
| Title 3. The President (Refs & Annos) |
| Chapter 1. Presidential Elections and Vacancies (Refs & Annos) |

3 U.S.C.A. § 19

§ 19. Vacancy in offices of both President and Vice President; officers eligible to act

Effective: March 9, 2006
Currentness

**(a)(1)** If, by reason of death, resignation, removal from office, inability, or failure to qualify, there is neither a President nor Vice President to discharge the powers and duties of the office of President, then the Speaker of the House of Representatives shall, upon his resignation as Speaker and as Representative in Congress, act as President.

**(2)** The same rule shall apply in the case of the death, resignation, removal from office, or inability of an individual acting as President under this subsection.

**(b)** If, at the time when under subsection (a) of this section a Speaker is to begin the discharge of the powers and duties of the office of President, there is no Speaker, or the Speaker fails to qualify as Acting President, then the President pro tempore of the Senate shall, upon his resignation as President pro tempore and as Senator, act as President.

**(c)** An individual acting as President under subsection (a) or subsection (b) of this section shall continue to act until the expiration of the then current Presidential term, except that--

**(1)** if his discharge of the powers and duties of the office is founded in whole or in part on the failure of both the President-elect and the Vice-President-elect to qualify, then he shall act only until a President or Vice President qualifies; and

**(2)** if his discharge of the powers and duties of the office is founded in whole or in part on the inability of the President or Vice President, then he shall act only until the removal of the disability of one of such individuals.

**(d)(1)** If, by reason of death, resignation, removal from office, inability, or failure to qualify, there is no President pro tempore to act as President under subsection (b) of this section, then the officer of the United States who is highest on the following list, and who is not under disability to discharge the powers and duties of the office of President shall act as President: Secretary of State, Secretary of the Treasury, Secretary of Defense, Attorney General, Secretary of the Interior, Secretary of Agriculture, Secretary of Commerce, Secretary of Labor, Secretary of Health and Human Services, Secretary of Housing and Urban Development, Secretary of Transportation, Secretary of Energy, Secretary of Education, Secretary of Veterans Affairs, Secretary of Homeland Security.

**(2)** An individual acting as President under this subsection shall continue so to do until the expiration of the then current Presidential term, but not after a qualified and prior-entitled individual is able to act, except that the removal of the disability of

an individual higher on the list contained in paragraph (1) of this subsection or the ability to qualify on the part of an individual higher on such list shall not terminate his service.

**(3)** The taking of the oath of office by an individual specified in the list in paragraph (1) of this subsection shall be held to constitute his resignation from the office by virtue of the holding of which he qualifies to act as President.

**(e)** Subsections (a), (b), and (d) of this section shall apply only to such officers as are eligible to the office of President under the Constitution. Subsection (d) of this section shall apply only to officers appointed, by and with the advice and consent of the Senate, prior to the time of the death, resignation, removal from office, inability, or failure to qualify, of the President pro tempore, and only to officers not under impeachment by the House of Representatives at the time the powers and duties of the office of President devolve upon them.

**(f)** During the period that any individual acts as President under this section, his compensation shall be at the rate then provided by law in the case of the President.

### CREDIT(S)

 (June 25, 1948, c. 644, 62 Stat. 677; Pub.L. 89-174, § 6(a), Sept. 9, 1965, 79 Stat. 669; Pub.L. 89-670, § 10(a), Oct. 15, 1966, 80 Stat. 948; Pub.L. 91-375, § 6(b), Aug. 12, 1970, 84 Stat. 775; Pub.L. 95-91, Title VII, § 709(g), Aug. 4, 1977, 91 Stat. 609; Pub.L. 96-88, Title V, § 508(a), Oct. 17, 1979, 93 Stat. 692; Pub.L. 100-527, § 13(a), Oct. 25, 1988, 102 Stat. 2643; Pub.L. 109-177, Title V, § 503, Mar. 9, 2006, 120 Stat. 247.)

3 U.S.C.A. § 19, 3 USCA § 19
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 20

§ 20. Resignation or refusal of office

Currentness

The only evidence of a refusal to accept, or of a resignation of the office of President or Vice President, shall be an instrument in writing, declaring the same, and subscribed by the person refusing to accept or resigning, as the case may be, and delivered into the office of the Secretary of State.

**CREDIT(S)**

(June 25, 1948, c. 644, 62 Stat. 678.)

3 U.S.C.A. § 20, 3 USCA § 20
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 21

§ 21. Definitions

Effective: December 29, 2022
Currentness

As used in this chapter the term--

**(1)** "election day" means the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State, except, in the case of a State that appoints electors by popular vote, if the State modifies the period of voting, as necessitated by force majeure events that are extraordinary and catastrophic, as provided under laws of the State enacted prior to such day, "election day" shall include the modified period of voting.

**(2)** "State" includes the District of Columbia.

**(3)** "executive" means, with respect to any State, the Governor of the State (or, in the case of the District of Columbia, the Mayor of the District of Columbia), except when the laws or constitution of a State in effect as of election day expressly require a different State executive to perform the duties identified under this chapter.

**CREDIT(S)**

(Added Pub.L. 87-389, § 2(a), Oct. 4, 1961, 75 Stat. 820; amended Pub.L. 117-328, Div. P, Title I, §§ 102(b), 104(b), Dec. 29, 2022, 136 Stat. 5233, 5235.)

3 U.S.C.A. § 21, 3 USCA § 21
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.   1

United States Code Annotated
    Title 3. The President (Refs & Annos)
        Chapter 1. Presidential Elections and Vacancies (Refs & Annos)

3 U.S.C.A. § 22

§ 22. Severability

Effective: December 29, 2022
Currentness

If any provision of this chapter, or the application of a provision to any person or circumstance, is held to be unconstitutional, the remainder of this chapter, and the application of the provisions to any person or circumstance, shall not be affected by the holding.

**CREDIT(S)**

(Added Pub.L. 117-328, Div. P, Title I, § 111(a), Dec. 29, 2022, 136 Stat. 5240.)

3 U.S.C.A. § 22, 3 USCA § 22
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.